# United States District Court
## Northern District of Alabama
## Middle Division

01 APR -6 AM II: 34

U.S. ...
H.N ...

| | |
|---|---|
| **Thomas J. Fortenberry,** | ] |
| | ] |
| Petitioner, | ] |
| | ] |
| vs. | ] |
| | ] |
| | ] |
| **Ron Jones,** Commissioner of the | ] |
| Alabama Department of Corrections, | ] |
| | ] |
| Respondent. | ] |

CV-96-N-1016-M



**ENTERED**

APR 0 6 2001

## Table of Contents

I.  Introduction ........................................................ 4

II. Factual and Procedural Background ..................................... 4

III. Discussion ......................................................... 21
    A. The Claims ...................................................... 21
    B. The Applicable Law .............................................. 23
    C. The Analysis .................................................... 24
        1. Ineffective Assistance of Counsel  ........................... 24
            a. Alleged Failure to Adequately Investigate ................. 25
            b. Alleged Ineffective Assistance at the Penalty Phase  ........ 32
            c. Alleged Ineffective Assistance on Appeal ................. 46
                (1) Failure to Raise Issues Regarding Denial of the Motion to
                    Suppress ..................................... 48
                (2) Failure to Raise Issues Related to the Denial of the
                    Motion for Change of Venue ...................... 51
                (3) Failure to Raise Issues Related to the Denial of the
                    Motion for Individual Voir Dire ................... 53
                  (4) Failure to Raise Issues Related to the Denial of the
                    Motion for Continuance in the Face of Allegedly Withheld
                    Evidence ..................................... 54
                  (5) Failure to Raise Issues Related to the Denial of the
                    Motion for Continuance of the Penalty Phase  ........ 55
                  (6) Failure to Raise Issues Related to the Alleged *Batson*

30

Error During Jury Selection . . . . . . . . . . . . . . . . . . . . . . 57

(7) Failure to Raise Issues Related to the Introduction of Allegedly Inflammatory Photographs . . . . . . . . . . . . . . . 57

(8) Failure to Raise Issues Related to the Allegedly Inappropriate Behavior and Statements of Prosecution During Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

(9) Failure to Consult or Communicate with Petitioner During Preparation of his Appeal . . . . . . . . . . . . . . . . . . . . . . . . 59

(10) Ineffective Assistance due to the Failure to Raise Issues Involving the Testimony of Parks, Ogle and Yates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

d. Ineffective Assistance Due to Prosecutorial Misconduct . . . . 68

e. Ineffective Assistance at the Suppression Hearing . . . . . . . . 69

f. Ineffective Assistance in Seeking Change of Venue . . . . . . . . 71

g. Ineffective Assistance in Selecting a Jury . . . . . . . . . . . . . . . . . 73

h. Ineffective Assistance Generally . . . . . . . . . . . . . . . . . . . . . . . . . 77

2. Alleged Failure of the Prosecution to Timely Provide Exculpatory Evidence; Trial Court's Allegedly Improper Denial of a Motion to Continue Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

3. The Trial Court's Allegedly Improper Restrictions on the Voir Dire Examination of Prospective Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

4. The Trial Court's Allegedly Improper Failure to Grant a Change of Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

5. Allegedly Improper Jury Inclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

6. Allegedly Improper Jury Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . 100

7. The Prosecution's Alleged *Batson* Violations . . . . . . . . . . . . . . . . . . . 101

8. The Trial Court's Allegedly Improper Rulings on Evidentiary Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

9. The Alleged Misconduct and Improper Arguments of the Prosecutor During the Guilt/Innocence Phase of Trial . . . . . . . . . . . . . . . . . . . . . 109

10. Challenges to the Petitioner's Arrest and Custodial Interrogation and to the Statements the Petitioner Gave While in Custody . . . . . . . . . . . . 112

11. Allegedly Illegal Arrest and Interrogation and Statements Allegedly Obtained in Unconstitutional Manner . . . . . . . . . . . . . . . . . . . . . . . . 112

12. The Introduction of Allegedly Prejudicial and Inflammatory Photographs at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

13. The Trial Court's Allegedly Improper Decision to Charge the Jury Concerning Complicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

14. The Trial Court's Refusal to Grant Defense Counsel's Request for a Continuance Between the Guilt/Innocence and Sentencing Phase of the Petitioner's Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

15. The Prosecutors' Allegedly Improper Conduct and Arguments at the Sentencing Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

16. Alabama's Allegedly Unconstitutional Application of the "Especially
   Heinous, Atrocious or Cruel" Aggravating Circumstance . . . . . . . . . 142
17. Alabama's Allegedly Arbitrary and Discriminatory Application of the
   Death Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

IV. Conclusion and Denial of Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

## Memorandum of Opinion

### I. Introduction

This is an action for habeas corpus relief under 28 U.S.C. § 2254 by an Alabama state

prisoner under a sentence of death. On April 22, 1996, with the assistance of counsel,

petitioner filed his petition for writ of habeas corpus challenging his state court murder

conviction and his sentence of death. Since then, the petitioner has twice amended his

petition. Currently before the Court is the petitioner's Second Amended Petition for Writ

of Habeas Corpus, filed June 20, 1996.

### II. Factual and Procedural Background

On August 25, 1984, four people at a gas station in Attalla, Alabama were shot and killed.

Several people were initially charged in connection with the murders, based upon the

testimony of a juvenile. (R. 1276, 1435-38, 1472-73.)[1] Those people were ultimately

released, however, because authorities discovered that the juvenile's testimony was false.

(R. 1277.)

In late March 1985, Gadsden resident James Jenkins found a pistol with four empty

cartridges in it on the bank of a local creek. (R. 1066-69.) He turned it over to a sheriff,

who came to Jenkins' home looking for the gun, a few weeks later. (R. 1076.) The

authorities determined that this pistol had been used to commit the murders. (R. 1120-22,

1126-28.) Police then traced the pistol to Jerry Gable, who owned a gun repair business

with the petitioner's father. (R. 1159-1161, 1379-80.) The police obtained statements from

---

[1]References to "R." are to pages in the record of the petitioner's trial proceedings.

4

three people who had seen the pistol in the petitioner's possession shortly before the murders. (R. 11-13.)

At about 6:00 p.m. on May 2, 1985, police went to the petitioner's home, and after obtaining permission from the petitioner's brother to enter the home, they went to the petitioner's bedroom and told him they needed to talk to him at the courthouse. (R. 13-15.) The petitioner, who had been sleeping, got out of bed, dressed, and went with the police. (R. 15.)   At the courthouse, the police obtained the petitioner's signature on a waiver of *Miranda*[2] rights form and began questioning him. (R. 17, 2956.) On May 3rd, at about 12:50 a.m., the petitioner made a statement on tape, in which he admitted stealing the murder weapon from his father's business. (R. 2957.) In his 12:50 a.m. statement, the petitioner stated that, on the day of the murders, he was riding in his brother's green Chevrolet truck, the stolen pistol with him, when he came upon Harvey Underwood and "this other guy" in the woods. (R. 2957.) The petitioner stated that the "other guy" was "passed out," and that Underwood was drinking beer and smoking marijuana. (*Id.*) He stated that he and Underwood decided to ride together to Albertville, but that they stopped at the Guest Service Station on the way when they had run out of beer. (R. 2957.) He said that, while they were at the station, he sat in the truck as Underwood, using the pistol, robbed the station and committed the murders. (R. 2958-60.) The petitioner said that he returned Underwood to the place where he had met him and that Underwood kept the gun until the petitioner got it from him a few days later and threw it into the creek where James Jenkins

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

later found it. (R. 2960.) He said he never told the police because he was scared, having been in trouble before. (R. 2961.)

On May 3, 1985, at 5:25 p.m., the petitioner made a written statement. He described how he went to the Guest Service Station on the evening of the murders, intending to rob it for gambling money. (R. 2971.) After he took the money from W.T. Nelson, he went outside, where Mike Guest and Bobby Payne walked in front of him. (*Id*.) He then shot the two men, and went back in the station and shot W.T. Nelson. (*Id*.) After he shot Nelson, he came back outside and saw Nancy Payne running up the hill, and took a "pot shot" at her. (*Id*.) He left with $240 of stolen money, threw the gun away, and went to a pool hall to get an alibi. (*Id*.) He also stated that his earlier statement blaming the murders on Harvey Underwood was false. (*Id*.)

The petitioner then gave a sworn statement before a court reporter on May 4, 1985 at 1:08 p.m. (R. 2973.) He stated that, on the day of the murders, he had a gun he had taken from his father's shop and went looking for a place to rob for gambling money when he came upon the Guest Service Station. (R. 2976.) He pulled up in front of the station in his brother's green and white Chevrolet truck, went in, pulled his gun on the cashier, W.T. Nelson, and demanded money. (R. 2977-78.) He also held his gun on Bobby Payne, who had just driven up to the station and come inside during the course of the robbery. (R. 2979.) Another car pulled up, he said, and Mike Guest opened the station door. (*Id*.) The petitioner hid his gun from Guest, but Guest turned away and left after Nelson whispered something to him. (*Id*.) The petitioner then got money from Nelson and was leaving when Bobby Payne followed him out of the store. Payne was apparently inebriated, with a glass

6

in his hand, cursing the petitioner and telling him to give Nelson his money back. Mike

Guest then came up beside him and said "Tommy, put down the gun." (R. 2981, 2996.)

The petitioner said that he panicked and ordered Bobby Payne to give him money,

whereupon Payne said the petitioner would have to kill him to get his money. (R. 2982.)

The petitioner then shot Bobby Payne and Mike Guest, and went back inside the station

and shot W.T. Nelson as he was trying to hide. (*Id.*) Afterwards, he went back out to his

truck when he saw a woman running and took a "pot shot" at her. (R. 2983.) He got into

his truck and drove northbound until he came to a turnaround and then headed back

toward Attalla. (*Id.*) As he drove back near the station, he heard a woman scream. (*Id.*)

He said that he took $240 from W.T. Nelson, but no money from anyone else. (R. 2984.) He

drove out to an area near the Black Creek, threw the gun into the woods, and proceeded

on to a pool hall in order to establish an alibi. (R. 2987-88.) The petitioner stated that his

earlier story that Underwood had committed the murders in his presence was a lie and he

offered to take a polygraph test to prove it.[3] (R. 2997-98.)[4]

On June 5, 1985, the petitioner was indicted on two counts under the Alabama Death

Penalty Act provisions relating to "[m]urder wherein two or more persons are murdered

by the defendant by one act or pursuant to one scheme or course of conduct," *Ala. Code*

---

[3]The only living witness to any of these events, other than the petitioner, is Tracy Henry Wood, who was the fiancée of Mike Guest at the time of the murders. Her testimony is discussed herein below.

[4]While he was awaiting trial, the petitioner escaped from jail with another inmate and committed a bank robbery before being recaptured in Kentucky. While he was in custody there, the petitioner made yet another statement admitting his guilt in the crimes, but this statement was apparently not presented to the jury. (*See* R. 1969; R. 1957-77.)

§ 13A-5-40 (a)(10) (1975), and "[m]urder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant." *Ala. Code* § 13A-5-40(a)(2)(1975).[5] (R. 1796-97.)

The petitioner pled not guilty and was tried. During trial, the petitioner told yet another story of how the murders occurred. He said that he was driving through the woods one evening and came upon "the fire place where everybody partied at." (R. 1497.) Earlier, he had unsuccessfully tried to sell the murder weapon and he still had it under his car seat when he arrived at "the fire place." (*Id.*) There, he saw Underwood drinking beer and another man who was "passed out." (R. 1498.) A truck was parked there, but that he did not know if it was Underwood's. (*Id.*) He tried to sell the gun to Underwood, but that Underwood said he could not afford it, although he knew some boys in Albertville who might want to buy it. (*Id.*) Underwood allegedly proposed that he and the petitioner go to Albertville together in the petitioner's car to meet the potential buyers. (*Id.*) The petitioner stated that he declined to drive, protesting that he did not have a spare tire, so Underwood then proposed that "we'll take this truck." (*Id.*)

He and Underwood were on their way to see the potential gun buyers in Albertville when they stopped at the Guest Service Station to get more beer. (R. 1499) He went in and bought some beer and that Underwood also came in and started going through the cooler as the petitioner walked out and got into the truck. (*Id.*) Mike Guest then pulled up and

---

[5]The first of these counts concerned all four murders, while the second concerned only the murder of W.T. Nelson.

started to go into the store when W.T. Nelson stopped him at the door, whereupon he returned to his car. (R. 1500.) The petitioner claimed that he then got out of the truck and walked back into the service station, where he saw Underwood threatening W.T. Nelson with a knife. (*Id.*) Underwood instructed him to get back in the truck, which he did. (R. 1500-01.) Mike Guest then backed his car up and reentered the service station and that the Paynes arrived, whereupon Bobby Payne went into the service station. (R. 1501.) The three men were in there for a minute, after which Mike Guest walked back out to his car and bent over inside of it. (*Id.*) The petitioner said a girl then got out of Guest's car and "ran up the back of the store," and that Guest started walking back to the station. (*Id.*) The petitioner then heard a shot. (R.1501-02.) At some point before this shot, Underwood returned to the truck and exchanged his knife for the murder weapon. (R. 1502.) After the shot, the petitioner looked up to see Underwood exiting the store, followed by Bobby Payne, who was shouting at him. (*Id.*) Payne walked in front of Underwood and Mike Guest came up on the other side of him. (*Id.*) The petitioner stated that Bobby Payne then started calling Underwood names and cursing him, whereupon Underwood asked Payne to shut up, said he was leaving, and said that Payne could not stop him. (R. 1503.) When Bobby Payne then told Underwood that he was going nowhere and he was going to stay and wait for the police, Underwood then shot him and Mike Guest as well. (*Id.*) The petitioner said they heard a car door slam and saw Nancy Payne running for the woods, so Underwood shot at her and then got in the truck. (*Id.*) They exited the station going north, turned around, and headed for Gadsden, traveling at about 95-100 miles per hour. (R. 1504.) They drove

9

around for a while, then returned to the woods where his car was parked, whereupon Underwood threatened his life and those of his family members if he told anyone about the murders. (R. 1505.) He then instructed the petitioner to throw the gun in Black Creek, which the petitioner did. (R. 1505-06.) The petitioner said that Underwood threatened him one other time after the murders. (R. 1506-07.)

The jury convicted the petitioner on both counts of the indictment on the Saturday after trial began. (R. 1722.) Immediately after the jury rendered a guilty verdict, the court started the penalty phase of trial. Defense counsel moved for a continuance before the penalty phase began, arguing that the jury needed to rest before considering sentencing, that a continuance "would be best for all concerned," and that "we feel that we will be much better able to present our position for mitigation at that point." (R. 1725.) The court denied this motion. (*Id.*) Defense counsel again moved for a continuance during the penalty phase "on the grounds stated earlier, on the basis that we have not had sufficient time to prepare any evidence or argument for this phase of the trial." (R. 1739.) His request was denied. During the penalty phase, petitioner's counsel called only the petitioner's father to briefly testify, (R. 1731-33), and referred to evidence that was presented during the guilt phase of trial. (R. 1748-53.) After deliberating for just under an hour, the jury returned a recommendation that the petitioner receive the death penalty. (R. 1768.)

The trial judge held a separate sentencing hearing on March 4, 1986. (R. 1770.) As the hearing began, defense counsel requested either a postponement of sentencing or a new sentencing hearing before a jury because they had not had sufficient time to prepare

evidence and argument in mitigation before the penalty phase and the court had erroneously denied their motion to continue the penalty phase. (R. 1770.) The judge denied this request and, after hearing the argument of counsel, accepted the sentencing recommendation of the jury. (R. 1770, 1793.)

The petitioner then appealed his conviction and sentence to the Alabama Court of Criminal Appeals, represented once again by Buttram and Harrison. (Tab R-28.[5]) He raised a number of issues, listed as follows in his direct appeal brief:

1. The "bare bones" affidavit upon which his arrest warrant was issued was fatally defective and his statements are inadmissible because they were made during an illegal detention and were not voluntary;

2. The state impermissibly impeached its own witness, Tracy Henry Wood;

3. The court improperly denied the petitioner's motion for continuance that he asserted at the beginning of trial as well as his motion to continue the sentencing hearing before the jury.

4. The court improperly denied the petitioner's motion for a change of venue;

5. The trial court erred by admitting evidence offered by the respondent which had been withheld from the defense in violation of a court order;

6. The court violated the petitioner's constitutional rights by considering an element of the crime--the fact that the murders were committed during the commission of a robbery--to be an aggravating circumstance; and

7. The trial court's sentencing order does not satisfy *Ala. Code* § 13A-5-47(d) and (e), which require the trial court to "enter specific written findings concerning the existence or nonexistence" of each aggravating and mitigating circumstance, and to "determine whether the aggravating circumstances it finds to exist

---

[5]"Tab R-__" refers to the documents in the record provided by the respondent, as they are tabbed and indexed in the Respondent's Habeas Corpus Checklist (Doc. 13). References to "Doc __" are to the docket number assigned a particular pleading by the Clerk of the Court and which are located in the lower right-hand corner of the documents in the case file.

outweigh the mitigating circumstances it finds to exist."

(Tab R-28 at 27-49).

On direct review of the petitioner's conviction and sentence, the Alabama Court of

Criminal Appeals summarized the background of the case, stating as follows:

> On August 25, 1984, four people were killed at the Guest Service Station near Attalla, Alabama. They were Ronald Michael Guest, the son of the station owner; Wilbur T. Nelson, an employee at the station; and Robert William Payne and his wife Nancy, customers present when the robbery occurred. Tommy J. Fortenberry was charged in a two-count indictment with the capital offense of murder wherein two or more persons are murdered, Alabama Code 1975, § 13A-5-40(a)(10), and robbery-murder, § 13A-5-40(a)(2). A jury found him "guilty as charged." After a sentencing hearing, that same jury unanimously recommended punishment by death. At the third stage of the capital trial proceedings, the trial judge held a separate sentencing hearing and sentenced the defendant to death by electrocution.

* * *

> The murders were committed on August 25, 1984. Four men were indicted but were never prosecuted after it was discovered that the juvenile who had accused them was lying. Then, in March of 1985, James Jenkins found a .44-caliber magnum Ruger Super Blackhawk revolver on the bank of Black Creek in Alabama City. The pistol contained four empty cartridges. On April 18, 1985, Etowah County Sheriff Roy McDowell received information that Jenkins had found the weapon. The sheriff obtained the pistol and cartridges from Jenkins and delivered them to a state firearms expert, Lawden Yates, at the Birmingham crime lab. On April 22, 1985, Yates examined the pistol and determined that it was the weapon used to kill the four people at the Guest Service Station.

> Marlin Carter, chief of the investigators for the Etowah County Sheriff's Office, obtained written statements from Ricky Downing, Thomas Neander, and Steve Whiteside, placing the .44 magnum in the hands of the defendant "a day or so before the shooting." Carter testified, "These three people had seen this murder weapon and knew the weapon, knew where it came from. And could positively identify it. They had seen this weapon in the possession of [the defendant]." The weapon had been stolen from the defendant's father, Jerry Fortenberry, and Jerry Gable, who were partners in a gun repair business located at Gable's residence. The pistol was especially distinctive because "somebody had had fashioned a bolt to retain the cylinder pin." Based upon this information, around 6:00 on the evening

12

of May 2, 1985, Investigator Carter and three other investigators from the Sheriff's Office went to the residence of the defendant's father, where the twenty-one-year-old defendant was living. Investigator Johnny Grant testified that they went to talk to both the defendant and his father.   The defendant's eighteen-year-old brother Terry answered the door. Carter asked for Terry's father and Terry said that he "was over at Jerry Gable's."  Carter then asked if the defendant was there and Terry replied that he was. Investigator Carter said, "We would like to see him, to talk to him." Terry opened the door, said "come on in," and walked to a bedroom where the defendant was lying in bed.  The four investigators followed Terry.  Investigator Grant testified that the defendant had been sleeping but was awake when they entered the room. The defendant said that he had been to Montgomery the night before and had slept during that day.  Carter testified that the defendant did not look tired. Carter testified that he said, "We need to talk with you, Tommy. We need to talk with you down at the Courthouse, we want you to go with us."  The defendant did not say anything but "got up" and "put his clothes on."  Captain Grant testified that Carter "told Tommy we needed to talk to him, would he mind coming down to our office with us, and Tommy got up" and that the defendant "agreed and came." After that, Carter sent Grant and Investigator Hershel Womack to find the defendant's father, whom they needed to question about an unrelated pistol that had been reported stolen.

Investigators Carter and Aubrey Newman took the defendant to the courthouse. The defendant was not handcuffed but was read his Miranda rights when they left the house, even though he was not questioned at that time.  Carter testified that the defendant "went with us willingly out to the car."

Carter testified that they arrived at the courthouse "about 6:45, or nearly 7:00" and went to the investigator's office on the third floor.  At 6:53 that evening, the defendant signed a waiver of rights form. The defendant was questioned about the pistol used in the four murders at the Guest Service Station.

The defendant admitted taking the .44 magnum from his father and Gable. Between 9:00 and 10:00, the defendant, at the request of the officers, telephoned a friend. The record does not reveal the subject matter of that conversation. Around 11:00 or 11:30, the defendant was left alone with his father for "probably fifteen to thirty minutes." Investigator Carter testified that he "probably" would have allowed the father to stay with the defendant "if he had requested to." Around midnight, the defendant showed the investigators where he had disposed of the pistol, which had subsequently been discovered by Mr. Jenkins.

At 12:50 on the morning of May 3, 1985, the defendant gave a tape-recorded statement, claiming that Harvey Underwood was solely responsible for the robbery

and the murders. The defendant did admit that he was present when the crime occurred, that Underwood got the murder weapon from him, and that he (the defendant) threw the pistol in the creek. The defendant was placed in a cell to sleep at approximately 2:15 that morning. Investigator Carter testified that at any time prior to the tape-recorded statement, the defendant "could have gotten up and left."

During the interval of approximately six hours between the time the defendant waived his rights until the tape-recorded statement was taken, he was questioned "on and off" and given something to eat. During that time, the investigators "checked out leads" the defendant had given them "to verify whether or not he had been telling us the truth." During this time, the defendant gave three different stories. Investigator Carter testified, "We would go over each statement until he decided that it wasn't true, and he would tell us another one, story. * * * Well, he would tell the same story, and then he would tell a little bit different. So we tried to check it out for him." Captain Grant testified, "We told him that the thing didn't check out, we needed to continue talking to him about it, not that we wanted another statement or we wanted him to say something else." Grant stated, "From the time he admitted that he stole the gun, yes, he would tell us all about it, and then, we would show him, you know, tell him what we had checked out, the story out, and it didn't fit, and he would start with another one."

Around 5:00 or 5:30 on the morning of May 3rd, Underwood was brought to the courthouse to face his accuser. There was testimony that this was done with the permission of both Underwood and the defendant. The defendant again accused Underwood of committing the murders, but Underwood "just practically got down on his knees and said, 'You know I didn't shoot nobody, you know. Why are you doing this?'"

At 5:25 on the afternoon of May 3rd, the defendant gave a handwritten statement admitting his responsibility for the robbery and murders. On Saturday, May 4, 1985, at 1:08 p.m., the defendant gave a detailed statement, recorded by a court reporter, admitting his guilt. On January 1, 1986, after he had escaped and been captured, the defendant gave a statement in the county jail in Bowling Green, Kentucky, wherein he again admitted his guilt.

Sometime before 5:00 on the afternoon of May 3, 1985, Investigators Grant and Carter, and William Payne, the father of one of the victims, went to the clerk's office to get an arrest warrant for the defendant. Payne did not relate any facts to the magistrate other than that he was the father of one of the victims. The affidavit merely recites that Payne "has probable cause for believing and does believe that" the defendant intentionally caused the death of four people.

14

At the hearing on the motion to suppress, Gene Mitchell, the magistrate, testified that when Carter and Grant "asked for a warrant all they had was an incident report, and I needed something else to go on." Grant left and "brought another [sic] statement back from" the defendant. Mitchell stated that he "read the statement. And before reading the statement and after reading the statement I asked questions of Chief Carter." The trial court sustained the objection of defense counsel and refused to allow Mitchell to testify to anything that Investigators Carter and Grant told him.

* * *

At the suppression hearing, Mitchell identified the handwritten confession given by the defendant at 5:25 on the afternoon of May 3rd as "appearing" to be the statement he reviewed: "I can't--I'm not--that appears to be the statement." However, Investigator Grant testified that Chief Carter got a transcript of the tape-recorded interview with the defendant and delivered it to the magistrate. Grant also testified that the 5:25 statement was given after the arrest warrant had been issued. As explained in Part A of Part I of this opinion, the determination of which statement the magistrate actually considered is legally insignificant in deciding the issue of the legality of the defendant's arrest.

At the pretrial hearing on the motion to suppress his statements, the defendant did not testify. At trial, the defendant testified that, on the afternoon of May 2, 1985, he was sleeping in his bed and was awakened by Sheriff Carter pulling on his foot. The defendant was "real hazy" and "still drunk" from the previous night. He had a "real bad hangover." He stated that the officers said "let's go" and would not give him time to "comb [his] hair, or anything." He testified that when he confessed he was afraid to make a statement because he and his family had been threatened by Harvey Underwood. He stated that the police told him that "even if [he] didn't make the statement, that they were going to release it to the newspapers that [he] had made a statement on somebody, and that was still going to jeopardize [his] family." He was threatened with being sent to "fry" in the electric chair if he did not make a statement. The officers also threatened to "pull his father in" and question his mother and brother at their place of employment and "see if we can't get them fried." He was promised a life sentence if he would give a full statement and turn state's evidence. The defendant testified that, after he learned that the officers were not going to arrest Underwood, he confessed in order to protect his family from Underwood.

*Fortenberry v. State*, 545 So. 2d 129, 131-34 (Ala. Crim. App. 1988). The state court findings

of fact set forth above are supported by the record and are entitled to the presumption of

correctness under 28 U.S.C. § 2254(d).[7]

The Alabama Court of Criminal Appeals affirmed the petitioner's conviction and death sentence. *Fortenberry*, 545 So. 2d at 145. The Alabama Supreme Court then affirmed the judgment of the Alabama Court of Criminal Appeals. *Ex parte Fortenberry*, 545 So. 2d 145 (Ala. 1989). The United States Supreme Court denied the petitioner's subsequent petition for writ of certiorari. *Fortenberry v. Alabama*, 495 U.S. 911, 110 S. Ct. 1937, 109 L. Ed. 2d 300 (1990).

The petitioner then filed a petition for post-conviction relief pursuant to Rule 20, Ala. R. Crim. P. Temp. (now Rule 32, Ala. R. Crim. P.), represented by the law firm that currently represents him in this action.[8] In that petition, the petitioner raised the following issues:

1. Ineffective assistance of trial counsel in seeking a change of venue;

2. Ineffective assistance of trial counsel during voir dire of potential jurors for failing to adequately identify jurors who would, based on a capital conviction, automatically sentence the petitioner to death or who would be biased or who should be stricken for cause or other reasons;

---

[7]Under the applicable law, the presumption of correctness applies unless: (1) the merits of the factual dispute were not resolved in the State court hearing; (2) the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) the material facts were not adequately developed at the State court hearing; (4) the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding; (5) the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; (6) the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; (7) the applicant was otherwise denied due process of law in the State court proceeding; or (8) that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for herein after, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. 28 U.S.C.A. § 2254(d) (1994).

[8]Rule 20 of the *Alabama Rules of Criminal Procedure* (Temporary) was enacted as a temporary rule, effective April 1, 1987, but was later recodified as Ala. R. Crim. P. 32. Although the record contains references to the petitioner's post-conviction proceedings as "Rule 20" proceedings and as "Rule 32" proceedings, the Court will refer to them as "Rule 20" proceedings, unless otherwise noted, for the sake of consistency and convenience.

3. Ineffective assistance of trial counsel during voir dire of potential jurors for failing to address each potential juror by name during voir dire, thereby failing to adequately preserve the record of the voir dire proceedings and making it impossible to assure the propriety and fairness of the jury selection process;

4. Ineffective assistance of trial counsel due to failure to adequately investigate and cross-examine state witnesses;

5. Ineffective assistance of trial counsel in preparing for the suppression hearing;

6. Ineffective assistance of trial counsel in failing to adequately request individual voir dire of potential jurors;

7. Ineffective assistance of trial counsel in failing to adequately object to the prosecution's improper examination of potential jurors and the prosecution's improper and racially biased exercise of peremptory challenges;

8. Ineffective assistance of trial counsel in failing to object adequately to the trial court's improper and arbitrary exercise of cause challenges against some venire members;

9. Ineffective assistance of trial counsel in failing to adequately object to the prosecution's improper closing arguments;

10. Ineffective assistance of trial counsel in failing to object adequately to the introduction of improper evidence during trial;

11. Ineffective assistance of trial counsel in failing to locate and call Harvey Underwood to testify at trial;

12. Ineffective assistance of trial counsel in failing to conduct redirect of the petitioner during the guilt/innocence phase of trial so as to rehabilitate him after cross-examination;

13. Ineffective assistance of trial counsel in failing to adequately investigate the petitioner's background or to adequately prepare for the penalty phase of trial;

14. Ineffective assistance of trial counsel in failing to adequately prepare for or present a motion to dismiss at the close of the evidence at the guilt/innocence phase of the petitioner's trial;

15. Ineffective assistance of trial counsel in improperly characterizing the jury's function

and the prosecution's burden of proof at the guilt/innocence phase of trial by stating, "We are here . . . simply to determine the truth, whether this man here did it, or whether he didn't.";

16. Ineffective assistance of trial counsel in improperly presenting the defense theory of the case during closing argument at the guilt/innocence phase of trial;

17. Ineffective assistance of trial counsel in improperly placing his personal interests above those of the petitioner during closing argument at the penalty phase of trial;

18. Ineffective assistance of trial counsel in failing to object adequately to the prosecution's improper and misleading arguments and misconduct during the penalty phase of trial, including the claim that the murders were heinous, atrocious and cruel in the absence of evidence to support this claim and to other misstatements of the law and facts;

19. Ineffective assistance of trial counsel in failing to object adequately to the trial court's instruction on complicity, which allowed and invited the jury to speculate about matters unsupported by the evidence;

20. Ineffective assistance of trial counsel in failing to object to the trial court's instruction that the sentencing jury could find the offenses for which the petitioner was convicted to be especially heinous, atrocious and cruel despite an absence of evidence to support such a finding;

21. Ineffective assistance of trial counsel in failing to prepare a penalty phase strategy and effectively make a case for saving the petitioner's life;

22. Ineffective assistance of trial counsel in failing to object to the introduction of improper and inadmissible evidence at the penalty phase hearing before the jury and trial court, including hearsay testimony as to statements by Harvey Underwood;

23. Ineffective assistance of trial counsel in failing to adequately prepare, investigate or pursue an effective defense of the petitioner, including the failure to investigate James Jenkins, who found the murder weapon, or the informant who led authorities to Mr. Jenkins;

24. Ineffective assistance of trial counsel in failing to request a ruling of the court during the guilt/innocence phase that would have prevented the prosecution from arguing to the jury that the number of victims alone made the "especially heinous, atrocious and cruel" aggravating circumstance applicable to the murders;

25. Ineffective assistance of trial counsel in failing to have transcribed the nature of the statement reviewed in camera by the court, as well as the court's review proceedings, if such review occurred;

26. Ineffective assistance of trial counsel in failing to consult or communicate adequately with the petitioner during the pre-trial investigation, the guilt/innocence phase and the penalty phase of the trial and the sentencing hearing before the trial court;

27. Ineffective assistance of appellate counsel in failing to raise on appeal many issues raised here and in failing to consult or communicate with the petitioner in preparation of his appeal;

28. The trial court violated the petitioner's constitutional rights by improperly restricting the voir dire examination of prospective jurors;

29. The trial court violated the petitioner's constitutional rights by refusing to grant a change of venue;

30. The petitioner was deprived of an impartial jury through improper jury inclusion;

31. The petitioner was deprived on an impartial jury through improper jury exclusion;

32. The petitioner was deprived of a fair trial by the prosecutor's use of peremptory challenges in a racially discriminatory manner;

33. The petitioner was deprived of a fair trial by the trial court's improper rulings on evidentiary issues, including the court's sustaining the prosecution's objection to defense counsel's attempts to elicit the name of the informant who contacted authorities about the location of the murder weapon;

34. The petitioner's rights were violated by the prosecutor's misconduct and improper arguments at the guilt/innocence phase of the petitioner's trial;

35. The petitioner's arrest for murder was illegal and predicated on unlawful custodial interrogation and illegally obtained statements;

36. The petitioner's conviction was predicated upon an illegal arrest and interrogation and upon statements unlawfully obtained from petitioner in violation of Alabama state law and the United States Constitution;

37. The petitioner's conviction was based upon the testimony of an unreliable witness,

Tracy Henry Wood;

38. The prosecutor's failure to provide all exculpatory evidence in a timely manner was improper and violated petitioner's rights;

39. The state's introduction of prejudicial and inflammatory photographs at petitioner's trial violated petitioner's rights;

40. The trial court's decision to charge the jury concerning complicity was improper and violated the petitioner's rights;

41. The trial court's refusal to grant defense counsels' request for a continuance between the guilt/innocence phase and the penalty phase of trial violated the petitioner's rights;

42. The prosecutors' conduct and arguments at the petitioner's sentencing hearing were improper and deprived the petitioner of a fundamentally fair hearing and due process.

43. The jury should not have been instructed that it could deem the offenses found to be especially heinous, atrocious or cruel;

44. Alabama's application of the "especially heinous, atrocious and cruel" aggravating circumstances is unconstitutionally vague and, as applied to the petitioner's case, violates due process and the prohibition against cruel and unusual punishment;

45. Alabama's death penalty is arbitrarily and discriminatorily applied in violation of the United States Constitution.

(Rule 20 R. 2-29).[9]

The state trial court denied the petitioner's Rule 20 petition following an evidentiary hearing. *Fortenberry v. State*, 659 So. 2d 194, 196 (Ala. Crim. App. 1994). The Alabama Court of Criminal Appeals affirmed the denial of post-conviction relief. *See id.* at 200. The Alabama Supreme Court then denied the petitioner's petition for writ of certiorari. *Id.* at

---

[9]The Court will use the term "Rule 20 R. ___" to refer to the state court record of the Rule 20 proceedings, which begins at Tab R-40, except that the term "Rule 20 Tr. ___" shall refer to the 361-page transcript of the Rule 20 hearing before the state trial court (*see* Tab R-45).

194. The United States Supreme Court denied the petitioner's subsequent petition for writ

of certiorari. *Fortenberry v. Alabama*, 516 U.S. 846, 116 S. Ct. 137, 133 L. Ed. 2d 84 (1995).

The petitioner filed a petition for writ of habeas corpus in this court on April 22, 1996

and has twice amended it. Currently before the court is the petitioner's Second Amended

Petition for Writ of Habeas Corpus (Doc. 9).[10]

### III. Discussion

#### A. The Claims

The petitioner makes the following claims:

1. Petitioner did not receive effective assistance of counsel in violation of his rights
   guaranteed by the Sixth, Eighth and Fourteenth Amendments to the Constitution of
   the United States.

   a. Failure to adequately investigate

   b. Ineffective assistance at the penalty phase

   c. Ineffective assistance on appeal

   d. Ineffective assistance due to prosecutorial misconduct

   e. Ineffective assistance at the suppression hearing

   f. Ineffective assistance in seeking change of venue

   g. Ineffective assistance in selecting a jury

   h. Ineffective assistance generally

2. The prosecutor's failure to provide all exculpatory evidence in a timely manner was
   improper and violated petitioner's rights guaranteed by the Fifth, Sixth, Eighth and

---

[10]Also before the Court are the Petitioner's Second Motion Requesting an Evidentiary Hearing (Doc. 27) and Petitioner's Rule 7 Motion to Expand the Record. (Doc. 26.) These motions are addressed in a separate memorandum opinion and order issued concurrently herewith by the Court.

Fourteenth Amendments to the United States Constitution.

3. Petitioner's rights to a fair trial by an impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by the trial court's restrictions on the voir dire examination of prospective jurors.

4. Petitioner's rights to a fair trial by an impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the trial court's failure to grant a change of venue.

5. Petitioner was deprived of an impartial jury through improper jury inclusion in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

6. Petitioner was deprived of an impartial jury through improper jury exclusion in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

7. Petitioner was deprived of a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution by the prosecutor's use of peremptory challenges in a racially discriminatory manner.

8. Petitioner was deprived of his rights to a fair trial by an impartial jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution by the trial court's improper rulings on evidentiary matters.

9. The prosecutor's misconduct and improper arguments at the guilt/innocence phase of petitioner's trial violated rights guaranteed to the petitioner by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10. Petitioner's arrest for the charge of murder was illegal and predicated on unlawful custodial interrogation and illegally obtained statements in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

11. Petitioner's conviction was predicated upon an illegal arrest and interrogation and upon statements unlawfully obtained from petitioner in violation of the United States Constitution.

12. The State's introduction of prejudicial and inflammatory photographs at petitioner's trial violated petitioner's rights.

13. The trial court's decision to charge the jury concerning complicity was improper

and violated rights guaranteed to the petitioner by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

14. The trial court's refusal to grant defense counsel's request for a continuance between the guilt/innocence phase and the sentencing phase of the trial violated petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

15. The prosecutors' conduct and arguments at petitioner's sentencing hearing were improper and deprived petitioner of a fundamentally fair hearing and due process.

16. The jury should not have been instructed that it could deem the offenses found to be especially heinous, atrocious or cruel.

17. Alabama's application of the "especially heinous, atrocious or cruel" aggravating circumstances is unconstitutionally vague and as applied to the petitioner's case violates due process and the prohibition against cruel and unusual punishment.

18. Alabama's death penalty is arbitrarily and discriminatorily applied in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

The state asserts that all of these claims are either procedurally barred or are meritless. The Court will analyze them each in turn.

### B. The Applicable Law

On April 24, 1996, two days after the habeas petition in this case was filed, President Clinton signed into law the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which heightens the degree of deference paid to a state court's findings of fact and makes other changes in habeas law.  Because the petition was filed before AEDPA's effective date and because Alabama has not met the conditions for application of the provisions in § 107 of AEDPA to capital cases, pre-AEDPA law applies to the issues in this case. *Lindh v. Murphy*, 521 U.S. 320, 327, 117 S. Ct. 2059, 2063, 138 L. Ed. 2d 481 (1997). The Court will thus apply pre-AEDPA law, and any references to federal habeas statutes

contained herein shall be intended to refer to the statutes as they existed before the effective date of AEDPA, unless the Court notes otherwise.

### C. The Analysis

#### 1. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Court formulated the two-prong test for assessing whether the representation provided by an attorney during a criminal trial constitutes "ineffective" representation under the Sixth Amendment. The Court wrote that

> [a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. To prove his ineffective assistance claims, the petitioner is thus required to meet both the performance and prejudice prongs of the *Strickland* test, which is difficult. As the Eleventh Circuit has noted, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S. Ct. 255, 130 L. Ed. 2d 175 (1994).

Meeting the first prong is difficult because "[j]udicial scrutiny of counsel's performance must be highly deferential," and courts must "indulge a strong presumption that counsel's

24

conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. In discussing the first prong of *Strickland*, the Eleventh Circuit has stated as follows:

> The Supreme Court has mandated a highly deferential review of counsel's conduct, especially where strategy is involved. *Strickland v. Washington*, 466 U.S. 668, 689-90, 104 S. Ct. 2052, 2065-66, 80 L. Ed. 2d 674 (1984). Intensive scrutiny and second-guessing of attorney performance are not permitted. *Id.*; accord, *e.g.*, *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) ("Most important, we must avoid second-guessing counsel's performance."); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts also should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."). Because it is a "wide range" of performance that is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between.

*Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994), *cert. denied*, 513 U.S. 1115, 115 S. Ct. 911, 130 L. Ed. 2d 793 (1995).

To meet the second prong, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[11] A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* All of the petitioner's ineffective assistance claims, to the extent they are not procedurally barred, must be analyzed under *Strickland*.

### a. Alleged Failure to Adequately Investigate

---

[11]In certain limited circumstances, prejudice is presumed. *Strickland*, 466 U.S. at 692.

The petitioner claims that his trial counsel rendered ineffective assistance by failing to "prepare adequately, investigate or pursue an effective defense of Petitioner, resulting in Petitioner's capital conviction and sentence of death." (Doc. 9 ¶ 61.) The petitioner claims that, although his initial statement and certain other evidence implicated Harvey Underwood in the crime, and although the defense theory was that Underwood committed the crime, trial counsel "never undertook any steps to discover facts which would support their defense theory or formulate the same." (Id. ¶ 64.)  The petitioner argues that, if trial counsel had done so, they would have discovered exculpatory witnesses, including William Jerry Pruitt and Phillip Shadwrick, to whom Underwood allegedly admitted his culpability in the crime.[12] (Id. ¶¶ 63-64.) The petitioner specifically complains that trial counsel never interviewed Underwood or even attempted to investigate his role in the crime or what information the police had gathered about him during their investigation. (Id. ¶ 65.)  He also complains that trial counsel did not investigate or interview Tracy Henry Wood, whose testimony supported defense arguments, until the day she was to testify at trial.  (Id. ¶¶ 66-67.)  Finally, he argues that trial counsel failed to discover other exculpatory evidence tending to show that two people in a blue truck were at the crime scene, rather than the

---

[12]Pruitt and Shadwick disagreed as to when Underwood made this admission in their presence. Shadwick testified that the admission occurred after the petitioner's trial, while Pruitt testified that it occurred in late 1988, just before the petitioner's trial. (Rule 20 Tr. 332, 345-46.) Another witness, Tammy McCoy, a friend of both the petitioner and Underwood, testified that Underwood also admitted his guilt to her just three or four weeks after the murder. (Rule 20 Tr. at 111-13.)  She says that she was scared and told no one until she talked to the petitioner's trial counsel the year before the Rule 20 hearing. (Id. at 114.)  Even assuming that the petitioner's trial counsel had thoroughly investigated Underwood's involvement (in spite of their client's assurances up to the time of trial that he, not Underwood, committed the crime), it is unlikely that the petitioner's trial counsel could have discovered the existence of such testimony. Some of the testimony may have concerned an event that occurred after trial, and other testimony was deliberately concealed by a witness until long after trial ended.

petitioner by himself in a green truck. (*Id.* ¶¶ 68-69.)

The Rule 20 court found that the petitioner's ineffective assistance claims were meritless. (Rule 20 R. 211-14.) The court specifically found that

[a]ny claim by Fortenberry that his trial counsel failed to adequately investigate the facts of this case is without merit. To the extent that Fortenberry asserts that his trial attorneys should have found Pruitt and Shadwrick, there has been no showing that the testimony of those two individuals concerned an event which pre-dated the defendant's trial. Moreover, after observing the demeanor of these witnesses, and reviewing their testimony, which conflicted in pertinent parts, this Court finds that those witnesses are not credible and that their testimony would not have helped Fortenberry. Further, and more fundamentally, trial counsel were preparing for the trial of a client who maintained his guilt until shortly before trial began. (Tr.R.176). Counsel cannot be faulted for their preparation of this case and for basing their strategy on facts conveyed to them by the defendant. Their performance certainly cannot be faulted when the defendant's last-minute change in his story is taken into account. Counsel performed admirably, and Fortenberry's claims of ineffective assistance of counsel are without merit.

(Rule 20 R. 213-14.)

In affirming the denial of the petitioner's petition for relief under Rule 20, the Alabama Court of Criminal Appeals made the following findings with respect to this claim:

An appellant claiming that his counsel's conduct was ineffective must satisfy the test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The appellant must show: (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient conduct, to the extent that but for the deficient conduct of counsel, the outcome of the case would have been different.

The appellant has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle [him] to relief." Rule 32.3, Ala. R. Crim. P. *See also Wilson v. State*, 644 So. 2d 1326 (Ala. Cr. App. 1994); *Elliott v. State*, 601 So. 2d 1118 (Ala. Cr. App. 1992); *Bell v. State*, 565 So. 2d 1244 (Ala. Cr. App. 1990).

To prevail on a claim of ineffective assistance of counsel:

"The appellant must show that his counsel's performance was unreasonable,

considering all of the attendant circumstances . . . . '[a] [sic] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066."

590 So. 2d at 362. This court cannot use hindsight when evaluating the performance of trial counsel. *Cartwright v. State*, 645 So. 2d 326 (Ala. Cr. App. 1994); *Wilson v. State*, 644 So. 2d 1326 (Ala. Cr. App. 1994); *State v. Tarver*, 629 So. 2d 14 (Ala. Cr. App. 1993). We must examine counsel's performance in light of the circumstances existing at the time of the challenged conduct. *Luke v. State*, 484 So. 2d 531 (Ala. Cr. App. 1985).

The Sixth Amendment of the United States Constitution guarantees an accused the right to counsel. The right to counsel has been interpreted to mean the right to "reasonably effective assistance" of counsel which goes to the first prong of the *Strickland* test. *Duren v. State*, 590 So. 2d 360, 362 (Ala. Cr. App. 1990), *aff'd*, 590 So. 2d 369 (Ala. 1991), *cert. denied*, 503 U.S. 974, 112 S. Ct. 1594, 118 L. Ed. 2d 310 (1992).

Initially, the appellant contends that his trial counsel's performance was deficient because, he says, counsel failed to adequately investigate the case.

> "In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court noted that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' 466 U.S. at 691, 104 S. Ct. at 2066."

*Hall v. State*, 521 So. 2d 1373, 1377 (Ala. Cr. App. 1988). No one, however, expects that defense counsel will possess and exercise all of the techniques and contacts of a professional private detective.

The trial in this case was scheduled to begin on a Monday. Up until the Saturday before, the appellant had told his attorneys that he was guilty. In addition, the appellant had escaped from jail before trial and had been a fugitive from justice for several weeks, during which time his counsel could not confer with him. As the United States Supreme Court stated in *Strickland*:

> "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions

are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."

466 U.S. at 691, 104 S. Ct. at 2066.

The appellant initially contends that his counsel's performance was ineffective because, he says, counsel did not call two potential witnesses who the appellant alleges could have testified that when they were out drinking with Harvey Underwood, Underwood confessed that he had killed the people at the Guest Service Station. However, the record of the post-conviction hearing shows that this alleged evidence did not come to light until years after the appellant had been tried and convicted. [Footnote omitted].[13] Therefore, counsel's performance could not be considered deficient for failing to call these witnesses at trial.

Further, the court made the following finding concerning these two witnesses testimony at the hearing:

"To the extent that Fortenberry asserts that his trial attorneys should have found Pruitt and Shadwrick, there has been no showing that the testimony of those two individuals concerned an event which pre-dated the defendant's trial. Moreover, after observing the demeanor of these witnesses, and reviewing their testimony, which conflicted in pertinent parts, this Court finds that those witnesses are not credible and that their testimony would have not helped Fortenberry."

The appellant has failed to satisfy the *Strickland* test for ineffective assistance of counsel.

---

[13]The text of this omitted footnote reads as follows: "The appellant has failed to satisfy the requirement of Rule 32.1(e), Ala. R. Cr. P., for relief on the grounds of newly discovered evidence."

29

For a thorough discussion of Underwood's possible involvement in the offense, see our opinion in *Fortenberry*, 545 So. 2d at 132-34.

The appellant further contends that his counsel's performance was deficient because, he says, defense counsel failed to call three potential witnesses who were present at the Guest Service Station directly after the murders. The record shows that interviews of these witnesses were in discovery material given to defense counsel by the prosecution on the Friday before trial on Monday. Two of these individuals testified at the post-conviction hearing that they saw a truck leaving the area after the murders. One witness testified that the truck was blue, unlike the truck in which the appellant had been traveling on the day of the murders. The third witness testified that when he arrived at the station, Mr. Guest told him that it did not look like a robbery because one of the victims still had money in his pocket, [Footnote omitted][14] therefore, the appellant argues, he would not have been found guilty of a capital offense.

The record shows that when defense counsel obtained the witnesses' statements, counsel requested a continuance and attempted to subpoena witnesses. The court refused the request. The court's refusal to grant a continuance was specifically addressed and discussed, and its judgment was affirmed by this court on direct appeal. *Fortenberry*, 545 So. 2d at 138.

As the court stated in its order denying the petition:

"[T]rial counsel were preparing for the trial of a client who maintained his guilt until shortly before trial began. Counsel cannot be faulted for their preparation of this case and for basing their strategy on facts conveyed to them by the defendant. Their performance certainly cannot be faulted when the defendant's last-minute change in his story is taken into account. Counsel performed admirably, and Fortenberry's claims of ineffective assistance of counsel are without merit."

The record of the post-conviction hearing also shows that one of these potential witnesses was a friend of both the appellant and of Underwood. She agreed to undergo a polygraph test but appeared not to have taken the test.

Further, the record reflects that a witness at the appellant's trial testified that she

---

[14]The text of this omitted footnote reads as follows: "The record, which contains the statement made by this witness to police, contains no reference to anything Mr. Guest told him at the station. This evidence was first presented at the Rule 32 hearing."

was present at the time of the murders and that she saw an individual, who she said was not the appellant, at the Guest Service Station at that time. This witness also testified at the post-conviction hearing. As to the appellant's allegation concerning the fact that no robbery occurred the record shows that the owner of the store testified that money was taken at the time of the murders.

Given the circumstances of this case and this court's rulings on direct appeal, we hold that the appellant has failed to satisfy the requirements of *Strickland* as to this issue.

*Fortenberry*, 659 So. 2d at 197-99. The findings of fact contained above are supported by the record and are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

The petitioner's complaint is that counsel failed to adequately investigate the facts and that this failure resulted in his conviction and death sentence because he was deprived of crucial exculpatory testimony and evidence. Given the state court findings of fact, which are presumed to be correct, and the evidence, the Court finds that counsel's performance was not deficient in failing to do the investigation the petitioner complains should have been done. Until just a few days before trial, the petitioner told his attorneys he committed the crime. Although counsel testified at the Rule 20 hearing that they believed someone else had committed the crime (Rule 20 Tr. 144-45), their client was of no assistance to them in determining who the name of that person, and they were left to guess as to the identity of such person. Counsel's investigation, in such light, was reasonable.

In addition, the Court finds that it is highly unlikely that the petitioner would have avoided his conviction or sentence if counsel had done the investigation the petitioner claims they should have done. The petitioner complains that, before trial, counsel did not adequately interview witness Tracy Henry Wood, who was at the crime scene just before

31

the murders. There is no evidence, however, that such interviews would have yielded any more exculpatory evidence than that appearing in Ms. Wood's pretrial statements or than the testimony she ultimately gave at trial. There is no evidence Ms. Wood would have related any additional information that would have changed the result of the trial.

The petitioner also believes that counsel should have discovered that Underwood admitted his guilt to Pruitt and Shadwrick. It is not clear from the evidence, however, that Underwood made this alleged admission before the petitioner's trial, so the petitioner has not shown that such testimony could have been elicited from Pruitt and Shadwrick during trial, even supposing counsel could have found them at all.[15] Furthermore, the Rule 20 court, before which Pruitt and Shadwrick testified, found that they lacked credibility, which undercuts the petitioner's arguments that their testimony would have changed the result of his trial. The petitioner's claim that he received ineffective assistance because of counsel's alleged failure to adequately investigate is therefore due to fail under both prongs of *Strickland*.

### b. Alleged Ineffective Assistance at the Penalty Phase

The petitioner claims he received constitutionally ineffective assistance of counsel during the penalty phase. He complains that trial counsel "failed to prepare a penalty phase strategy and effectively make a case for saving Petitioner's life, including, but not

---

[15]Insofar as the petitioner intends also to base this claim upon counsel's failure to discover and present the testimony of Tammy McCoy, a friend of both the petitioner and Underwood, that Underwood admitted his guilt to her, this claim must fail. McCoy testified that she was too frightened to tell anyone about the incident until long after the trial began. (Rule 20 Tr. 114.) Counsel did not perform deficiently in failing to find information that a witness was unwilling to divulge to anyone until long after trial had ended.

limited to, a failure to prepare adequately and/or call essential witnesses." (Doc. 9 ¶ 70.) The petitioner complains that trial counsel did not adequately investigate his background and that the only evidence trial counsel offered at the sentencing hearing was his father's testimony, consisting of just fourteen lines in the trial transcript. (*Id.* ¶¶ 71-72.)

As further evidence that his trial counsel was unprepared for the penalty phase, the petitioner cites counsel's second request for a continuance, which was based upon counsel's contention that there had been insufficient time for them to prepare evidence or witnesses for the penalty phase; the petitioner also points out that his counsel failed to call available mitigation witnesses other than his father. (*Id.* ¶¶ 71, 81.) The petitioner further argues that counsel did not prepare his father to testify at the penalty phase or inform him that he would be called. (*Id.* ¶ 75.) The petitioner complains that counsel did not investigate his background and was not prepared to present psychological or psychiatric testimony in mitigation, or to call available character witnesses from the community. (*Id.* ¶¶ 77-80.) The petitioner contends that if counsel had adequately prepared for the penalty phase, it is likely the jury would have refused to recommend a sentence of death.

In affirming the denial of petitioner's request for relief under Rule 20, the Alabama Court of Criminal Appeals made the following findings with respect to this claim:

> The appellant further contends that his counsel's performance was ineffective because, he says, counsel failed to investigate in preparation for the penalty stage of the proceedings and failed to call additional witnesses. The record reflects that the guilt phase was completed on Saturday. Counsel asked for a continuance until Monday to have more time to prepare for the penalty phase. The court polled the jury and after ascertaining that the members of the jury wished to proceed, the court continued the proceedings without delay. The court made the following findings at the Rule 32 hearing:

"[T]he Court also finds specifically that counsel did not seek a continuance of the penalty phase proceedings due to any lack of preparation, but rather to allow the jury a cooling-off period before beginning penalty phase deliberations. Likewise, any claim by Fortenberry that his trial counsel were ineffective for not presenting mental state testimony in mitigation is specious given that no mental state evidence was presented in this proceeding even though Fortenberry had every opportunity to do so."

Counsel at the post-conviction hearing testified that they discussed his options with Fortenberry and that the only person suggested by the appellant as a potential witness was his father. They further stated that the jury already had evidence before it concerning the appellant's age, background, and his lack of a criminal record. The appellant contends that the attorneys should have been prepared to present psychiatric or psychological evidence at the sentencing hearing. However, counsel stated that the appellant had been evaluated at Taylor Hardin Secure Medical Facility and that there was no evidence that the appellant suffered from a mental deficiency.

"There had never been a case where additional witnesses could not have been called." *Tarver*, 629 So. 2d at 21. Based on the facts of this case we cannot say that counsel's performance was ineffective for failing to call additional witnesses.

*Fortenberry*, 659 So. 2d at 199. The findings of fact contained above are supported by the record and are entitled to a presumption of correctness under 28 U.S.C. § 2254(d), except as is noted below.

Ineffective assistance claims relating to the penalty phase of a capital punishment trial are subject to the two-prong *Strickland* test. *Waldrop v. Thigpen*, 857 F. Supp. 872, 914 (N.D. Ala. 1994), *aff'd*, 77 F.3d 1308 (11th Cir.), *cert. denied*, 519 U.S. 898 (1996). Whether a defendant was prejudiced during the penalty phase of a capital trial depends upon whether "the sentencer . . . would have concluded that the  balance of aggravating and mitigating circumstances did not warrant death." *Stevens v. Zant*, 968 F.2d 1076, 1081 (11th Cir. 1992), *cert. denied*, 507 U.S. 929 (1993) (quoting *Strickland*, 466 U.S. at 691). As is set

forth above, the petitioner specifically complains that counsel presented almost no mitigation evidence during the penalty stage. Failure to present mitigating evidence during the penalty stage of a capital trial is not ineffective *per se*. *Waldrop*, 857 F. Supp. at 914-15. Counsel does, however, have "a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Middleton v. Dugger*, 849 F.2d 491, 493 (11th Cir. 1988), (citing *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir. 1986), *cert. denied, Thompson v. Dugger*, 481 U.S. 1042, 107 S. Ct. 1986, 95 L. Ed. 2d 825 (1987)). In addition, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691.

There is a three-step test for determining whether counsel's failure to present mitigating evidence constitutes ineffective assistance of counsel, as is set forth below:

> The first step of the analysis is a determination whether there existed, in fact, mitigating evidence that a reasonable investigation would have uncovered. . . . The attorney's duty under the Sixth Amendment is to conduct a reasonable investigation, not such an exhaustive investigation that all conceivable mitigating evidence is necessarily uncovered. . . .
>
>     . . . .
>
> The second question presented by the analysis is whether the failure to present existing mitigating evidence was the product of an informed tactical decision or due to oversight. *See Middleton v. Dugger*, *supra*. While the *reasonableness* of a decision is a question of law for the habeas court, whether a decision constituted a tactical decision is a question of fact to which the presumption of correctness applies. *See Stevens v. Zant*, *supra*; *Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991);

*Bundy v. Wainwright*, 808 F.2d 1410 (11th Cir. 1987).

Finally, if it is determined that counsel failed to present reasonably available mitigating evidence due to error or oversight, and not due to a tactical or strategic decision, ineffectiveness of counsel is established only if the petitioner also shows that the oversight caused actual prejudice. There must be a reasonable probability that the outcome of the sentencing proceeding would have been different if the mitigating evidence had been presented. Stated another way, there must be a reasonable probability that the sentencer, if presented with the mitigating evidence, would have determined that the balance of aggravating and mitigating circumstances leaned against imposition of the death penalty. *See Stevens v. Zant, supra.*

*Waldrop*, 857 F. Supp. at 915-16. The first two steps of this analysis show, in effect, how the

petitioner can meet the first prong of *Strickland* in this situation. The third step shows how

the petitioner can meet the second prong of *Strickland*.

With respect to the first step of the analysis, the petitioner argues that counsel did not

conduct a reasonable investigation into mitigating evidence, and submits affidavits from

family and friends showing that there was mitigation evidence that a reasonable

investigation would have uncovered. (Pet'r's Mot. Requesting an Evidentiary Hr'g (Doc.

17), Exs. A-K.) The petitioner is not entitled to submit this new evidence that the state

courts had no opportunity to hear in reviewing his claims. The Eleventh Circuit has stated

as follows:

A habeas petitioner is not entitled to an evidentiary hearing to develop facts that he failed to show in state court unless he can establish cause for and prejudice from such failure. *Keeney v. Tamayo-Reyes*, --- U.S. ----, ----, 112 S. Ct. 1715, 1719-20, 118 L. Ed. 2d 318 (1992); *see Mathis v. Zant*, 975 F.2d 1493, 1497 (11th Cir. 1992) (although the district court allowed petitioner to submit additional evidence supporting his claim of ineffective assistance at the sentencing stage and granted relief largely based on this evidence, we reversed and held that *Keeney* required petitioner to show cause and prejudice before reviewing evidence that was not presented in state court). Without a cause and prejudice showing for evidence not

36

submitted to the state court, a habeas petitioner is procedurally barred on federal habeas review just as he is from presenting new claims not previously before the state court.

*Weeks v. Jones*, 26 F.3d 1030, 1043 (11th Cir. 1994), *cert. denied*, 513 U.S. 1193 (1995). Since the petitioner has not shown that the failure to present these affidavits to the Rule 20 court was due to cause and prejudice, the Court cannot consider them in deciding whether the petitioner is due habeas relief.

Even if the Court were to consider these affidavits, however, the petitioner would not prevail on this claim. An examination of the substance of the affidavits demonstrates why this is true. In the first affidavit, the petitioner's father complains that counsel failed to prepare him for the penalty phase or to explain it to him. (Doc. 17, Ex. A ¶ 5.) He states that, had he been prepared, he could have given more detail about the petitioner, the type of person he is, their relationship, and their family life. (*Id.* ¶ 7.) He also states that, if counsel had asked him to name possible mitigation witnesses, he could have named a number of people, and he lists eleven people he could have named, including those who have, in these proceedings, submitted affidavits summarized herein below in support of the petitioner's case. (*Id.* ¶ 8.)

The petitioner's lifelong friend, Steve Elliott, provided an affidavit. He stated that the petitioner is a good friend who has helped out when needed, petitioner is from a good home, is polite, has always wanted to help others, and would not run over or hurt others, even on the athletic field. (Doc. 17, Ex. B ¶¶ 1-8.) He always got along with his teachers, was never a bully, never started trouble, and was very close to his parents. (*Id.* ¶¶ 9-11.)

Elliott also states that, had he been asked, he would have so testified on the petitioner's behalf at the sentencing phase of trial. (*Id.* ¶ 12.)

Steve Elliott's mother, Esther Elliott, also submitted an affidavit. She states that the petitioner was always very polite and a gentleman while visiting at her home. (Doc. 17, Ex. G ¶ 3.) The petitioner would call his mother if he was going to be late getting home and that he was just a normal kid in the neighborhood, like the other kids. (*Id.* ¶¶ 4-5.) If counsel asked her, she would have so testified on the petitioner's behalf at his trial. (*Id.* ¶ 6.)

In an affidavit provided by Craig Gannon, the petitioner's friend of twenty years, Gannon states that the petitioner was not a troublemaker, he was easy-going and not hot-headed, and he was not a bully, despite his large size. (Doc. 17, Ex. C ¶¶ 1-5.) The petitioner was polite and of good character, a "good fellow," spoke respectfully to his parents and was an average student. (*Id.* ¶¶ 6-8, 11.) He does not know of anytime the petitioner started trouble with someone. Further, he believes someone else committed the crime and the petitioner would not commit such a crime. (*Id.* ¶¶ 9-10, 14.) Tracy Henry [Wood] called him about three days after the petitioner's arrest and stated that she did not see Tommy at the scene. (*Id.* ¶ 12.) He states that Mike Guest's mother called him about a week after the petitioner's arrest and stated that "she did not think they had the right person." (*Id.* ¶ 13.) If he had been asked, he would have so testified on the petitioner's

behalf at trial.[16]  (*Id.* ¶ 15.)

Teia Horton, petitioner's friend in nursing school, also furnished an affidavit. She states that petitioner was "a normal every day kid" who was polite and respectful to everybody, who was very nice around women, "and would watch his mouth."  (Doc. 17, Ex. D ¶¶ 1-4.) Petitioner was an average student. He loved his mother and talked about her often. She further states that he seemed to enjoy spending time with his father at the school and his father was nice. She does not believe that the petitioner had anything to do with the crime, but if he did, he was not alone.  (*Id.* ¶ 5-7.) She states that, had counsel asked her, she would have so testified on the petitioner's behalf at trial.  (*Id.* ¶ 8.)

In another affidavit, the petitioner's nursing professor, Anetha Bell Simmons, stated that the petitioner received his diploma and he was a fun, above-average student whose father made him study hard and who always acted like a gentleman around her.  (Doc. 17, Ex. E ¶ 1-7.) Petitioner was a happy, fun-loving person who was liked by the other students and who did not cause trouble, and that she thinks he was a very fine young man.  (*Id.* ¶ 8-10.) She states that, had counsel asked her, she would have so testified on the petitioner's behalf at trial.  (*Id.* ¶ 11.)

Petitioner's sister-in-law, Lisa Ranee Hardin Fortenberry, also submitted an affidavit. She has known the petitioner for fourteen years and she describes him as a "big teddy bear." He would always take care of her and treat her like a little sister, he would never start a

---

[16]The Court notes that, had the defense called Mr. Gannon to testify at the penalty phase, it is unlikely the trial court would have admitted his testimony regarding the hearsay statements by Tracy Henry Wood and Mike Guest's mother.

fight with anyone, and he always tried to be a peacemaker. (Doc 17, Ex. F ¶¶ 1-7.) She states that he wanted to get his nursing degree so he could help people in need. (*Id.* ¶ 7.) She states that the petitioner was a regular churchgoer as a young man and was baptized, and that his great-grandfather was a preacher. (*Id.* ¶ 8.) She states that she named her son after the petitioner. (*Id.* ¶ 9.) She also states that, had counsel asked her, she would have so testified on the petitioner's behalf at his trial. (*Id.* ¶ 10.)

An additional affidavit was provided by petitioner's lifelong friend, Timothy Scott Hunter. He states that the petitioner was not a troublemaker, he was a good guy, a good student, a good football player, and a big fellow with a big heart. (Doc. 17, Ex. H ¶¶ 1-5, 7-9.) The petitioner would look after him and Scott Fortenberry (the petitioner's brother) when they were younger. (*Id.* ¶ 6.) He believes the petitioner is scared for his family and did not commit the crime. (*Id.* ¶ 10.) He also states that, had counsel asked him, he would have so testified on the petitioner's behalf at trial. (*Id.* ¶ 11.)

Michelle Head, a high school friend of the petitioner's, also supplied an affidavit. She states that petitioner reminded her of a big "teddy bear" and that he was "a protector" who took care of kids who needed protecting. (Doc. 17, Ex. I ¶¶ 1-5.) The petitioner was polite and respected in high school, would never hurt a woman, could not stand to see a woman mistreated, and showed a lot of respect for women. (*Id.* ¶¶ 5-6.) She states that the petitioner was a good friend who was always there for those who needed him. (*Id.* ¶ 7.) The petitioner told her that Underwood was at the store with him, Underwood had committed the murders, and everything had happened so fast, he could not stop it. (*Id.* ¶

8.) She believes the petitioner would go to prison to protect his family and she would never believe the petitioner was there alone or committed the crime of which he is accused. (*Id.* ¶¶ 8-9.) She also states that, had counsel asked her, she would have so testified on the petitioner's behalf at trial. (*Id.* ¶ 10.)

In another affidavit, Jim Dial, the petitioner's schoolmate and fellow football team member, states that he and the petitioner were normal kids growing up. He was the petitioner's friend, the petitioner treated him as such, he never saw the petitioner start trouble with anyone, and the petitioner was a very good person and was like a brother to him. (Doc. 17, Ex. K ¶¶ 1-4.) He also states that, had counsel asked him, he would have so testified on the petitioner's behalf at trial. (*Id.* ¶ 5.)

If these affidavits were properly before the Court, they would show that there was mitigating character evidence the petitioner's trial counsel could have discovered through a reasonable investigation, so the petitioner would meet the first step of the *Waldrop* analysis. To meet the second step, the petitioner would have to show that the failure to present such mitigating evidence was an error or oversight, and not the product of an informed tactical decision.

At the Rule 20 hearing, the petitioner's trial counsel testified that, in discussing potential mitigation witnesses, the petitioner mentioned only his father. In his affidavit, however, the petitioner's father stated that counsel did not discuss the penalty phase of trial with him and, if asked, he could have provided the names of many mitigation witnesses, including those who signed the affidavits summarized above. Counsel also testified that they offered

41

limited mitigation evidence during the penalty phase because they intended to rely on other mitigation evidence presented during the guilt/innocence phase.   This Rule 20 testimony is belied by statements counsel made during the penalty phase, in which they emphatically asserted to the court that they were not ready to present any evidence or argument in mitigation. (R. 1739.) These facts reveal that petitioner's trial counsel may have failed to offer mitigation evidence at the penalty phase because they were not prepared to do so, and not because of a tactical decision to do so.

The petitioner would then have to satisfy the third step of the *Waldrop* test, which reflects the second prong of *Strickland*, by showing that the oversight caused actual prejudice--that there is a reasonable probability the outcome of the sentencing proceeding would have been different if the mitigating evidence had been presented, or that there is a reasonable probability that the sentencer, if presented with the mitigating evidence, would have determined that the balance of aggravating and mitigating circumstances leaned against imposition of the death penalty. *Waldrop*, 857 F. Supp. at 916.

The Eleventh Circuit has noted that certain death penalty defendants may be able to meet *Strickland*'s second prong with respect to claims that counsel rendered ineffective assistance at the sentencing stage. The court stated as follows:

In death penalty cases, *Strickland*'s prejudice inquiry is no sanitary, academic exercise--we are aware that, in reality, some cases almost certainly cannot be won by defendants. *Strickland* and several of our cases reflect the reality of death penalty litigation:  sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder--or, even, a less brutal murder for which there is strong evidence of guilt in fact. *Id*. at 696, 104 S. Ct. at 2069;  *see also Thompson v. Wainwright*, 787 F.2d 1447, 1453 (11th Cir. 1986) ("Nothing [the lawyer] could have presented would have rebutted the

testimony concerning Thompson's participation in the brutal torture murder.");
*Daugherty v. Dugger*, 839 F.2d 1426, 1432 (11th Cir. 1988) ("given the severity of the aggravating circumstances," failure to present psychiatric testimony was not prejudicial).

*Clisby v. State of Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994), *cert. denied*, 513 U.S. 1162, 115 S. Ct. 1127, 130 L. Ed. 2d 1089 (1995) (finding that, in view of the brutal nature of the murder and the defendant's past record of killing, he was not prejudiced by counsel's failure to relate his lack of intelligence or his drug and alcohol-exacerbated antisocial personality to the sentencer).

In this case, the petitioner's crime was shocking because he shot and murdered four innocent people. Three he shot at close range and another he gunned down from a greater distance, as she was trying to escape the murder scene. In one statement, he admitted he reentered the service station to kill W.T. Nelson after having shot the two victims who allegedly had approached him in an attempt to convince him to desist in the robbery. (R. 2982.) In that statement he also admitted he shot Nancy Payne last of all as she was trying to run away. (R. 2983.) The murders, particularly those of W.T. Nelson and Nancy Payne, were effectively characterized by the prosecution as the deliberate, calculated elimination of eyewitnesses. (R. 1745, 1753-54.) Moreover, although counsel argued that Underwood, not the petitioner, committed the crime, the fact remains that the petitioner did admit to the crime, and only recanted on the eve of trial, switching back to a modified version of his first story that Underwood had committed the crime. His explanation for allegedly lying about his culpability was that the actual shooter had threatened to kill his family. In convicting the petitioner, the jury apparently rejected this explanation, as well as the petitioner's story

43

that Underwood committed the crimes. These factors greatly decrease the likelihood that the jury would have recommended a different sentence if they had heard the character evidence now offered by the petitioner. Given this consideration, the Court finds, as is set forth below, that, even if the affidavits were properly before the Court, the newly offered mitigating evidence would have not changed the result of the penalty phase.

When the penalty phase began, the jury had already heard some mitigating evidence earlier in the trial—evidence of the petitioner's youth (R. 1487-88), his lack of significant criminal background (R. 1516-17), and the fact that he had graduated from nursing school (R. 1511.) During the penalty phase, counsel expressly adopted this evidence of mitigating circumstances elicited in the guilt/innocence phase of trial. (R. 1733.)

During sentencing, counsel implored the jury to consider the petitioner's youth and his lack of significant criminal background, and argued that, if the petitioner committed the crime, then it was not heinous because he did it out of panic, not premeditation. (R. 1747-49.)  Counsel also argued as follows:

> He graduated from high school; he came from a good family; both of his parents are nurses; his brother has a good job.  Tommy is a nurse, he is a licensed practical nurse, who went through school, went through the school with his father and with his girlfriend.  He graduated, he passed his bar, he is a practicing nurse.
>
> This is a young man who went through school to take a job, not just a job to make a living, but a job dedicated to helping people.  I submit to you that there is no profession, probably in the world, that more is designed to help people than in the profession of nursing.  That's what – he could have gone to any type trade school, he could have studied anything, he could have chosen any profession.  He chose to be a nurse, a profession designed to help people.

(R. 1749-50.)

44

Counsel also stressed that the crime was not heinous, was not premeditated, and the evidence showed it was done in panic, not in a calculated way to eliminate eyewitnesses. (R. 1751.) Counsel argued that the murders were not comparable to executions, but were shots fired off in a panic; they reminded jurors that the petitioner's taped statement indicates he did not even think he had hit Nancy Payne and the evidence shows he did not attempt to shoot or follow Tracy Henry Wood as she headed up to the Guest residence from the gas station just before the murders.[17]   (R. 1751-52.)   Counsel also argued that the murders were not heinous as compared to other murders.  In spite of this mitigating evidence and argument, the jury recommended that the petitioner receive the death penalty.

Even if the new affidavits offered by the petitioner were properly before the Court, they would not allow the petitioner to meet the second prong of *Strickland*.  The affidavits focus on the petitioner's character for being polite, respectful of women and of his parents, being close to his family, being a "good guy" and a good friend, having a normal childhood, not being a trouble-maker or a bully, being a "protector" during his youth, being a regular church-goer, and desiring to help people.  Although this evidence shows that the petitioner has some worthy character traits and is valued by his friends and family, it is not of the

---

[17]It is possible that the jury recalled, in all of the petitioner's pre-trial statements, he indicated he never saw Tracy Henry Wood during his visit to the Guest Service Station. (R. 2963, 2981, 2984-85), which would detract significantly from this argument.  The jury may also have recalled, in his statement blaming Underwood for the murders, the petitioner was asked, "But when ya'll left there [the Guest Service Station] that night, you thought that the girl [Nancy Payne] had gotten away?"  To which the petitioner replied, "Yea." He was then asked, "You didn't know she had been shot?"  To which petitioner replied, "No sir, I sure didn't, *That's what worried me, I said, Look I hope you don't get caught.* [sic]"  (R. 2964 (emphasis added).)  This arguably could support the prosecution's argument that the petitioner intended to eliminate Nancy Payne as an eyewitness.

import and weight that would lead the Court to determine that there is a reasonable possibility that the sentencer would have concluded that the balance of aggravating and mitigating circumstances leaned against the imposition of the death penalty.[18] Some of it is cumulative of what was presented at trial. Some of it is very general information with little specific detail or facts about the petitioner. Thus, even if the Court could consider these affidavits, the petitioner would be unable to meet the second prong of *Strickland* as to this claim, and would therefore receive no habeas relief on this claim. Whether or not the Court considers the new affidavits, this claim must fail.

### c. Alleged Ineffective Assistance on Appeal

The petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise before the state appellate courts many of the issues presented in the instant petition and by failing to consult or communicate with him in preparation of his appeal. (Doc. 9 ¶ 83). The petitioner specifically complains that his counsel failed to adequately raise on appeal issues related to the trial court's denial of his motions to suppress, for change of venue, for individual voir dire, for continuance when the defense discovered allegedly withheld evidence, and for a continuance of the sentencing phase. (*Id.* ¶ 84.) The petitioner also complains that his counsel failed to adequately raise on appeal issues

---

[18]The Court notes that this evidence also had the potential of decreasing the sentencer's sympathy for the petitioner. For instance, it could have persuaded the sentencer that the robbery and murders were an incomprehensible betrayal not only of the petitioner's family and friends who believed in him but also of his own character. The evidence that he had a normal childhood and close family ties, he attended church, and had good friendships could have convinced the sentencer that the petitioner had far less reason for his vicious criminal behavior than someone reared in a malignant, dysfunctional environment, without nurturing, love, discipline, friendship or spiritual training.

related to the alleged *Batson* error during jury selection, the introduction of allegedly inflammatory photographs, and the allegedly inappropriate behavior, statements, and arguments of the prosecution during trial.[19]  (*Id.*)

To establish an ineffective assistance claim against appellate counsel, it is necessary to show that appellate counsel's representation fell below an objective standard of reasonableness for attorneys and that specific errors resulted in actual  prejudice to the defense. *Waldrop*, 857 F. Supp. at 921 (citing *Williams v. Weldon*, 826 F.2d 1018 (11th Cir. 1987), *cert. denied*,  485 U.S. 964, 108 S. Ct. 1231, 99 L. Ed. 2d 431 (1988)).  Insofar as the petitioner argues that his attorney was ineffective for failing to raise and assert certain appellate issues, the test is whether those issues not raised "'contain sufficient merit that appellate counsel can be faulted for not having raised them.'" *Id.*  Appellate counsel need not advance every possible argument, even those that are non-frivolous, and should instead concentrate his advocacy on "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3312, 77 L. Ed. 2d 987 (1983).[20]

In discussing how to apply the second prong of *Strickland* in the ineffective assistance

---

[19]*Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)(prohibiting prosecutors from using peremptory strikes in a racially discriminatory way during jury selection).

[20]*See also Smith v. Robbins,* — U.S. —, 120 S. Ct. 746, 765 (2000), in which the Court stated as follows:

Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. *See, e.g., Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome").

*Smith*, 120 S. Ct. at 765.

of appellate counsel context, the Eleventh Circuit stated as follows:

> this Court in *Cross v. United States*, 893 F.2d 1287 (11th Cir. 1990), held that in order to determine prejudice the court must first perform "a review of the merits of the [omitted or poorly presented] claim." *Id.* at 1290. If the Court finds that the neglected claim would have a reasonable probability of success on appeal, then according to *Cross* it is necessary to find "appellate counsel's performance prejudicial because it affected the outcome of the appeal." *Id.*

*Heath v. Jones*, 941 F.2d 1126, 1132 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077, 112 S. Ct. 981, 117 L. Ed. 2d 144 (1992). Using the standards set forth above, the Court will proceed to analyze the petitioner's ineffective assistance of appellate counsel claims.

### (1) Failure to Raise Issues Regarding Denial of the Motion to Suppress

The petitioner claims that his appellate counsel rendered ineffective assistance by failing to adequately raise issues regarding the trial court's denial of his motion to suppress. The petitioner does not specifically describe counsel's failure, but states that the issues counsel "failed to adequately raise on appeal include, but are not limited to the trial court's denial of the Motion to Suppress," etc. (Doc. 9 ¶ 84.) The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Even assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it does not to satisfy *Strickland*.

In the instant petition, the petitioner argues that his conviction was unconstitutional and must be overturned because "it was predicated upon an illegal arrest and interrogation which resulted in unlawfully obtained statements of the Petitioner." (Doc. 9 ¶ 180.) The petitioner argues that his arrest was illegal and predicated on unlawful custodial

48

interrogation and statements obtained in violation of his constitutional rights. (*Id*. ¶¶ 169-79.) The petitioner argues specifically that the police improperly entered his home to take him into custody, because they relied on the permission of his brother to enter, although they were unaware of his brother's identity or authority to admit them into the residence. (*Id*. ¶¶ 170-71.) He argues that his questioning by police was coercive and that his arrest warrant was improperly based upon the unsworn written statement he gave to police during their questioning. (*Id*. ¶¶ 172-76.) The petitioner also argues that, because the magistrate judge who issued the arrest warrant failed to make known the information he relied upon in doing so, there was no way for the petitioner to effectively challenge its constitutionality. (*Id*. ¶¶ 177-78.) The petitioner thus argues that his statements were improperly admitted at trial because they were the fruit of a warrantless arrest, an unlawful custodial interrogation, and an invalid arrest warrant. (*Id*. ¶ 179.)

In comparison, petitioner's counsel argued on direct appeal that the petitioner's statements on May 3, 4, and 5, 1985, resulted from an illegal detention. Counsel argued that the first of these statements was given involuntarily by the petitioner after six hours of intense interrogation by the police. (Tab R-28 at 30-31.) Counsel further argued that the arrest warrant, which a state magistrate judge issued before the petitioner gave his second and third statements, was improperly based upon a "bare bones" affidavit which contained no substantive information, much less any evidence of probable cause. (*Id*. at 27-28.) Counsel pointed out that the trial court initially found that the respondent had failed to meet its burden as to the admissibility of the post-arrest statements, and then allowed

(improperly, according to the petitioner) the respondents to submit further evidence supporting the statements' admissibility. Counsel noted that the magistrate judge testified that the only evidence supporting the arrest warrant, other than the "bare bones" affidavit, was one of the petitioner's statements; only petitioner's first statement, in which he named Underwood as the killer, predates the arrest warrant. (*Id.* at 28.) Based upon these facts and upon case law citations, counsel argued that the petitioner's detention was illegal and any statements resulting therefrom were inadmissible, even if voluntarily given. (*Id.* at 30-31.) In summary, counsel thus argued that the first statement was involuntary and the second and third statements were inadmissible because they were taken after an illegal arrest based upon a constitutionally defective arrest warrant.

The Court cannot find that the differences between the arguments presented in this proceeding and those presented on direct appeal with respect to these issues lead to the conclusion that appellate counsel rendered ineffective assistance. The arguments are in many respects similar, although the petitioner's arguments in the instant petition are more detailed and encompass alleged improprieties by the police in entering his home to take him into custody. The petitioner has not shown that appellate counsel's arguments are so weak in comparison that they would satisfy *Strickland*'s first prong. Neither has the petitioner shown that any alleged deficient performance prejudiced the petitioner; indeed, he cannot make such a showing because the Court finds herein that  the substance of this habeas claim is meritless, as is explained in sections III.C.10. and III.C.11. herein below. The petitioner could not be prejudiced by appellate counsel's failure to raise meritless

claims. Nor could appellate counsel's failure to raise meritless claims be characterized as deficient performance. This claim must therefore fail.

### (2) Failure to Raise Issues Related to the Denial of the Motion for Change of Venue

The petitioner claims that his appellate counsel rendered ineffective assistance by failing to adequately raise issues regarding the trial court's denial of his motion for change of venue. The petitioner does not specifically describe counsel's failure, but states that counsel "failed to adequately raise on appeal . . . the trial court's denial of the . . . Motion for Change of Venue." (Doc. 9 ¶ 84.) The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it does not satisfy *Strickland*.

In the instant petition, the petitioner argues that Etowah County is a small community of 105,000 people and, at the hearing on the Motion for Change of Venue, counsel presented testimony of local media officials that illustrated the "pervasive saturating and inflammatory pre-trial publicity that the case received." (*Id.* ¶ 151.) He argues that "community sentiment was strongly aroused against [him]" and that "inflammatory pre-trial publicity saturated and influenced prospective jurors to the point that an impartial jury could not possibly be selected." (Doc. 9 ¶¶ 150, 152.) He argues that almost all of the prospective jurors had extensive knowledge of the case through media reports and held pretrial opinions about his guilt, and he cites voir dire responses from several prospective jurors in support of his arguments. (*Id.* ¶ 153.)

51

On appeal, petitioner's counsel argued that the trial court had committed reversible error by denying the motion for change of venue. (Tab R-28 at 39-42.) Counsel argued that ample evidence had been presented to the trial court that pre-trial publicity was so pervasive as to necessitate a change of venue. (*Id.*) Counsel cited legal authority for the proposition that a defendant can win a change of venue by proving that there was pervasive pre-trial publicity which prejudiced him. (*Id.* at 39.) Counsel also recounted the extensive evidence offered at trial to show that a change of venue was necessary, and highlighted facts about the jury venire in support of his position. (*Id.* at 39-41.) Further, counsel argued that the trial court committed reversible error by failing to disqualify all prospective jurors "who, at one point in time, had decided that the Defendant was guilty of the charge for which he was being tried." (*Id.* at 42.)

The Court cannot find that the differences between the arguments presented in this proceeding and those presented on direct appeal with respect to these issues lead to the conclusion that appellate counsel rendered ineffective assistance. The arguments are in many respects similar. The petitioner has not shown that appellate counsel's arguments are so weak in comparison that they would satisfy *Strickland*'s first prong. Neither has the petitioner shown that any alleged deficient performance prejudiced the petitioner. Indeed he cannot make such a showing, because the Court has found the substance of this habeas claim to be meritless, as is explained in section III.C.4. herein below. The petitioner could not be prejudiced by appellate counsel's failure to raise meritless claims. Nor could appellate counsel's failure to raise meritless claims be characterized as deficient

performance. This claim must therefore fail.

### (3) Failure to Raise Issues Related to the Denial of the Motion for Individual Voir Dire

The petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise issues regarding the trial court's denial of his Motion for Individual Voir Dire. It appears that appellate counsel did not raise any claims with respect to the denial of the Motion for Individual Voir Dire, but this omission does not constitute ineffective assistance of counsel.

An ineffective assistance claim based upon such an omission would not meet the first prong of *Strickland*. Although the Eleventh Circuit has stated that individual voir dire is the "preferred method" in highly publicized cases, but not necessarily required, *see Cummings v. Dugger*, 862 F.2d 1504, 1507-08 (11th Cir.), *cert. denied*, 490 U.S. 1111, 109 S. Ct. 3169, 104 L. Ed. 2d 1031 (1989), the Eleventh Circuit also has stated that appellate counsel "is, of course, permitted to winnow out weaker arguments from his appellate brief." *Julius v. Johnson*, 840 F.2d 1533, 1543-44 (11th Cir. 1988). Appellate counsel in this case stated during the Rule 20 hearing that they attempted to select the strongest issues for appeal. (Tab R-45 at 193-94.) There may have been some basis to argue that the trial court should have granted the motion for individual voir dire, but the appellate counsel's choice not to pursue a weaker argument does not meet the first prong of *Strickland*. Appellate counsel made an informed decision to raise certain stronger arguments and discard weaker arguments. The denial of the motion for individual voir dire does not appear to be a stronger issue than those the petitioner raised on appeal. (*See* Tab R-28 at 4-6.)

Moreover, the petitioner has not met the second prong of *Strickland* with respect to this claim. He has not shown that there is a reasonable likelihood, but for appellate counsel's failure to raise the individual voir dire issue, that the result of the proceeding would have been different. This claim therefore fails.

### (4) Failure to Raise Issues Related to the Denial of the Motion for Continuance in the Face of Allegedly Withheld Evidence

The petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise issues regarding the trial court's denial of his motion for continuance in the face of evidence allegedly withheld by the prosecution. The petitioner does not specifically describe counsel's failure, but states that counsel "failed to adequately raise on appeal many of the issues contained in this proceeding including, but not limited to, the trial court's denial of the . . . Motion[ ] for Continuance at the time of the defense discovery of withheld evidence." (Doc. 9 ¶ 84.) The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it fails to satisfy *Strickland*.

On direct appeal, the petitioner generally complained that the court prejudiced his case by failing to continue trial in spite of a last-minute surrender of certain exculpatory evidence by the prosecution, which the petitioner had no time to investigate. (Tab R-28 at 35-37.) In the instant petition, the petitioner complains that the prosecutor withheld allegedly exculpatory evidence, particularly the statements of Donna Yates Ogle, Rachel Parks, and Willard Yates until just before trial and that the court refused to allow him

54

enough time to investigate this evidence.  (Doc. 9 ¶¶ 134-39.)  The petitioner argues that, given the lack of substantive evidence pointing to his guilt, other than his allegedly inadmissible confessions, this evidence would have supported his story that Underwood committed the crimes.  (*Id.* ¶¶ 139-40, 143.)  Furthermore, the petitioner argues that this evidence would have "impeached the State's theory that a robbery took place." (*Id.* ¶ 144.) As the Court states in sections III.C.1.c.x., III.C.1.d. and III.C.2., these claims are meritless. The petitioner was not prejudiced by the failure of appellate counsel to properly assert or argue meritless claims.   Nor could any such failure be characterized as deficient performance on the part of appellate counsel.  The petitioner thus meets neither prong of *Strickland* with respect to this ineffective assistance claim.   The claim therefore fails.

### (5) Failure to Raise Issues Related to the Denial of the Motion for Continuance of the Penalty Phase

The petitioner claims that his appellate counsel rendered ineffective assistance by failing to raise issues regarding the trial court's denial of his motion for continuance at the penalty phase.  The petitioner does not specifically describe counsel's failure, but states that counsel "failed to adequately raise on appeal . . . the trial court's denial of the . . . Motion[ ] for Continuance at the time of the defense discovery of withheld evidence." (Doc. 9 ¶ 84.)   The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it fails to satisfy *Strickland*.

On direct appeal, the petitioner argued that the trial court committed reversible error

by failing to grant his request to continue sentencing until the Monday following his Saturday conviction.  The petitioner argued that he needed this time to procure his witnesses and get them to the courthouse.

In this proceeding, the petitioner argues that the trial court improperly delegated its scheduling duties to the jury when it asked them if they wanted to continue with sentencing just after they had rendered a verdict. (Doc. 9 ¶ 186.)  The petitioner implies that the court pressured the jury to proceed by telling them they would have to return the following Monday for sentencing, knowing that they were sequestered until the end of trial.  (*Id.*)  The petitioner complains that the trial court improperly denied his request for a continuance, which he made in order to prevent the jury from rushing through their duties and to allow him to further prepare for the penalty phase.  (*Id.* ¶¶ 187-88.)  He complains that this denial prevented him from preparing and presenting the testimony of a number of witnesses who knew him and could testify as to his character.  (*Id.* ¶ 189.)  As the Court states in section III.C.14., these claims are meritless.  The petitioner was not prejudiced by the failure of appellate counsel to properly assert or argue meritless claims.  Nor could any such failure be characterized as deficient performance on the part of appellate counsel.  The petitioner thus meets neither prong of *Strickland* with respect to this ineffective assistance claim.  The claim therefore fails.

### (6) Failure to Raise Issues Related to the Alleged *Batson* Error During Jury Selection

The petitioner claims that appellate counsel "failed to adequately object" to the *Batson* error that allegedly occurred during jury selection. (Doc. 9 ¶ 84.) The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it fails to satisfy *Strickland*.

On direct appeal, counsel for petitioner did not raise *Batson* issues. In this proceeding, the petitioner does assert a *Batson* claim, but it is meritless, as the Court explains in section III.C.7. The petitioner was not prejudiced by the failure of appellate counsel to properly assert or argue meritless claims. Nor could any such failure be characterized as deficient performance on the part of appellate counsel. The petitioner thus meets neither prong of *Strickland* with respect to this ineffective assistance claim. The claim therefore fails.

### (7) Failure to Raise Issues Related to the Introduction of Allegedly Inflammatory Photographs

The petitioner claims that appellate counsel "failed to adequately object" to the introduction of inflammatory photographs that allegedly occurred during trial. (Doc. 9 ¶ 84.) The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it fails to satisfy *Strickland*.

57

On direct appeal, counsel for petitioner did not assert a claim regarding the introduction of inflammatory photographs. In this proceeding, the petitioner does assert such a claim, but it is meritless, as the Court explains in section III.C.12. The petitioner was not prejudiced by the failure of appellate counsel to properly assert or argue meritless claims. Nor could any such failure be characterized as deficient performance on the part of appellate counsel. The petitioner thus meets neither prong of *Strickland* with respect to this ineffective assistance claim. The claim therefore fails.

### (8) Failure to Raise Issues Related to the Allegedly Inappropriate Behavior and Statements of Prosecution During Trial

The petitioner claims that appellate counsel "failed to adequately object" to the allegedly inappropriate behavior and statements of the prosecution that occurred or were made during trial. (Doc. 9 ¶ 84.) The petitioner apparently argues that appellate counsel should have asserted these issues as they are asserted in this petition. Assuming that such an allegation is sufficient to state an ineffective assistance claim against appellate counsel, the claim would fail because it fails to satisfy *Strickland*.

On direct appeal, counsel for petitioner did not assert a claim regarding the allegedly inappropriate behavior and statements of the prosecution that occurred or were made during trial. In this proceeding, the petitioner does assert such a claim, but it is meritless, as the Court explains in section III.C.9. The petitioner was not prejudiced by the failure of appellate counsel to properly assert or argue meritless claims. Nor could any such failure be characterized as deficient performance on the part of appellate counsel. The petitioner thus meets neither prong of *Strickland* with respect to this ineffective assistance claim.

The claim therefore fails.

### (9) Failure to Consult or Communicate with Petitioner During Preparation of his Appeal

The petitioner claims that appellate counsel rendered ineffective assistance of counsel by failing to communicate or consult with him in preparation for his appeal. (Doc. 9 ¶ 83.) The petitioner does not elaborate on why the alleged failure to communicate or consult with him constitutes deficient performance on the part of appellate counsel, or how he was prejudiced by said failure. He offers no explanation of how he could have assisted in the preparation of his appeal. *See, e.g., McBride v. Sharpe*, 25 F.3d 962, 973 (11th Cir.), *cert. denied*, 513 U.S. 990, 115 S. Ct. 489, 130 L. Ed. 2d 401 (1994). So stated, this claim does not sufficiently allege that appellate counsel rendered ineffective assistance under *Strickland*.

### (10) Ineffective Assistance due to the Failure to Raise Issues Involving the Testimony of Parks, Ogle and Yates

In his "Reply Brief of Petitioner to Respondent's Memorandum Brief in Support of Answer," the petitioner states as follows:

On direct appeal the Court did not consider the issues presented here involving the testimony of Parks, Ogle and Yates and thus no determination was made concerning its exculpatory nature. *See Fortenberry v. State*, 545 So. 2d 129, 138-42 (Ala. Crim. App 1988) (Tab R-30). The circumstances involving Parks, Ogles and Yates were never raised by trial counsel either at trial or on appeal. *See id.* Clearly, this issue should have been raised, and arguably would have been grounds for the granting of a new trial. *See, e.g., Brady v. Maryland*, 373 U.S. 83 (1963). It would not have been "shotgunning" to include these witnesses in the appeal as this argument represents a solid basis for appellate relief. Thus, it cannot appropriately be said that trial counsel's failure to raise the issue of Parks, Ogle and Yates was merely strategic. The only plausible explanation is that trial counsel, having failed to conduct the appropriate investigation, also neglected to raise any companion issues on appeal.

(Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 36.)

In this passage, the petitioner refers to the Rule 20 hearing testimony of three witnesses: Rachel Parks, Donna Yates Ogle and Willard J. Yates. On the night of the murders, Parks and Ogle, who are sisters, were on their way to see their father, Willard Yates, who lived a short distance from the murder scene. They apparently were among the first people to happen upon the murder scene. The petitioner claims that the testimony of these witnesses is strongly exculpatory and corroborates his testimony.

The petitioner is evidently asserting an ineffective assistance claim based upon counsel's alleged failure to discover and present both at trial and on direct appeal the testimony of Parks, Ogle and Yates. The petitioner argues that this testimony would have caused the trial or appellate court to grant him a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), because the existence of these witnesses was allegedly withheld from the defense until just before trial and because the trial court denied the petitioner's motion for a continuance so as to interview them.[21]

Since the petitioner's trial counsel were informed of these witnesses just before trial, and since the petitioner has also alleged that the trial court's refusal to grant a continuance

_____

[21]Although most *Brady* claims involve "'the discovery, after trial of information which had been known to the prosecution but unknown to the defense,'" *United States v. Kubiak*, 704 F.2d 1545, 1549 (11th Cir.) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976)), *cert. denied*, 464 U.S. 882, 104 S. Ct. 163, 78 L. Ed. 2d 149 (1983), they may involve the disclosure of information that occurred so late or so close to trial that it is of no use to the defense. *See United States v. Knight*, 867 F.2d 1285, 1289 (11th Cir.), *cert. denied*, 493 U.S. 846, 110 S. Ct. 139, 107 L. Ed. 2d 98 (1989). The *Kubiak* court stated that, in order to show prejudice, the defense must show that "the disclosure came so late that it could not be effectively used." *Knight*, 867 F.2d at 1289. In this instance, since the petitioner's trial counsel testified during the Rule 20 hearing that they received information relating to these witnesses (or at least two of them) just before trial and that counsel was unable to contact the witnesses, the Court will assume for the purposes of this analysis that the disclosure came too late for counsel to effectively use the information.

of trial deprived counsel of the opportunity to investigate these witnesses, the Court would find it difficult to conclude that trial counsel performed deficiently under *Strickland* by failing to present these witnesses at trial.[22] Any claim based upon such a failure would therefore fail. The question thus is whether counsel performed deficiently in the interim between trial and the direct appeal in failing to discover these witnesses and make post-trial or appellate arguments based upon their information.

Even if the Court were to assume that counsel's performance was deficient under *Strickland* for failing to discover and present this testimony during post-trial motions or on direct appeal, this claim would still fail the second prong of *Strickland* because it is unlikely that the presentation of information held by Parks, Ogle, and Yates would have changed the result of any of the proceedings.

Parks testified that she was riding down Sand Mountain with her sister on the night of the murders and, when they were about two-tenths of a mile from the murder scene, she saw a blue truck with scenery painted on the back coming up the mountain at a high rate of speed. (Rule 20 Tr. at 279-80.) She testified there was more than one person in the truck, although she was unsure of the number, and the occupants were male. She testified that she and her sister drove slowly past the murder scene as they were turning to go to their parent's home. (*Id.* at 281.) There she saw Mike Guest trying to get up from the

---

[22]In his Rule 20 testimony, one of the petitioner's trial and appellate counsel testified that the defense had gotten the names of Parks and Yates from the prosecution only two or three days before trial started, and that counsel were unable to contact them before or during trial. (Rule 20 Tr. at 267-71.) He was not sure about whether he had gotten Ogle's name from the prosecution. (*Id.* at 267.) The Monday that trial began, the trial court denied counsel's motion to continue, which was filed to seek more time to contact the witnesses just disclosed to the defense. (*Id.* at 270.)

ground, Bobby Payne lying on the ground and Alvis Guest running out of the service station with his hands over his face. (*Id.* at 281-82.) She also saw a silver truck moving slowly in front of the service station with its headlights on and dust visible in front of the headlights. (*Id.* at 281.) She and her sister continued to their father's house nearby, and he went to the scene. (*Id.* at 282-83.) Parks testified that they returned to the murder scene to see if they could help and that the ambulance came about twenty minutes later, followed shortly thereafter by police. (*Id.* at 284-86.) She testified that the police interviewed her, but she was never interviewed by defense counsel or called to testify at trial. (*Id.* at 286.)

Ogle testified she was coming down the mountain with her sister, Rachel Parks, when they came upon the murder scene. (*Id.* at 295.) Several seconds earlier, she had noticed a truck going up the mountain "real fast," but did not notice the color of the truck. (*Id.* at 295, 297.) At the scene, she saw two bodies lying on the ground and Tracy Henry Wood running down the hill from the Guest's house to the service station. (*Id.* at 296.) She testified that she and Parks continued on to their father's home to get their father and brother, who went to the murder scene. (*Id.*) She and Parks also returned to the murder scene, where, at her father's request, she went behind the service station to sit with Nancy Payne as she died. (*Id.* at 296-97.) She also testified that the police interviewed her, but that she was never interviewed by defense counsel or called to testify. (*Id.* at 298.)

Yates testified that, on the night of the murders, his daughters came to his house saying that there were people laying down at the Guest Service Station as if there had been a fight. (*Id.* at 303-04.) He went to the service station and saw Bobby Payne's body and Alvis

Guest, with Mike Guest's head in his lap. Yates testified that, at Alvis Guest's request, he had his son contact the authorities from his car radio. (*Id*. at 304.) Yates stated he went inside the service station with Alvis Guest, where he observed W.T. Nelson's body. (*Id*. at 305.) Yates testified that "Mr. Guest [then] said, 'Yates,' said, 'don't look like no robbery,' said, 'see, he has still got the money in his pocket, in his shirt there." (*Id*.) Yates testified that he could see a wad of money two and a half to three inches thick in Nelson's pocket, and that there was money in the cash drawer when Alvis Guest opened it, but Yates stated he did not learn what or if any amount was ever determined to be missing. (*Id*. at 305-06, 312, 316.) Guest then told him that there was a woman outside as well, so Yates found Nancy Payne outside, who was still alive and trying to speak, but could not. (*Id*. at 306.) By that time, Yates' daughter had arrived and he sent her to sit with Nancy Payne until she died. (*Id*.) Yates testified that the police interviewed him several times, but he was never interviewed by defense counsel. (*Id*. at 306-07.) He further testified that, before his daughters arrived that night, he heard through his open window several shots in a row and then the sound of a truck or pickup truck quickly driving away with something that sounded like a 60 gallon barrel in the back. (*Id*. at 307-08, 313-14.)

It is unlikely that this testimony would have changed the result of the petitioner's post-trial proceedings or his direct appeal. Even assuming that counsel had used this testimony during post-trial or appellate proceedings to argue that the petitioner was entitled to *Brady* relief, it is unlikely the result of the proceedings would have been any different, because he would not have been able to show that his rights under *Brady* had been violated. To

have made such a showing, the petitioner would have had to demonstrate

> (1) that the Government possessed evidence favorable to the defendant (including impeachment evidence) . . . ; (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence . . . ; (3) that the prosecution suppressed the favorable evidence . . . ; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different . . . .

*United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989) (citations omitted). For *Brady* purposes, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Stewart*, 820 F.2d 370, 374 (11th Cir. 1987) (citation and internal quotation marks omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

*Wright v. Hopper*, 169 F.3d 695, 701 (11th Cir.), *cert. denied*, *Wright v. Haley*,

— U.S. —, 120 S. Ct. 336, 145 L. Ed. 2d 262 (1999).[23]

The petitioner would have likely met the first *Meros* factor, since the prosecution did

have evidence from Parks, Yates, and Ogle that it did not disclose to the defense until just

a few days before trial.   Even assuming that the petitioner could have met the second

*Meros* factor, by showing that he could not have obtained that evidence with any

reasonable diligence and the third *Meros* factor, by showing that the evidence was at least

potentially favorable, the petitioner still would not have been entitled to *Brady* relief

because he could not have shown the existence of a reasonable probability that the

---

[23]The Supreme Court also has stated that "[a]s we made clear in *Kyles*, the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. [Citation omitted]. Rather, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler v. Greene*, 527 U.S. 263, 290, 119 S. Ct. 1936, 1952, 144 L. Ed. 2d 286 (1999)(citing *Kyles v. Whitley*, 514 U.S. 419, 434-35, 115 S. Ct. 1555, 1565-66, 131 L. Ed. 2d 490 (1995)).

outcome of the proceedings would have been different if the evidence had been disclosed to defense counsel.

The petitioner particularly argues that his *Brady* rights were violated with respect to certain testimony of Parks, Ogle, and Yates. Parks testified that she saw a blue truck containing more than one male quickly leaving the general area of the crime scene; it was coming up the mountain north on Highway 431, in the opposite direction from her vehicle, which was approximately two-tenths of a mile from the Guest Service Station. She said there was scenery painted on the back of the truck. Ogle, who was riding in the same vehicle, also noticed a truck going at a high rate of speed down the road in the opposite direction, but did not notice its color or occupants. The petitioner argues that this comports with his final story of the events, which he told at trial--that he was not in his brother's green and white truck alone, but rather in another truck with Underwood, who committed the murders, and that they pulled out of the station, sped away north on 431, turned around, and drove south on 431.

Parks' testimony could have impacted the petitioner's case if the jurors had believed that the truck she described was the truck that Alvis Guest saw driving away from the station as he ran down to the murder scene. This is a significant assumption, however. Neither Parks nor Ogle saw the truck leave the service station parking lot, so it is possible that they had already passed the murderer's truck or that the murderer's truck had already turned around and headed back south on 431 before Parks and Ogle ever passed the blue truck going north. The Court also notes that one aspect of Parks' description of the truck

suggests that they saw a different truck than that driven by the murderer: Parks testified that the back of the blue truck she saw was painted with scenery. (Rule 20 Tr. at 280.) Yet Alvis Guest, who saw the murderer's truck driving away north on 431, told the jury that the tailgate was either down or off. (R. 995.)

The information related by Parks and Ogle is cumulative of, and significantly less probative than evidence that was actually presented at trial. The petitioner's final story of the crime was far better supported by the trial testimony of his brother and two of the brother's friends. They stated that, at the time of the murders, they were all away at a fish camp in the same green truck that the prosecution argues was used by the petitioner in committing the murders. (R. 1442-46, 1451-54, 1458-61.) One of the friends who testified at trial actually recounted the trip to the fish camp in a diary entry, which included a reference to the truck having a camper on it, unlike the truck spotted by witnesses. (R. 1460-61.) That entry was offered at trial. (R. 3012.) The petitioner's story was also better supported by the trial testimony of Tracy Henry Wood, which indicates that she saw not only a blue truck, but someone of a similar description to Underwood at the service station just before the shootings, and that Mike Guest said "they" were giving W.T. Nelson a hard time. (R. 970.) The jury heard all of this more probative evidence and it failed to convince them that the petitioner was telling the truth.

It is thus highly unlikely that the jury's decision would have been changed by the testimony of another witness who said that, as she was driving the opposite direction, she saw a blue pickup with more than one male occupant going north on Highway 431 shortly

66

after the shootings–such evidence has less impact than the more probative evidence presented at trial. In other words, if the testimony presented at trial failed to create a reasonable doubt in the jurors' minds, then it is unlikely that the additional testimony of Parks and Ogle would have done so, either. It is thus unlikely that the state courts would have granted *Brady* relief to the petitioner on post-trial motions or direct appeal, since the testimony of Parks and Ogle would not have changed the outcome of the trial. Thus the Court could not find, but for the failure of counsel to find and use this evidence on post-trial motions or direct appeal, that the outcome of the proceeding would have been different. This claim therefore fails the second prong of *Strickland*.

It is similarly unlikely that the petitioner would have won *Brady* relief on post-trial motions or direct appeal based upon Yates' testimony. Yates testified that, just after the murders, Alvis Guest said he did not think there was a robbery involved and that the service station's money still appeared to be on the premises, both in the pocket of W.T. Nelson and in the cash drawer. The record reflects that, if this evidence had been admitted, it would not have changed the result of the petitioner's direct appeal. Yates acknowledged that he did not know whether any money was ultimately determined to be missing or in what amounts. He merely recounted certain of Alvis Guest's statements at the murder scene, which were made at a time when he was greatly distressed by the murder of his son and when he had not had time to evaluate the facts and circumstances. Guest testified at trial that, after reviewing the service station receipts, he determined that about $383 was missing. (R. at 1001-02.) Nothing in Yates' testimony shows Guest's statements

to have been inaccurate or untrue in this regard. Thus, Yates' testimony would not have created a reasonable doubt in the jurors' minds, and would not have resulted in *Brady* relief during any of the state proceedings. As it is highly unlikely that Yates' testimony would have affected the outcome of the petitioner's state court proceedings, the claim that appellate counsel rendered ineffective assistance by failing to discover and present his testimony would not meet *Strickland*'s second prong.

The petitioner's ineffective assistance claims based upon counsel's failure to discover and present the testimony of Parks, Ogle, and Yates and to assert a *Brady* claim in connection therewith, whether during post-trial motions or on direct appeal, must fail because the petitioner cannot satisfy *Strickland* with respect to such claims.

### d. Ineffective Assistance Due to Prosecutorial Misconduct

The petitioner complains that the ineffective assistance of counsel that he received was exacerbated by prosecutorial misconduct. The petitioner argues that his counsel failed to find potential exculpatory witnesses Parks, Ogle, and Yates because prosecutors withheld evidence from the defense. (Doc. 9 ¶ 85-90.) He complains that prosecutors withheld certain evidence until just before trial, including the names and statements of witnesses who provided exculpatory evidence corroborating his defense. (*Id.* ¶¶ 88-89.) In section III.C.1.c(10) above, the Court addressed the potential effect of the allegedly exculpatory evidence on the outcome of trial and found that, even if counsel had discovered and presented the testimony of Parks, Yates, and Ogle at trial or on direct appeal, that this would not have changed the result of any of the proceedings. As the Court has found

above that introduction of the allegedly exculpatory evidence at issue would have had no effect on the result of the trial or direct appeal, it is plain that, insofar as any alleged prosecutorial misconduct prevented the petitioner from presenting such evidence, the misconduct would have been harmless and would therefore not support an award of habeas relief.

The petitioner further argues that the court's failure to grant his counsel a continuance of the trial caused him to receive ineffective assistance because trial counsel did not have an adequate opportunity to investigate exculpatory materials prosecutors provided to the defense just before trial. (*Id.* ¶¶ 90-95.) As is set forth above, any such failure to continue would have been harmless, since this Court has found that the presentation of the allegedly exculpatory materials would not have affected the outcome of the trial.[24]   The court's failure to grant a continuance of the trial to allow defense counsel adequate opportunity to investigate the exculpatory materials, and to thereby discover the allegedly exculpatory testimony, would therefore not support an award of habeas relief.

The petitioner also argues that it is likely that the jury would have found him not guilty or would have declined to recommend a death sentence if it had heard the exculpatory evidence. (*Id.* ¶ 96.) As is stated above, the Court has found to the contrary.

### e. Ineffective Assistance at the Suppression Hearing

---

[24]"The principle of *Mooney v. Holohan* [294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935)] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87 (1963).

The petitioner claims that trial counsel failed to prepare him to testify at the suppression hearing. (Doc. 9 ¶ 97.) He complains that it was crucial for his second statement to be excluded, because it was the only evidence, other than a gun with no grips or fingerprints, linking him to the crime. ( *Id.* ¶ 98, 114.) He complains that counsel failed to call him to testify at the suppression hearing or to present a defense strategy, in spite of facts indicating the existence of grounds to challenge the legality of the petitioner's arrest and statements. (*Id.* ¶¶ 97, 99-109.) This omission, he argues, rendered it necessary for him to testify at trial about the legality of his statements and arrest, depriving him of the constitutional right not to testify at trial. (*Id.* ¶ 97, 114.) The petitioner also complains that trial counsel spent little time preparing for the suppression hearing and that his Fourth Amendment claims were not adequately litigated below, as is required by *Stone v. Powell*, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). (*Id.* ¶ 110-15.)

The Court's discussion in sections C.10-11 below demonstrates that the petitioner's challenge to the legality of his statements and the manner in which they were obtained is meritless. Without a meritorious Fourth Amendment claim showing the illegality and inadmissibility of the statements, the petitioner cannot win this ineffective assistance claim. *See Kimmelman v Morrison*, 477 U.S. 365, 382, 106 S. Ct. 2574, 2586, 91 L. Ed. 2d 305 (1986). Without such a meritorious Fourth Amendment claim, the petitioner would not have been prejudiced by any deficient performance by counsel in asserting or arguing the motion to suppress. Thus, the petitioner could not meet the second prong of *Strickland*. This claim must therefore fail.

The petitioner argues, in essence, that his counsel rendered ineffective assistance by failing to offer his testimony at the suppression hearing, which made it necessary for him to testify at trial and face cross-examination. (Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 41.) This argument is not well-taken. As is explained in sections III.C.10.-11. below, the motion to suppress would not have been granted even if the petitioner had testified at the hearing on that motion. This would have left the petitioner in the same position at trial whether or not he had testified at the hearing on his motion to suppress. He still would have "been forced to take the stand at trial to explain his side" of how his statements were obtained. (*Id.* at 42-43.) As the petitioner has not satisfied the second prong of *Strickland*, this claim must fail.

### f. Ineffective Assistance in Seeking Change of Venue

The petitioner complains that trial counsel spent little time preparing for the hearing on the motion to change venue, although there was enormous local pre-trial publicity surrounding the case. (Doc. 9 ¶¶ 116-17.) He complains that counsel's fee declaration sheets show that they spent little time researching and preparing the motion for change of venue, or researching and preparing for the hearing on that motion. (*Id.* ¶¶ 118-19, 121.) He also complains that trial counsel again failed to argue for a change of venue after nearly everyone on the venire indicated during voir dire that they knew about the crime and about the petitioner's alleged involvement. (*Id.* ¶ 120.)

This claim is meritless. Trial counsel introduced a profusion of evidence in support of the motion for change of venue. They called witnesses representing  numerous media

71

outlets with an audience in Etowah County and submitted records, transcripts, and videotapes regarding what those outlets reported on the murders, as well as statistics regarding the size of their audience or readership in Etowah County. (R. 164-269, 1990-2908.) It appears that counsel went to great lengths to demonstrate the level of the community's exposure to publicity about the murders at the Guest Service Station, as well as the tenor and content of that publicity. The trial court simply disagreed with trial counsel that the evidence warranted a change of venue and denied the motion.

The petitioner has not made the showings required by *Strickland* with respect to this claim, opting instead to make vague and conclusory allegations that counsel failed to adequately prepare and research before the hearing. In his reply brief, the petitioner cites two Eleventh Circuit cases vacating convictions on venue grounds, *Isaacs v. Kemp*, 778 F.2d 1482 (11th Cir. 1985), *cert. denied,* 476 U.S. 1164, 106 S. Ct. 2289, 90 L. Ed. 2d 730 (1986); *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985), *cert. denied*, 476 U.S. 1164, 106 S. Ct. 2289, 90 L. Ed. 2d 730 (1986). He argues that "[i]n light of those cases, and potentially due to their failure to properly research the relevant cases, trial counsel failed to establish that as a result of the inordinate pre-trial publicity, Mr. Fortenberry could not obtain a fair and impartial jury." (Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 43.) The petitioner cites no other "relevant cases" besides *Isaacs* and *Coleman*, and does not state how those cases show that his trial counsel performed deficiently. After examining *Isaacs* and *Coleman*, this Court is unable to independently decide how they demonstrate that the petitioner meets either or both prongs of *Strickland* with respect to this claim. Trial counsel

referred to one of those cases and raised the venue issues discussed therein during argument on the motion for change of venue. (R. 280-81.) The court's comments indicate that it was also familiar with the case. (R. 284.) Nothing raised by the petitioner shows that counsel rendered deficient performance or that further preparation or work on trial counsel's part would have changed the result of the hearing. Likewise, the petitioner has failed to show that he was prejudiced by counsel's performance with respect to the motion for change of venue, so he satisfies neither prong of *Strickland*. This claim must therefore fail.

The petitioner's complaint that trial counsel rendered ineffective assistance because they did not reassert the motion for change of venue at the close of voir dire is likewise meritless. Trial counsel clearly did reassert the motion for change of venue after voir dire, and argued it aggressively. (R. 921-931.) There is nothing to indicate that counsel's argument after voir dire would give rise to any habeas relief for the petitioner under *Strickland*.

### g. Ineffective Assistance in Selecting a Jury

The petitioner complains that trial counsel failed to adequately examine the jurors so as to identify the jurors who would, based upon a capital conviction, automatically sentence him to death, or so as to identify those jurors who were biased or due to be stricken "for cause for other reasons." (Doc. 9 ¶ 122.) The complaint that trial counsel failed to examine potential jurors so as to discern who would be biased against him in the guilt/innocence phase is belied by the fact that trial counsel extensively examined potential jurors (R. 360-723, 736-918), and by the fact that counsel's examination led to six challenges for cause of

73

individuals who had a fixed opinion of guilt based upon pretrial publicity. *Fortenberry*, 545 So. 2d at 140. There is nothing to indicate that counsel's performance in this regard was deficient. There is also nothing to indicate that the result of the proceeding would have been different if counsel had handled the jury selection process any differently. Since the petitioner satisfies neither prong of *Strickland*, this claim must fail.

Petitioner's complaint that trial counsel failed to examine potential jurors so as to discern who would automatically sentence him to death is meritless. Under *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), defendants do have the right to inquire whether potential jurors would automatically impose the death penalty upon conviction and to challenge for cause those that would. In this case, trial counsel extensively questioned potential jurors about their beliefs regarding the death penalty, its applicability in this case, and when mitigation might prevent its imposition. (*See, e.g.*, R. 431-440, 522-33, 541-43, 605-24, 699-709.) Even if such a thorough inquiry were deemed not to satisfy *Morgan*, the petitioner cites no authority for the proposition that defense counsel is, in all cases, obliged to make such an inquiry or that the failure to do so is per se ineffective assistance. In addition, the Court notes that *Morgan* was not announced until after petitioner's conviction became final, so counsel should not be held ineffective for failing to make some objection or raise some argument *later* recognized by the Supreme Court. The Sixth Amendment requires only competent counsel, familiar with the law as it then exists, not clairvoyant counsel. That some attorneys may anticipate a claim or defense later recognized by the Supreme Court does not mean that those who fail to do so are ineffective. Thus, the

petitioner has not shown that counsel's performance was deficient so as to satisfy the first prong of *Strickland*. The petitioner also fails to meet the second prong of *Strickland* because he has not identified potential jurors who should have been excluded.[25] This claim must fail.

The petitioner next complains that trial counsel failed to adequately preserve the record of voir dire proceedings when they failed to address each potential juror by name during those proceedings, "making it impossible to assure the propriety and fairness of the jury selection process." (*Id.* ¶ 123.) This complaint is too vague and generalized to effectively raise issues under *Strickland*. For example, the petitioner fails to cite particular instances in which counsel failed to address potential jurors by name, or how any such failure impacted his chances of successfully challenging his conviction or sentence. By failing to specifically allege the instances of deficient performance or how that performance

---

[25]In *U.S. v. Chandler*, 950 F. Supp. 1545 (N.D. Ala. 1996), *affirmed by* 218 F.3d 1305 (11th Cir. 2000), the court required a petitioner to show he was prejudiced by his trial counsel's allegedly deficient *Morgan* inquiry. The petitioner in that case claimed that his trial counsel rendered ineffective assistance by failing "to conduct the kind of searching voir dire inquiry necessary to discover jurors" that would be "disqualified from service under *Morgan*." *Chandler*, 950 F. Supp. at 1557. The habeas court rejected this contention not only because the trial court had questioned individual potential jurors as to their feelings about the death penalty and their ability to vote for or against the death penalty based upon the evidence, but also because the petitioner had alleged no facts entitling him to relief. *Id.* The court stated as follows:

> Although Chandler's § 2255 motion states that "[i]t is the belief of the defense" that some members of Chandler's jury should have been discovered and excluded under *Morgan*, Chandler pleads no specific facts on this point. Chandler's claim that there were pro-death penalty jurors in this case that were unable to follow the weighing instructions required by § 848(k) is founded on sheer speculation.

*Id.* The *Chandler* court thus rejected the ineffective assistance claim in part because the petitioner presented no evidence that there were jury members that should have been excluded under *Morgan*. Similarly, the petitioner in this case has failed to offer specific facts showing that his jury included people who could have been excluded under *Morgan*, or that the exclusion of any particular juror would have resulted in a sentence other than the death penalty.

specifically prejudiced him, the petitioner has failed to meet either prong of *Strickland* with respect to this claim.

The petitioner further complains that, given the pretrial publicity regarding the case, trial counsel "failed to request individual voir dire adequately," which, he argues, resulted "in a process whereby each venire person was tainted by the comments of the other venire persons including those venire persons who were stricken for cause." (*Id.* ¶ 124.)   This complaint does not state a claim under *Strickland*.   The petitioner does not show how counsel performed deficiently in requesting individual voir dire.   The request, as it is set forth in the record, appears to be wholly adequate. (R. 354.)   The petitioner has not alleged that he had any right to individual voir dire, and this Court has been unable to discern that he had such a right. (*See* Resp't's Mem. Br. in Supp. of Answer at 20; Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 44.)   Nor has the petitioner shown that there is a reasonable likelihood, but for counsel's failure to "adequately" request individual voir dire, that the result of the proceeding would have been different.[26]   The petitioner fails to meet either prong of *Strickland* with respect to this claim.   The claim therefore fails.

---

[26]In *Waldrop*, 857 F. Supp. at 909, the court stated as follows:

> [p]etitioner has made no showing that there is a reasonable probability that the outcome of his trial or sentencing procedure would have been different if his attorney had insisted upon an individualized voir dire of prospective jurors. Despite raising this claim in his coram nobis petition, no evidence was offered during that hearing to establish that any juror was affected by the en masse voir dire of the entire venire. Absent some showing that there is a reasonable probability that the outcome of the proceeding would have been different had such an individualized voir dire occurred, it cannot be said that counsel's failure to request such a voir dire resulted in prejudice to the defense.

*Waldrop*, 857 F. Supp. at 909 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

The petitioner further argues that trial counsel "failed to object adequately to the Prosecution's improper examination of prospective jurors and the Prosecution's improper and racially biased exercise of peremptory challenges." (*Id.* ¶ 125.) As is set forth in section III.C.7. below, there is no evidence that the prosecution exercised its peremptory challenges in an improper and racially biased manner. The Court also notes that the petitioner does not allege what sort of "improper examination" by the prosecution should have been the subject of an objection by trial counsel. The petitioner has thus failed to meet the first prong of *Strickland* by showing that trial counsel performed deficiently. The petitioner also fails to meet the second prong of *Strickland* because he does not show that the result of the proceeding would have been different had trial counsel made any different objections to the prosecution's examination of prospective jurors or to the manner in which the prosecution exercised its peremptory challenges. This claim must therefore fail.

### h. Ineffective Assistance Generally

The petitioner asserts a variety of unconnected ineffective assistance claims in this subsection.[27] He first complains that trial counsel rendered ineffective assistance by failing

---

[27]In his Reply Brief of Petitioner to Respondent's Memorandum Brief in Support of Answer, the petitioner mentions an instance of alleged ineffective assistance that is not set forth in the petition–that counsel failed to adequately object to the prosecution's "denigration" of the sole mitigation witness offered by the defense. (Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 45). The petitioner does not specify what "denigration" occurred, and the Court has been unable to ascertain any such "denigration" from the transcript of the penalty phase of trial. This allegation does not adequately state an ineffective assistance claim under *Strickland*. In his reply brief, the petitioner also claims that the Rule 20 court erred in not considering all of trial counsel's alleged errors "in totality" under *House v. Balkcom*, 725 F.2d 608, 615 (11th Cir.), *cert. denied*, 469 U.S. 870, 105 S. Ct. 218, 83 L. Ed. 2d 148 (1984); *Nero v. Blackburn*, 597 F.2d 991, 995 (5th Cir. 1979). (*Id.* at 48.). Insofar as the petitioner is attempting to argue that the Court must consider all of his ineffective assistance claims together rather than individually, the Court notes that the authority he cites arguably does not even support such a contention. However, that even if all the instances of ineffective assistance alleged by the petitioner were considered together, he would still be due no habeas relief.

"to object effectively to the Prosecution's improper examination of prospective jurors and the Prosecution's improper and racially biased exercise of peremptory challenges." (Doc. 9 ¶ 126.)[28] He does not specify, however, what aspects of the prosecution's examination were improper and upon what basis counsel should have objected to it. Neither does he show that the result of the proceedings would have been different had his trial counsel done anything differently in this regard. Also, as is set forth in section III.C.7. below, there is no evidence showing that the prosecution's exercise of peremptory challenges was improper or racially biased. There is no proof that the result would have been different but for the petitioner's failure to object to the prosecution's exercise of peremptory challenges. The petitioner's allegations thus fail to adequately state a claim under *Strickland*. This claim must therefore fail.

The petitioner next complains that trial counsel rendered ineffective assistance by failing to rehabilitate him via redirect examination after "the Prosecution's misleading cross-examination," which allegedly left the jury with an "incorrect impression." (*Id.* ¶ 127.) The petitioner fails to state what "incorrect impression" the jury was given by the prosecution's "misleading cross-examination," how the prosecution's cross-examination was "misleading," or what defense counsel should have done to rehabilitate him or to correct the "incorrect impression." Neither is there any showing that the result of the proceeding would have been different but for the any error or omission counsel made in this regard. The

---

[28]See also the discussion contained in section III.C.1.g. herein.

petitioner's allegations thus fail to adequately state a claim under *Strickland*. This claim must therefore fail.

The petitioner further complains that trial counsel should have cited cases such as *Hance v. Zant*, 696 F.2d 940 (11th Cir.), *cert. denied*, 463 U.S. 1210 (1983), *overruled on other grounds*, *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), to support their objections to the admission of murder scene photographs. (*Id.* ¶ 128). The petitioner admits that counsel did object to the photographs on the basis that they were prejudicial and meant only to inflame the jury, but he faults their failure to cite cases such as *Hance* in support of their position. (*Id.*) The petitioner does not show how the failure to cite case law in support of such a common evidentiary objection constituted deficient performance or how it prejudiced him. It is highly unlikely that the citation of such a case would have changed the court's opinion about the admissibility of the photographs.[29] It is even more unlikely that the citation of such a case would have changed the result of the entire proceeding. The petitioner has not shown that counsel's failure to cite cases in this instance meets either prong of *Strickland*. This claim must therefore fail.

The petitioner also complains that trial counsel should have objected to certain "highly improper" closing arguments, including "the Prosecution's arguments of and comments on

---

[29]It is especially unlikely that the citation of *Hance* would have changed the court's opinion. In *Hance*, the prosecution introduced numerous photographs of the victim's mutilated and largely decomposed body, as well as fragments of her corpse, including "pieces of jawbone with the teeth attached, fragments of human skull no larger than a dime, individual teeth." The court found that the photographs and corpse fragments were inflammatory, but still found them to be admissible under state law because they depicted the crime scene and were relevant to the state's case. *Hance*, 696 F.2d at 950.

facts not in evidence," such as the comment that, if Underwood had done the crime, his fingerprints would have been on the grips of the murder weapon. (*Id.* ¶ 129, citing R. 1600-01.) The petitioner complains that this statement was improper, given that the murder weapon had no grips, and gave the jury the impression that Underwood's fingerprints would have been on the gun if he had been guilty. (*Id.*) The jury had already heard that the gun had no grips, however, and had actually seen the gun for themselves. (R. 1066, 1083.) The jury would therefore have known that the prosecutor's subsequent reference to the grips on the gun was therefore either erroneous or speculative.[30] Counsel's failure to object to that reference during closing argument does not rise to the level of deficient performance. Neither did it prejudice the petitioner because the petitioner has failed to show that, but for counsel's failure to object, that the result of the proceeding would have been different. As this claim satisfies neither prong of *Strickland*, it must fail.

The petitioner complains that counsel should have objected to the prosecution arguments that he killed the victims to eliminate eyewitnesses. (*Id.* ¶ 130.) There was little or no basis for such an objection, however. The argument was not improper or inflammatory, but was, rather, a legitimate theory regarding the murderer's motive that the prosecution derived from the evidence and properly presented to the jury. Defense counsel's failure to object to these arguments does not constitute deficient performance. Counsel properly responded to these arguments by showing how they were inconsistent

---

[30]The jury had also heard that James Jenkins, who had found the gun, had cleaned it before handing it over to police, making it highly unlikely that the killer's fingerprints would still be on it. (R. 1067-69.)

with the evidence that the petitioner fired his weapon out of panic and fright.  The petitioner has thus failed to show that counsel's failure to object constituted deficient performance under the first prong of *Strickland*.  Likewise, he has failed to meet the second prong of *Strickland* by showing that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different.  This claim must therefore fail.

The petitioner argues that counsel should have objected to the prosecution's statement that, if Underwood had done the crime, "You reckon he would let that thing [the petitioner] live?" (*Id.* ¶ 130, citing R. 1687.)  Calling the petitioner "that thing" was a gratuitously unflattering characterization by the prosecutor, but it was an isolated comment, and it was certainly not of such significance that would have made counsel's failure to object to it tantamount to deficient performance.[31]  Counsel was not remiss in failing to object to the substance of the comment because it represents a legitimate logical critique of the petitioner's story by the prosecution–if Underwood acted as the petitioner says he did, he arguably would have little compunction about eliminating the petitioner as an eyewitness to his wrongdoing.  Counsel did not perform deficiently in failing to object to the comment.  Also, the petitioner has failed to show that there is a reasonable probability that, but for counsel's failure to object to this comment, that the result of the proceeding would have

---

[31]"For a prosecutor's remarks to offend due process, the remarks must be improper and a reasonable probability must exist that, but for the offending remarks, the defendant would not have been convicted." *United States v. Rodgers*, 981 F.2d 497, 499 (11th Cir. 1993); *see also Waldrop*, 857 F. Supp. at 931("The passing reference to the laws of God was not so inflammatory that there is a reasonable probability that the outcome of the sentencing proceeding would have been different if the argument had not been made.")

been different. The petitioner has thus failed to meet either prong of *Strickland*. This claim must therefore fail.

The petitioner next argues that counsel should have argued that there was no evidence such as "testimony regarding rape, torture, etc.," (*Id.* ¶ 131), to support the characterization of the crime as "heinous, atrocious or cruel" because such a characterization requires an element beyond that which always exists when a capital offense is committed. (*Id.*) The petitioner claims that counsel's failure to object to the prosecution's argument and to ask the court to prohibit such arguments failed to preserve crucial issues for appeal and constitutes ineffective assistance of counsel. The petitioner appears to be asserting that the "heinous, atrocious or cruel" aggravating circumstance was invalid as applied to his case and that, had this been asserted at trial, he would have won relief during appellate proceedings.

It is by no means clear, had counsel argued that the "heinous, atrocious or cruel" aggravating circumstance was invalid in this case, that the trial court would have agreed, or that an appellate court would have granted relief on that basis. Certain evidence introduced at trial amply supports a finding that the crimes were "heinous, atrocious and cruel." The murders of Nancy Payne and W.T. Nelson, in particular, could be so characterized. According to the petitioner's own statement, he had already shot Bobby Payne and Mike Guest, who he says tried to prevent him from leaving the scene of the robbery, when he reentered the station to kill W.T. Nelson. The petitioner said that Nelson was "falling back" behind the counter when he was shot, evidently in fear for his life, having

seen the shootings of the other two men outside. (R. 1935.) Nancy Payne was then gunned down as she ran away in mortal fear from the scene where she witnessed the murders of her unarmed husband and Mike Guest.   The petitioner already had his stolen money.   The petitioner thus had no reason to kill Nancy Payne and W.T. Nelson, other than to ensure that they could not identify him. Unlike the other two murder victims, they did not try to detain the petitioner or get him to relinquish his plunder from the robbery. (R. 1934-35.)   Rather than leaving with his money, he murdered two terrified and helpless people who had just seen two others shot to death before them and who quite apparently knew that they would suffer a similar fate. In addition to this evidence, the jury also heard Alvis Guest's testimony that Nancy Payne did not die immediately–he heard her groaning as he ran down to the station just after the shots were fired. (R. 996.) He also testified that his son, Mike Guest, also lived for some time after the shooting and was able to respond to his voice before he died at the scene. (R. 998.)

When this case was tried, such facts would have arguably supported the "heinous, atrocious and cruel" aggravating circumstance. *See, e.g., Wright v. State*, 494 So. 2d 726, 744 (Ala. Crim. App. 1985)("Here, the evidence supports the trial court's findings that the defendant deliberately killed Mr. and Mrs. Green 'in order that they would not be witnesses' and that they 'were each shot in the head, wherein they slowly died in a pool of blood.'"), *aff'd*, 494 So. 2d 745 (Ala. 1986), *cert. denied*, 479 U.S. 1101, 107 S. Ct. 1331, 94 L. Ed. 2d 183 (1987). The Court will therefore decline to find that counsel performed deficiently by failing to object to the presentation of this aggravating circumstance to the jury. Such an objection

would likely have been futile. The Court notes, however, that counsel presented a forceful argument during the penalty phase that the murders were not "heinous, atrocious or cruel," but the jury still opted to recommend the death penalty.[32] At sentencing, the prosecutors did not waive the "heinous, atrocious or cruel" aggravating circumstance, but chose not to argue it, advising the court that it could rely solely on the aggravating circumstance that the murders had occurred during a robbery in order to follow the jury's sentencing recommendation. (R. 1778-79.) The court, apparently following this suggestion, stated that, "after carefully weighing both the aggravating *circumstance* and all of the mitigating circumstances in this case, it is the judgment and sentence of this Court that you be put to death by electrocution."   (R. 1793 (emphasis added).)   Thus, the "heinous, atrocious or cruel" aggravating circumstance likely had little effect upon the court's decision to accept or reject the jury's sentencing recommendation.

---

[32] Defense counsel stated as follows:

You heard him testify that he saw Tracy Henry [Wood] leave the store. He didn't go after her. He didn't eliminate eye-witnesses. This is not an execution style slaying where they put somebody on the floor and shoot them in the back of the head, or something like that.

He panicked. That is what his taped confession said. And you said those are what you believe to be the truth [by finding the petitioner guilty]. That's not execution style slaying. This is not a Judith Neely [sic] case where they take somebody out in the woods and torture them before they shoot them.

This is not an Audrey Marie Hiley case where somebody goes out and calculatedly sets about a plan to eliminate one or two people.

You said that you believed he did it. You said that you believed he did it under the State's evidence. The State's evidence shows that this was not a cold or calculated murder. This was not atrocious or heinous, it's not cruel. Their own witness--their own evidence said he panicked, and that is one of the things that you should consider. It's not cold and calculated, it's not execution style.

(R. 1781-82.)

The petitioner thus has failed to show that counsel's failure to object to the "heinous, atrocious or cruel" aggravating circumstance prejudiced him or constituted deficient performance so as to satisfy either prong of *Strickland*. This claim must therefore fail.

### 2. Alleged Failure of the Prosecution to Timely Provide Exculpatory Evidence; Trial Court's Allegedly Improper Denial of a Motion to Continue Trial

The petitioner claims that the prosecution failed to provide exculpatory evidence to his trial counsel until the day before his trial was to start, and that this failure denied his counsel the opportunity to adequately prepare, thereby causing them to render ineffective assistance. (Doc. 9 ¶ 133.) The petitioner also claims that the trial court's refusal to grant a continuance to investigate the newly discovered evidence similarly prevented his counsel from preparing and caused them to render ineffective assistance. (*Id.* ¶ 134.) The petitioner complains that the prosecution's evidence against him was sketchy and that the testimony of Donna Yates Ogle, Rachel Parks, and Willard Yates is "highly exculpatory." (*Id.* ¶ 139.) He argues that Parks' testimony that she saw a blue truck with more than one male occupant quickly driving away from the area of the murder scene, supported by Ogle's testimony summarized herein above, is consistent with his story that Underwood committed the crime. (*Id.* ¶ 137.)[33] He further argues that Yates' testimony that Alvis Guest said the service station money was still in the cash drawer and in W.T. Nelson's pocket is inconsistent with the charge that the murders took place during a robbery. (*Id.* ¶ 138, 143-44.) The petitioner

---

[33]Ogle is Parks' sister who was riding in the same vehicle and who also noticed a pickup truck going by at a high rate of speed, although she did not notice other details about the truck. (Rule 20 Tr. 294-302.)

claims that he was denied his right to present this exculpatory evidence to the jury for the purpose of countering his confession, which he argues was the sole incriminating evidence against him and was not supported by the testimony of Tracy Henry Wood, the last living person known to have observed the crime scene before the shootings. (*Id.* ¶¶ 139-40.) He argues that, had it heard this evidence, the jury would likely have found him not guilty or spared his life. (*Id.* ¶ 140.)   He complains that, although the trial court ordered the prosecution to divulge all such exculpatory evidence by Wednesday, February 5, 1986, at 1:00 p.m., the prosecution did not do so until the late afternoon of Friday, February 7, 1986, before trial was to start that Monday morning. (*Id.* ¶ 141-42.)

The Court has thoroughly addressed the substance of these complaints in sections III.C.1.c(10) and III.C.1.d. above.  There, the Court found, in the context of a *Brady* analysis, that the petitioner would not be able to show that the proffer of testimony by Parks, Ogle, and Yates would have changed the result of the trial.  Since the petitioner has not shown that the outcome of the proceeding would have been different but for the failure to offer this testimony, he cannot meet the second prong of *Strickland*.  This claim must therefore fail.

### 3. The Trial Court's Allegedly Improper Restrictions on the Voir Dire Examination of Prospective Jurors

The petitioner complains that he was denied his right to a fair trial because the trial court disallowed individually sequestered voir dire in favor of voir dire by panel. (*Id.* ¶ 145.) He argues that, because counsel needed to ask potential jurors about their knowledge of the facts of the case as other potential jurors listened in, "[e]xploration as to what a juror knew

about the case necessarily educated and tainted other potential jurors with statements containing prejudicial pretrial publicity." (*Id.* ¶ 146.) He also complains that voir dire by panel "educated veniremen as to the answers which would result in their exclusion or inclusion as potential jurors." (*Id.* ¶ 147.) The petitioner further complains that the trial court improperly disallowed follow-up voir dire, in spite of juror statements indicating bias and knowledge of the alleged facts, and that the court did not allow counsel adequate time to conduct voir dire. (*Id.* ¶ 148-49.) Further, the petitioner points to several of the court's comments that allegedly show an overriding concern with swift, rather than fair selection of the jury. (*Id.* ¶ 149.)[34]

The respondent argues that this claim is barred by the doctrine of procedural default because the petitioner could have raised it on direct appeal but did not. (Resp't's Mem. Br. in Supp. of Answer at 26, citing A. R. Cr. P. 32.2(a)(5).) The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals. (Tab R-44 at 8; *Fortenberry*, 659 So. 2d at 196.) It appears that the claim is indeed procedurally defaulted, as is explained below.

In discussing procedural default, the Eleventh Circuit has stated that:

[t]he federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the

---

[34]The petitioner quotes the court as saying "I am going to limit you on voir dire," and ". . . I am going to see that the defendant gets a fair trial but I am not going to allow you to turn this into a circus." (Doc. 9 ¶ 149, citing R. 410.) The petitioner also quotes the court as saying "We have two more panels to go through this afternoon and we're going to do it. If it takes all night, fellows." (*Id.*, citing R. 723.)

procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See id.* at 262, 109 S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, [499] U.S. [467], 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991), *cert. denied*, 506 U.S. 930, 113 S. Ct. 361, 121 L. Ed. 2d 274 (1992). Thus, if a claim has been presented in some form to a state court, a federal habeas court may refuse to hear the claim only if the last state court rendering the judgment "'clearly and expressly' states that its judgment rests on a state procedural bar" that represents an "adequate and independent state ground for denying relief." *Harris*, 489 U.S. at 262-67.

The last state court to review the claims here asserted was the Alabama Court of Criminal Appeals, which affirmed the trial court's denial of the petitioner's request for post-conviction relief under Rule 20 of the Alabama Rules of Criminal Procedure (Temporary). The Court of Criminal Appeals "clearly and expressly" stated that several of the petitioner's claims, including the "claim that the court unduly restricted voir dire" were procedurally barred under Rule 32.2(a)(4) and Rule 32.2(a)(5) "because they were either addressed on

88

direct appeal or could have been, but were not, raised by the appellant on direct appeal."[35] *Fortenberry*, 659 So. 2d at 196. Since the petitioner could have but did not raise this claim on direct appeal, it is evident that it is one of those barred under Rule 32.2(a)(5). (*See also* Tab R-44 at 8) (finding this claim procedurally defaulted because petitioner could have but did not raise it on appeal).

Rule 32.2(a)(5) is an adequate and independent state ground for denying relief, so any claim barred by it in state court is procedurally defaulted in this federal habeas proceeding. *See Waldrop v. Jones*, 77 F.3d 1308, 1314-15 (11th Cir.), *cert. denied, Waldrop v. Hopper*, 519 U.S. 898, 117 S. Ct. 247, 136 L. Ed. 2d 175 (1996)(determining that Rule 32.2(a)(5) is "adequate and independent" state ground for denial of relief); *Hill v. Jones*, 81 F.3d 1015, 1023 (1996), (finding that "firmly established and regularly followed" state procedural rules may bar federal habeas claims)(quoting *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 857, 112 L. Ed. 2d 935 (1991)), *cert. denied*, 519 U.S. 1119, 117 S. Ct. 967, 136 L. Ed. 2d 851 (1997).

The petitioner argues that this Court must nevertheless consider the merits of his habeas claims because he falls within the "cause and prejudice" exception to the procedural default rule. A petitioner who has procedurally defaulted on a constitutional claim is barred from litigating that claim in a federal habeas corpus proceeding unless he can show adequate "cause" for and "actual prejudice" from the default. *Engle v. Isaac*, 456 U.S. 107,

---

[35]Although the petitioner filed his motion for post-conviction relief under Temporary Rule 20, those temporary rules were codified under Rule 32 during his post-conviction proceedings. As the provisions of both rules are virtually identical, whether they are referred to as "Rule 20" or "Rule 32," is not of substantive importance.

128, 102 S. Ct. 1558, 1572, 71 L. Ed. 2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *Wilson v. Jones*, 902 F.2d 923, 925 (11th Cir. 1990).

The petitioner argues that he falls within the cause and prejudice exception because he allegedly received ineffective assistance of counsel. Attorney performance cannot serve as cause unless the performance is shown to have constituted ineffective assistance violative of the petitioner's Sixth Amendment rights. *See Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986) (determining that defendant represented by counsel whose performance is not constitutionally ineffective under *Strickland* must bear the risk of attorney error that results in a procedural default). As is set forth above, the Court has considered and rejected the petitioner's claims of ineffective assistance of counsel.[36] Because the petitioner has failed to show that he suffered ineffective assistance of counsel, none of the instances of ineffective assistance he has alleged may serve as "cause" to excuse his procedural default of these claims.[37]

As he is unable to meet the cause and prejudice test, the petitioner cannot avoid procedural default of some of his claims unless he falls under the "fundamental miscarriage

---

[36]The petitioner argues in his separate Motion for an Evidentiary Hearing that a hearing is required to determine whether he is entitled to circumvent the procedural bar. As is set forth in this Court's Memorandum Opinion and Order denying the petitioner's Motion for Evidentiary Hearing, issued concurrently herewith, the petitioner is not entitled to an evidentiary hearing as to any cause and prejudice that would excuse the default of these claims.

[37]"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Amadeo v. Zant*, 486 U.S. 214, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988). The petitioner must also demonstrate that he was prejudiced; he must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596, 71 L. Ed. 2d 816 (1982)(emphasis in original). The petitioner has made no such showing.

of justice" exception, which allows a federal habeas court to consider a procedurally

defaulted claim in the absence of cause if a "fundamental miscarriage of justice" has

"probably resulted in the conviction of one who is actually innocent," or where the petitioner

shows "by clear and convincing evidence that but for a constitutional error, no reasonable

juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513

U.S. 298, 323-24, 327 n. 44, 115 S. Ct. 851, 864-67, n. 44, 130 L. Ed. 2d 808, 833-36, n.44

(1995)(quoting *Sawyer v. Whitley*, 505 U.S. 333, 335, 112 S. Ct. 2514, 2517, 120 L. Ed. 2d 269

(1992)); *see also Smith v. Murray*, 477 U.S. 527, 537-38, 106 S. Ct. 2661, 2668, 91 L. Ed. 2d

434 (1986) (quoting, respectively, *Engle*, 456 U.S. at 135, and *Murray*, 477 U.S. at 496).

Although the petitioner has vehemently argued that Underwood actually committed the

crime, he still has not made a showing of "actual innocence" necessary to circumvent his

procedural default of any claim in his habeas corpus petition.[38] The Court therefore cannot

---

[38]The petitioner must show "actual innocence" either as to the crime or his eligibility for the death penalty. As to his "actual innocence" of the crime, such a showing requires the petitioner "to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence--that was not presented at trial." *Schlup*, 115 S. Ct. at 868. Although the petitioner offered new evidence in his post-conviction and federal habeas proceedings, and although he has argued and alleged that Underwood actually committed the crime, he has not made the required showing that he is actually innocent of the crime. He offered three witnesses who stated that Underwood told them he was the killer. The state post-conviction court found two of these witnesses to be lacking in credibility and that the other was a friend of both the petitioner and Underwood. The Court also notes that Underwood allegedly made his admission to this last witness just a few weeks after the murders, also telling her that he loved her and that he would kill her and her family if she revealed his admission. (Rule 20 Tr. at 111-13.) She later married a friend of Underwood who allegedly threatened and beat her to prevent her from revealing Underwood's admission. (*Id.* at 123-25.) She finally contacted petitioner's counsel a few months after she divorced her husband, which was nearly seven years after Underwood made the admission to her. (*Id.* at 125.) Such evidence of actual innocence as the petitioner has offered since trial is not adequate to make an actual innocence showing under *Schlup*—it is not eyewitness testimony about the crime and it is lacking in credibility. As to his "actual innocence" regarding his eligibility for the death penalty, the petitioner must show by clear and convincing evidence that, but for a constitutional error at trial, no reasonable juror would have found him eligible for the death penalty under state law. *Schlup, supra; Sawyer, supra.* Given that the evidence supports the aggravating circumstances argued by the prosecution—that the murders occurred during a robbery and that the crime was "heinous, atrocious or cruel," the petitioner was clearly eligible for the death penalty under state law.

consider the merits of this procedurally defaulted claim.

### 4. The Trial Court's Allegedly Improper Failure to Grant a Change of Venue

The petitioner claims that the trial court should have changed the venue for his trial because sentiment in the community of Etowah County, encompassing a population of about 105,000, was "strongly aroused" against him. (Doc. 9 ¶¶ 150-51.) He argues that the testimony elicited from media officials at the hearing on the change of venue motion established "the pervasive saturating and inflammatory pre-trial publicity that the case received," and that the transcript of the voir dire proceedings shows that this pretrial publicity "saturated and influenced prospective jurors to the point that an impartial jury could not possibly be selected." (*Id.* ¶ 151-52.) The petitioner argues that almost all the prospective jurors had "extensive knowledge" of the case through news and electronic media, and that a "high percentage" of the jurors had "definite pretrial opinions" about his guilt, which rendered it impossible for him to be tried by an impartial jury, although he cites little evidence of this alleged prejudice among the potential jurors.[39]   (*Id.* ¶¶ 153-54.)

The Alabama Court of Criminal Appeals addressed this claim on direct appeal and found as follows:

> The jury venire was composed of seventy-six persons. The jury was divided into six panels for the voir dire. All but two jurors indicated that they had read or heard of the case in the media.

---

[39]The petitioner refers to the statement of prospective juror Burgess, who said she read newspaper articles about the case. (Doc. 9 ¶ 153, citing R. 403.) He also states that prospective juror Watkins said that he read a newspaper article that, after his arrest, the petitioner escaped from jail and was rearrested. (*Id.*, citing R. 399.) He further states that prospective juror Watkins said he believed the police had "done a good thing by catching the guy who done the killing." (*Id.*)

The defendant challenged six jurors for cause on the basis of their fixed opinions of his guilt based on pretrial publicity. All six challenges were granted. We agree with the trial court's specific finding that it "allowed a full and fair and sifting and exhausting voir dire in this case."

After reviewing the evidence of the pretrial media publicity, the trial court found that "[t]here has been extensive coverage of this case, both before this investigation, or charges were focused on this defendant, and since he has been charged. Of course, there was extensive coverage of the escape in this case."

The controlling principles on this issue are set out in *Ex parte Grayson*, 479 So. 2d 76, 80 (Ala.), *cert. denied, Grayson v. Alabama*, 474 U.S. 865, 106 S. Ct. 189, 88 L. Ed. 2d 157 (1985):

> "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. *Ex parte Magwood*, 426 So. 2d 929, 931 (Ala.), *cert. denied*, 462 U.S. 1124, 103 S. Ct. 3097, 77 L. Ed. 2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *Franklin v. State*, 424 So. 2d 1353 (Ala. Crim. App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. *Anderson v. State*, 362 So. 2d 1296, 1298 (Ala. Crim. App. 1978). As the Supreme Court explained in *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1642-43, 6 L. Ed. 2d 751 (1961):
>
> > "'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court . . . .'
>
> "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. *Murphy v. Florida*, 421 U.S. 794, 799-800, 95 S. Ct. 2031, 2035-2036, 44 L. Ed. 2d 589 (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' *Anderson v. State*, 362 So. 2d 1296, 1299 (Ala. Crim. App. 1978)."

The defendant argues that nineteen of the 76 jurors "stated that at some point in time prior to the trial, they felt that the Defendant was guilty, or that they had negative feelings toward him." Appellant's brief, p. 39. However, the fact that even a majority of the prospective jurors had preconceived notions of the guilt of the accused does not require a change of venue where there is evidence that the jurors would be able to lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Callahan v. State*, 471 So. 2d 447, 452 (Ala. Cr. App. 1983), *reversed on other grounds*, *Ex parte Callahan*, 471 So. 2d 463 (Ala. 1985). "The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984).

The trial court's findings of impartiality should be overturned only for "manifest error." *Irvin v. Dowd*, 366 U.S. 717, 724, 81 S. Ct. 1639, 1643, 6 L. Ed. 2d 751 (1961). We find that the following comments of the court in *Patton v. Yount, supra*, are applicable here:

> "In short, the record of publicity in the months preceding, and at the time of, the . . . trial does not reveal the 'barrage of inflammatory publicity immediately prior to trial,' *Murphy v. Florida*, 421 U.S. 794, 798, 95 S. Ct. 2031, 2035, 44 L. Ed. 2d 589 (1975), amounting to a 'huge . . . wave of public passion,' *Irvin, supra*, 366 U.S. at 728, 81 S. Ct. at 1645, that the Court found in *Irvin* . . . .

> " . . . In addition, while it is true that a number of jurors and veniremen testified that at one time they had held opinions, for many, time had weakened or eliminated any conviction they had had . . . .

> " . . . Not all members of the venire had put aside earlier prejudice, as the voir dire disclosed. They retained their fixed opinions, and were disqualified. But the testimony suggests that the voir dire resulted in selecting those who had forgotten or would need to be persuaded again." 467 U.S. at 1032-34, 104 S. Ct. at 2889-90.

Our review convinces us that there is nothing in the record to suggest that the jurors could not or did not render a verdict based solely on the evidence presented at trial. It has not been shown that the trial court abused its discretion in denying the motion for change of venue.

*Fortenberry*, 545 So. 2d at 140-41. The findings of fact contained above are supported by

the record and are entitled to a presumption of correctness.

In reviewing a habeas petitioner's challenge to the denial of her motion for change of

venue by the state trial court, the Eleventh Circuit stated as follows:

> This Court has articulated two standards for evaluating change of venue requests based on allegations of pretrial publicity--actual prejudice and presumed prejudice. In *Coleman v. Zant*, the Court described the standards in this way:
>
>> To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. *Irvin v. Dowd*, 366 U.S. at 727, 81 S. Ct. at 1645. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. at 723, 81 S. Ct. at 1643.
>>
>> Prejudice is presumed from pretrial publicity when (1) pretrial publicity is sufficiently prejudicial and inflammatory, and (2) the prejudicial pretrial publicity saturated the community where the trials were held. *Rideau v. Louisiana*, 373 U.S. at 726-27, 83 S. Ct. at 1419-20; *Murphy v. Florida*, 421 U.S. at 798-99, 95 S. Ct. at 2035-36.

708 F.2d at 544-45.  The defendant bears the burden of demonstrating either type of prejudice. *Murphy*, 421 U.S. at 803, 95 S. Ct. at 2039; *Coleman v. Zant*, 708 F.2d at 545. When an appellant claims actual prejudice, the trial court's finding of impartiality should be overturned only if the reviewing court finds "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 2888-89, 81 L. Ed. 2d 847 (1984). Although the Supreme Court has not directly addressed the standard of review for a claim of presumed prejudice, this Circuit has treated the standard as a mixed question of fact and law. *Coleman v. Kemp*, 778 F.2d at 1537 & n. 17.

* * *

The presumed prejudice standard involves two prongs--the pretrial publicity must be sufficiently prejudicial and inflammatory and the publicity must have saturated the community where the trial was held. *Coleman v. Zant*, 708 F.2d at 544.  Relief is granted under this standard only in extreme situations. *Coleman v. Kemp*, 778 F.2d at 1537.

After reviewing the news articles, affidavits and video cassettes filed in this case,[Footnote omitted] and after conducting an evidentiary hearing on the issue, the district court found that Cummings had failed to introduce enough evidence for the court to presume prejudice from the pretrial publicity.  The court found that the

reports contained primarily factual accounts of the circumstances surrounding Bradford's death and that none of the publicity was calculated to provoke hostility. [Footnote omitted] *See Murphy*, 421 U.S. at 802, 95 S. Ct. at 2038-39 (news articles did not create inflamed community atmosphere when largely factual in nature). The evidence presented to the district court included eleven articles from the *Sentinel Star*, the local Sanford County paper. These articles had been published over a three month period and only some of them specifically refer to Cummings by name. *Compare Rideau v. Louisiana*, 373 U.S. at 726, 83 S. Ct. at 1419-20 (defendant's televised confession seen by large part of community raises presumption of prejudice) *and Coleman v. Kemp*, 778 F.2d at 1538 (repetitious news coverage containing hostile bias against defendant created "overwhelming showing in the press of [defendant's] guilt before his trial ever began"). We agree with the trial court that Cummings has failed to meet the extensive evidentiary showing required to warrant relief under the presumed prejudice standard.

*Cummings*, 862 F.2d at 1509, 1511-12.

The petitioner does not attempt to show actual prejudice, but instead states that the facts of this case meet the presumed prejudice standard. The Alabama Court of Criminal Appeals found that almost all of the prospective jurors knew about the case and had heard about it in the media. In addition, the petitioner presented evidence at the venue hearing of the extensive news coverage the case received in Etowah County. It therefore appears that publicity about the case "saturated the community where the trial[ was] held." *Coleman*, 708 F.2d at 544. This allows the petitioner to make one of the two necessary showings to prove presumed prejudice. The Court is not convinced, however, that the petitioner made the other required showing–that the pretrial publicity was "sufficiently prejudicial and inflammatory." *Id*.

The petitioner argues that a "high percentage" of the jurors had "definite pre-trial opinions" about his guilt, implying that jurors' voir dire responses demonstrate the

prejudicial, inflammatory effect of pretrial publicity as evidence. (Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 56.) As evidence, however, he cites only the comment of prospective juror Watkins, who said he believed the police had "done a good thing by catching the guy who done the killing." (Id., citing R. 399.)[40] The petitioner also states that "[t]he same holds true for numerous other jurors who admitted hearing or reading about the case." (Id., citing R. 356-934.)

The Court has reviewed the transcript of voir dire and finds no evidence showing that the sentiments of prospective jurors had been aroused against the petitioner by prejudicial or inflammatory media reports.[41] Nor does the Court find evidence among the written

---

[40]Taken in context, however, the juror's statement is fairly innocuous: "if he's the man that done it, I think it's a good thing that they caught him. If he's the right man." (R. 399.) Watkins also represented that he had not formed an opinion about whether or not the petitioner was the murderer, stating "No, I didn't know whether it was the right one or not. I just heard–if it was the right one, I thought it was a good thing, if it's the right man." (R. 400.)

[41]The Court has reviewed the entire transcript of voir dire proceedings, particularly noting questions and responses on the following pages: R. 396-408,411-431, 486-521, 575-604, 673-699, 779-803, 868-896. The information on these pages does not reflect that the venire was infected with any prejudicial publicity, or that members of the six panels infected each other with prejudicial knowledge of the case. Many potential jurors could recall little about the case, while others recalled only bits and pieces of information about it; only a few had apparently followed the case carefully in the media for its duration. Many jurors particularly recalled press coverage of the petitioner's escape and subsequent bank robbery, but indicated that this information did not lead them to form an opinion about his guilt or innocence of the four murders. One juror said that the news accounts that the murder weapon had been tied to the petitioner and "people talking" had led her to believe the petitioner was guilty, but the court granted the petitioner's challenge to this juror. (R. 487-89, 547.) Another juror stated that he was "relieved" someone was charged, but added that "hopefully, he is the right one. Or if he's not the right one, he won't be, you know, charged." (R. 500.) A third juror stated that he had negative feelings toward the petitioner due to his escape, but the court granted the petitioner's challenge as to that juror. (R. 538, 547.) Another juror recalled a news report that the petitioner had signed a statement as to his guilt and stated, "Most of the time when you read it you think he is [guilty], you know, of course, you have to prove it." (R. 578.) A different juror said that news of the petitioner's escape led him to think that he was guilty, but the court granted the petitioner's challenge as to that juror. (R. 674, 720.) Another juror said that, since she had read that the petitioner made a statement confessing his guilt, that he would have to prove that he was not guilty, but the court granted the petitioner's challenge as to that juror. (R. 678, 720.) Lastly, a juror said that, when the petitioner was arrested, he initially doubted that any one person could kill four people with a pistol that quickly, but that his doubts "diminished" when he escaped. (R. 680-81.) The court granted the petitioner's challenge as to that juror, as well. (R. 722.)

materials and record testimony offered at the venue hearing to show that media coverage was prejudicial or inflammatory.   (R. 164-297, 1990-2908.)[42]   As in *Cummings*, the pretrial publicity in this case is largely factual in nature, does not appear to be biased against the petitioner, and does not appear to be calculated to generate hostility toward him.   The petitioner has not shown that the pretrial publicity was "sufficiently prejudicial and inflammatory" to support a finding of presumed prejudice.[43]   There is thus an insufficient

---

[42]After reviewing the record evidence of media coverage, the Court notes that most of the coverage was purely factual.  On occasion, however, the media characterized the crime in superlative terms, particularly in the time period just following the murders.  Media reports stated, in some form, that the crime was the worst or largest mass murder in Etowah County history, (R. 1993, 1996, 2096, 2177, 2314, 2467, 2470, 2473, 2474, 2687, 2684-86, 2798, 2800), "one of Alabama's worst murder cases in history" (R. 2014, 2017), and "one of the worst [mass murders] in Alabama history" (R. 1999, 2004).  Other media reports referred to the crime as a "mass murder," (R. 2031, 2449, 2723, 2783), "multiple murders," (R. 2092), a "massacre," (R. 2450, 2451, 2456, 2456), a "[m]ass slaying," (R. 2677), the "[l]argest mass killing in history of Etowah County," (R. 2629) and as the "worst [slayings] in Etowah County history." (R. 2239.)  In initial reports, one media outlet called the murders a "horrifying crime" (R. 2778) and reported that the people were "shocked and angry" and that they "want justice." (R. 2804.) There were a very few references scattered among the media reports to the gun being traced to the petitioner, (*See, e.g.,* R. 2631, 2632, 2712), and that the petitioner stole the gun. (R. 2667, 2712.)  The Court also notes that there was a report that the petitioner had a prior record of a burglary (R. 2522) and an arrest for larceny. (R. 2539.)  There were a few media references to the impressions of a law enforcement officer that the petitioner seemed "relieved" when police asked him to come in for questioning. (R. 2248, 2251, 2539.)  One media outlet reported that the petitioner showed the sheriff where he threw his gun and that he acknowledged that the truck used as the getaway car was owned by him. (R. 2712, 2715.)  Another media outlet stated that the petitioner "has already confessed to the murders." (R. 2744.)  In the context of all the pre-trial media coverage, however, these references are not so significant, repetitive or dramatic as to allow the petitioner to show that pretrial publicity was sufficiently pervasive or inflammatory to support a finding of presumed prejudice.  The  media reported on the case for over eight months before the petitioner even became a suspect, and focused on the arrest and aborted prosecution of the wrong people for the crime.  There were about another eight months of media reports after the petitioner was linked to the crime.  Most of this coverage was factual and objective.  Nothing in the record evidence of media coverage convinces the court that the coverage was prejudicial or inflammatory.

[43]*See also Devier v. Zant*, 3 F.3d 1445 (11th Cir. 1993), *cert. denied*, 513 U.S. 1161, 115 S. Ct. 1125, 130 L. Ed. 2d 1087 (1995), in which the court stated as follows:

> Although it is certainly true that a large proportion of the jurors had *some* knowledge of the crime, we cannot say that the voir dire raises an inference that pretrial publicity so infected Devier's trial as to deny him a fair trial.  [Footnote omitted].  As the Supreme Court has noted, "the mere existence of any preconceived notion [by a juror] as to the guilt or innocence, *without more*" is insufficient to establish a claim of prejudicial pretrial publicity.  [Footnote omitted].  Viewing the totality of the circumstances, we conclude that because Devier did not suffer any prejudice from pretrial publicity, the trial court did not err in failing to grant his motion for a change of venue.

basis for concluding that the state trial court committed manifest error in denying the motion for change of venue. This claim therefore fails.

### 5. Allegedly Improper Jury Inclusion

The petitioner claims that the trial court improperly refused to exclude biased jurors for cause, "including but not limited to, the following:"

(a) Venire member Downs stated that he knew the families of the victims well and that he could find no factors in mitigation of granting the death penalty. (R. 523-526.)

(b) Venire persons Gilbreath, Fortenberry and Spurlow also were qualified by the trial court for jury service even though they admitted that they had difficulty in finding any factors in mitigation of granting the death penalty. (R. 545-550.)

(Doc. 9 ¶ 155.) The petitioner also complains that the trial court improperly denied the defense request to strike venire person Morgan, who stated that "he tended to lean 'towards siding with the law enforcement officials.'" (Id. ¶ 156, citing R. 830.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it on direct appeal but did not. (Resp't's Mem. Br. in Supp. of Answer at 31, citing A. R. Cr. P. 32.2(a)(5).) The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals. (Tab R-44 at 10; *Fortenberry*, 659 So. 2d at 200.) It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

---

*Devier*, 3 F.3d at 1462. The text of the first omitted footnote in the above passage reads as follows: "*See id.* [*Patton v. Yount*, 467 U.S.] at 1031-35, 104 S. Ct. at 2889-91 (holding no presumption of prejudice in case in which all but 2 of 163 venirepersons had heard of the case and 126 venirepersons admitted that they would carry that opinion into the jury box)." The text of the second omitted footnote reads as follows: "*Irvin*, 366 U.S. at 723, 81 S. Ct. at 1642 (emphasis added)." *Devier*, 3 F.3d at 1462 n.57, n.58.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received.  As the Court has rejected the petitioner's ineffective assistance claims, this argument fails.  Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence" necessary to circumvent his procedural default of any claim in his habeas corpus petition.  The Court therefore cannot consider the merits of this procedurally defaulted claim.

### 6.  Allegedly Improper Jury Exclusion

The petitioner claims that prospective jurors Smith, Middleton, and King, who professed opposition to capital punishment, were improperly and prematurely stricken for cause, over the petitioner's objections that they had not been properly questioned as to whether or not they could enter a fair verdict and not consider their views on the death penalty in determining punishment.  (Doc. 9 ¶¶  158-59, citing R. 825-31.)   The petitioner also complains that prospective juror Smith was excluded despite her declaration that her views on capital punishment would not impair her performance as a juror.  (*Id.* ¶ 159, citing R. 827.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it on direct appeal but did not.  (Resp't's Mem. Br. in Supp. of Answer at 31, citing A. R. Cr. P. 32.2(a)(5).)  The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals.  (Tab R-44 at 10-11; *Fortenberry,*

659 So. 2d at 200.)  It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received.  As the Court has rejected the petitioner's ineffective assistance claims, this argument fails.  Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence."  The Court therefore cannot consider the merits of this procedurally defaulted claim.

### 7.  The Prosecution's Alleged *Batson* Violations

The petitioner claims that the prosecution used its peremptory challenges in a racially discriminatory way so as to exclude black venire members from the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  (Doc. 9 ¶¶ 160-62.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it at trial and on direct appeal but did not.  (Resp't's Mem. Br. in Supp. of Answer at 32, citing A. R. Cr. P. 32.2(a)(4)-(5)).[44]  The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals.[45]  (Tab R-44 at 11-

---

[44]The respondent apparently intended to cite to A. R. Cr. P. 32.2(a)(3) and (5), rather than 32.2(a)(4)-(5).

[45]The Court notes that the Alabama Court of Criminal Appeals addressed the merits of this claim after it had already held the claim to be procedurally barred.  *Fortenberry*, 659 So. 2d at 200.  These two holdings appear to be alternative holdings affirming the judgment of the Rule 20 trial court, which also held alternatively that the claim was not only procedurally barred but also that it lacked merit.  (Tab R-44 at 12.)  The fact that the Alabama Court of Criminal Appeals addressed the merits of the claim in an alternative holding does not affect the finding of procedural default.  *See Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999), wherein the court stated as

12; *Fortenberry*, 659 So. 2d at 197.)  It appears that the claim is indeed procedurally defaulted.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received.  As the Court has rejected the petitioner's ineffective assistance claims, this argument fails.  Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence."

The petitioner further asserts that, notwithstanding any procedural default, the court must hear the merits of this claim because in Alabama, the rule providing for procedural default of such claims was not "firmly established and regularly followed."  (Pet'r's Br. in Supp. of his Second Mot. for an Evidentiary Hr'g at 23.)  In support of this argument, the petitioner cites *Cochran v. Herring*, 43 F.3d 1404, 1408 (11th Cir.), *opinion modified on denial of reh'g,*

---

follows:

> although the Alabama Court of Criminal Appeals could have been more explicit, its opinion rested on procedural default and failure to state a claim as alternative grounds and therefore fits within the exception reserved in footnote 10 of the Supreme Court's opinion in *Harris*: "[A] state court need not fear reaching the merits of a federal claim in an alternative holding. Through its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n. 10, 109 S. Ct. 1038 (emphasis in original). *See also Alderman v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir.) (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lacked merit based on the evidence, "[t]his ruling in the alternative did not have the effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S. Ct. 673, 130 L. Ed. 2d 606 (1994).

*Bailey*, 172 F.3d at 1305.

61 F.3d 20 (11th Cir. 1995), *cert. denied*, 516 U.S. 1073, 116 S. Ct. 776, 133 L. Ed. 2d 728

(1996) (determining that Alabama courts have not consistently applied a procedural bar to

*Batson* claims in certain cases).  The holding of *Cochran* is limited, however, to cases in

which defense counsel asserted at trial an objection to the prosecution's use of peremptory

strikes under *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965),

*overruled*, *Batson v. Kentucky*, 476 U.S. 79 (1986).

The Eleventh Circuit has discussed the limitations on *Cochran's* applicability, stating as

follows:

> Wright contends that the State used its peremptory strikes in a racially discriminatory
> manner in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d
> 69 (1986). The district court correctly determined that Wright procedurally defaulted
> this claim because he did not raise a
> substantive *Batson* claim at trial, or on direct appeal, or in his state coram
> nobis proceeding.  To excuse his procedural default, Wright must show cause and
> prejudice. *See Weeks v. Jones*, 26 F.3d 1030, 1043 (11th Cir. 1994).
>
> Wright urges this court to overlook his procedural default because the Alabama
> courts have not regularly and consistently applied a procedural bar to cases where
> a *Batson* claim was not raised on direct appeal. Wright relies on this court's decision
> in *Cochran v. Herring*, 43 F.3d 1404 (11th Cir.), *modified on reh'g*, 61 F.3d 20 (1995),
> to support his contention. In *Cochran*, this court found that "where the trial took place
> pre-*Batson*, a properly made *Swain* claim made in a pre-trial motion is treated as a
> timely made *Batson* objection for the purpose of preserving the *Batson* issue for
> appeal." 43 F.3d at 1409 n. 7.  This court noted that the Alabama Supreme Court in
> *Ex parte Floyd*, 571 So. 2d 1234 (Ala. 1990), allowed a defendant to raise a *Batson*
> claim in a postconviction motion because he had raised a *Swain* objection at trial.
> Cochran was identically situated to Floyd, and we concluded that the Alabama state
> courts had applied its procedural rules inconsistently when it allowed Floyd to
> proceed with his *Batson* claim but denied Cochran that right.
>
> Although Wright's case does share some similarities with Cochran's-- both cases
> were tried *pre-Batson* and *Batson* was decided while their direct appeals were
> pending--there is one fatal flaw in Wright's reliance on *Cochran*:  Wright never made

a *Swain* objection. His counsel even conceded at the federal evidentiary hearing that there was no *Swain* claim presented to the district court. ROA, Vol. 8, p. 75-76. Wright's case is more similar to *State v. Tarver*, 629 So. 2d 14, 18-19 (Ala. Crim. App. 1993), in which the Alabama Court of Criminal Appeals held that Tarver was procedurally barred from raising a *Batson* claim in a post-conviction hearing because Tarver did not preserve the claim for appellate review by making a *Swain* objection at trial (*Batson* was decided while the case was on direct appeal). As such, Wright procedurally defaulted his substantive *Batson* claim.

*Wright v. Hopper*, 169 F.3d 695, 708-09 (11th Cir.), *cert. denied*, — U.S.— , 120 S. Ct. 336, 145 L. Ed. 2d 262 (1999).

In this case, there is no indication in the record that counsel ever made a *Swain* objection. This case is therefore similar to *Tarver* and to *Wright*. Thus, even assuming that *Batson* was applicable to the petitioner's case, he still could not get around the procedural bar because counsel made no *Swain* objection.

The petitioner further argues that his *Batson* claim is not procedurally defaulted because the state court's denial of the claim was contrary to clearly established federal law. (Pet'r's Br. in Supp. of his Second Mot. for an Evidentiary Hr'g at 23-26.)  Yet the petitioner's conviction was final before *Batson* was applied to cases such as his, where the defendant is of a different race than the jurors whose exclusion is challenged. *See Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991) (racial discrimination in the use of peremptory strikes is forbidden, regardless of the defendant's race). Although the petitioner argues that *Powers* must be applied retroactively to his case, the Eleventh Circuit has ruled to the contrary. *See Farrell v. Davis*, 3 F.3d 370, 371-72 (11th Cir. 1993); *see also Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997), *cert. denied*, 523 U.S. 1080, 118 S. Ct. 1529, 140

L. Ed. 2d 680 (1998).[48]  Given such authority, the Court must reject this claim that the petitioner's *Batson* claim is not procedurally barred.

Even if this claim were not procedurally barred, however, the petitioner would be due no relief on the merits.  To establish a *Batson/Powers* violation, the petitioner must present a prima facie case showing "'that the prosecutor has exercised peremptory challenges to remove from the venire members of [a] [cognizable] race'" and the circumstances raise an inference of discrimination. *See United States v. Rodriguez*, 935 F.2d 194, 195 (Ala. 1991). As the Rule 20 trial court noted, the petitioner presented no evidence on this claim during the Rule 20 hearing.  (Tab R-44 at 12.)  Although the petitioner now offers the prosecution's juror voir dire notes and strike sheets, (*see* Pet'r's Rule 7 Mot. to Expand the R." at Ex. A), this evidence does not, on its face, demonstrate that petitioner can establish a prima facie case of purposeful discrimination.  The petitioner does little to demonstrate how this evidence helps him present such a case, other than to say that the notes indicate that the "the prosecutors may have identified prospective jurors by race and gender" and that "the prosecutors may have struck at least six African-Americans from the venire."  (Pet'r's Brief in Supp. of his Second Mot. for an Evidentiary Hr'g at 16.)  This is not enough to establish a prima facie case under *Batson*.  The strike sheets do not uniformly indicate the racial

---

[48]Although the petitioner argues that, in *United States v. Rodriguez*, 935 F. 2d 194, 195 (11th Cir. 1991), *cert. denied, Leon v. United States*, 502 U.S. 1047, 112 S. Ct. 911, 116 L. Ed. 2d 811 (1992), the court applied *Powers* retroactively, *Farrell* and *Cargill* are more recent authority, and they state that *Powers* announced a "new rule" within the meaning of *Teague v. Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334 (1989) (finding that with few exceptions, new constitutional rules of criminal procedure are not applicable to those cases that have become final before the new rules are announced).

identity of the potential jurors, and many of the notes on the sheets would require interpretation by the prosecutors for their significance to be understood. Any such required interpretation should have been elicited during state post-conviction review, when the petitioner first asserted a *Batson* claim. The petitioner's contention that he is now entitled to an evidentiary hearing to fill the evidentiary gap on this claim is without merit, as the Court states in a separate Memorandum Opinion and Order issued concurrently herewith. This claim therefore fails on the merits as well as on the basis of procedural default.

### 8. The Trial Court's Allegedly Improper Rulings on Evidentiary Matters

The petitioner claims that the trial court improperly ruled on evidentiary matters "including, but not limited to, the trial court's sustaining a prosecution objection to defense counsel's attempts to elicit the name of the informant who telephoned Sheriff McDowell regarding the location of the murder weapon." (Doc. 9 ¶ 163, citing R. 1063, 1064.) The petitioner complains that the court thereby hampered the ability of trial counsel to properly cross-examine the witness. (*Id.* ¶ 163.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it on direct appeal but did not. (Resp't's Mem. Br. in Supp. of Answer at 32-33, citing A. R. Cr. P. 32.2(a)(5).) The state post-conviction court so held. (Tab R-44 at 12-13.) In affirming the judgment of the state post-conviction court, however, the Alabama Court of Criminal Appeals failed to "clearly and expressly" state that its judgment rested "on a state procedural bar" representing an "adequate and independent state ground for denying relief." *Harris*, 489 U.S. at 262-63. The Court will therefore address the merits of

this claim.

The Court initially notes that, with respect to federal habeas review of state court evidentiary rulings, the Eleventh Circuit has stated as follows:

> In habeas corpus proceedings, federal courts generally do not review a state court's admission of evidence. *McCoy v. Newsome*, 953 F.2d 1252, 1265 (11th Cir. 1992). We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial. *Id. Accord Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir.) (evidentiary ruling claims reviewed only to determine whether the error "was of such magnitude as to deny fundamental fairness"), *cert. denied*, 516 U.S. 946, 116 S. Ct. 385, 133 L. Ed. 2d 307 (1995). [The petitioner] cannot demonstrate that the trial court's admission of this evidence adversely affected his trial. Additionally, such trial court errors are subject to the harmless error analysis and will not be the basis of federal habeas relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (quotation omitted).

*Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998), *cert. denied*, --- U.S. ---, 119 S. Ct. 2373, 144 L. Ed. 2d 777 (1999).

The petitioner only alleges one specific error by the state trial court in making evidentiary rulings–its refusal to permit defense counsel to question Sheriff McDowell about the identity of the confidential informant who told him that James Jenkins had found the gun that was later determined to be the murder weapon. The Eleventh Circuit has discussed a defendant's right to discover the identity of a confidential informant, stating as follows:

> The government has the privilege to withhold from disclosure the identity of its informants, but this privilege is limited. The Supreme Court in *Roviaro v. United States*, 353 U.S. 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957), which reversed a criminal conviction where the defendant had been denied access to a confidential informant, set forth a balancing test in which a court must take into account the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony. 353 U.S. at 62, 77 S. Ct. 623. If disclosure is "relevant and helpful to the defense of an accused, or is essential to a fair

> determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61, 77 S. Ct. 623. *See also United States v. Gutierrez*, 931 F.2d 1482 (11th Cir.), *cert. denied*, 502 U.S. 916, 112 S. Ct. 321, 116 L. Ed. 2d 262 (1991); *United States v. Kerris*, 748 F.2d 610, 613-14 (11th Cir. 1984).

*United States v. Rutherford*, 175 F.3d 899, 901 (11th Cir. 1999). The petitioner has failed to explain why the identity of this informant would have been "relevant or helpful" to his defense, or how it was "essential to a fair determination of [his] cause." *Rutherford*, 175 F.3d at 901. He merely states that, by sustaining the objections to his questions about the informant's identity, that the court "hampered trial counsel's ability to properly cross-examine [Sheriff McDowell]," but he does not show how counsel was hampered.[47] (Reply Br. of Pet'r to Resp't's Mem. Br. in Supp. of Answer at 60.)  It appears that the informant simply alerted Sheriff McDowell that James Jenkins had found a gun in a local creek, whereupon McDowell obtained the gun and then determined that it was the murder weapon. There is absolutely no indication that the identity of the informant was relevant to the petitioner's case or possibly helpful to his defense.  The petitioner has failed to show that the trial court erred in allowing the prosecution to assert the confidential informant privilege or how that affected the "fundamental fairness of the trial." *McCoy v. Newsome*, 953 F.2d 1252, 1265 (1992) (noting that "federal habeas corpus relief based on evidentiary rulings will not be granted unless it goes to the fundamental fairness of the trial").  This claim therefore fails.

---

[47]The Court notes that, during trial, petitioner's counsel told the court that the informant might be called to testify on the petitioner's behalf, but he failed to offer even speculation about how such testimony would benefit the petitioner's case.  (R. 1063-64.)

### 9. The Alleged Misconduct and Improper Arguments of the Prosecutor During the Guilt/Innocence Phase of Trial

The petitioner claims that the prosecutors made improper closing arguments and engaged in misconduct during the guilt/innocence phase of trial, in violation of his constitutional rights. (Doc. 9 ¶¶ 164-65.) Specifically, the petitioner complains that the prosecution made closing arguments that misstated the burden of proof, "including, but not limited to, such statements as '[w]hat did they do that would change that confession' (R. 1614) and 'I cannot believe that any of the evidence they have offered will convince you beyond a reasonable doubt that the [petitioner] is not guilty.'" (Id. ¶ 166.) The petitioner complains that such arguments caused the jury to believe that he had the burden of proving his innocence. (Id.)

The petitioner also claims that the prosecutors argued facts not in evidence, including, but not limited to, the following:

> Mr. Hart's statement that during the time of Petitioner's interrogation Petitioner's father "knew his son was tied in with the murder weapon," (R. 1599); Mr. Hart's statement that if Harvey Underwood had committed the murders his fingerprints would have been on the grips of the gun, even though the grips of the gun were missing at the time the weapon was located (R. 1600); statements that Petitioner committed the killings in order to eliminate an eyewitness, (R. 1687, 1689); statements that if Harvey Underwood had committed the murders, "You reckon he would let that thing (Petitioner) live", (R. 1687); statements regarding an alleged conversation between Sherry Studdard and Petitioner even though there was no testimony that any such conversation occurred (R. 1693); and numerous other statements which invited the jury to speculate as to how the killings occurred.

(Id. ¶ 167.) The petitioner further claims that the prosecutors tried to "impassion the jury's sense of vengeance," with their closing arguments, including but not limited to the

following:

> Mr. Wasden's reference to Petitioner in his closing arguments that "You have got to get the person before you" (R. 1623); Mr. Valeska's statement when you go back there to vote on this case you are going to render the most important decision for this community that you will ever do in the rest of your life unless unfortunately you get called for jury service when five or more people are murdered, (R. 1686) and Mr. Valeska's reference to Petitioner as a "thing." (R. 1687.)

(Doc. 9 ¶ 168.) The petitioner complains that the prosecutor's closing arguments constitute fundamental error because they present arguments regarding alleged crimes with which he was not charged. (*Id.*)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it at trial and on direct appeal but did not. (Resp't's Mem. Br. in Supp. of Answer at 33-34, citing A. R. Cr. P. 32.2(a)(4)-(5).)[48] The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals. (Tab R-44 at 13; *Fortenberry*, 659 So. 2d at 196.) It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received. As the Court has rejected the petitioner's ineffective assistance claims, this argument fails. Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence." The Court therefore cannot

---

[48] The respondent apparently intended to cite to A. R. Cr. P. 32.2(a)(3) and (5), rather than 32.2(a)(4)-(5).

consider the merits of this procedurally defaulted claim.

The Court notes that, even if this Court were to consider the merits of this claim, the petitioner would be due no relief. In judging a prosecutor's closing argument against a constitutional challenge, the standard is "whether the [argument] so 'infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144, 157 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). In *Darden*, the Court found no constitutional violation despite clearly improper closing arguments by the prosecutor, including "offensive comments reflecting an emotional reaction to the case." *Darden*, 477 U.S. at 180. The challenged arguments would not meet this standard. Some of them are entirely proper. Those that allegedly misstate the burden of proof would have been ameliorated by the court's burden instructions, which the petitioner has not challenged. None of the arguments are so inflammatory or improper as to have so "'infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181.

111

**10. Challenges to the Petitioner's Arrest and Custodial Interrogation and to the Statements the Petitioner Gave While in Custody**

**11. Allegedly Illegal Arrest and Interrogation and Statements Allegedly Obtained in Unconstitutional Manner** [49]

The petitioner claims that the police illegally entered his residence to take him into custody on May 8, 1985. (Doc. 9 ¶ 169.) He argues that the police did not properly gain permission to enter the premises because they relied upon the consent of a third party (the petitioner's brother) without having any information regarding the authority of that party to give a valid consent. [50] (*Id.* ¶¶ 170-71.)

The petitioner claims that, after he was taken into custody, the police interrogated him for six hours, although he said that he had been drinking the night before and was tired. (*Id.* ¶ 172.) He admits that he was not under arrest during his interrogation, but states that he was not free to leave because the only exit from the interrogation area was through a locked elevator. [51] (*Id.* ¶ 173.) He complains that, after his interrogation, the police tried to obtain from a magistrate an arrest warrant "which stated only that William Payne, the father of one of the victims, as affiant, had 'probable cause for believing and does believe' that the Petitioner intentionally caused the death of four people." (*Id.* ¶ 174.) He states that the magistrate initially refused, stating that he "'needed something else to go on,'" but that he

---

[49]The petitioner lists claims 10 and 11 separately, but because they are analytically related, the Court will address them together.

[50]The petitioner argues that the police did not know the identity of the person who allowed them to enter into the house and that one police officer even admitted as much. (Doc. 9 ¶ 170, citing R. 18-24.)

[51]The record indicates that the petitioner was interviewed in an office on the third floor of the Etowah County Courthouse, and that a key is required to operate the elevator on that floor. (R. 234.)

finally issued the warrant before 5:00 p.m. on May 3, 1985, finding probable cause based upon one of the petitioner's statements that allegedly was not taken until after the warrant was issued. (*Id.* ¶ 175, 176, citing R. 104.)[82] The petitioner argues that the warrant was therefore void and that the magistrate denied him an effective means of challenging the constitutionality of the warrant by failing to make known the information he relied upon in issuing it. (*Id.* ¶ 177-78.) Thus, the petitioner argues, his pretrial statements should have been excluded because they were "the fruit of an unlawful warrantless arrest, an unlawful custodial interrogation, and an invalid arrest warrant and were improperly admitted at trial." (*Id.* ¶ 179.)[83] The petitioner argues that his conviction is unconstitutional because it was predicated upon an illegal arrest and interrogation which resulted in his "unlawfully obtained" statements. (Doc. 9 at ¶ 180.)

With respect to these claims, the Alabama Court of Criminal Appeals made the following findings on direct appeal:

[A]round 6:00 on the evening of May 2, 1985, Investigator Carter and three other investigators from the Sheriff's Office went to the residence of the defendant's father, where the twenty-one-year-old defendant was living. Investigator Johnny Grant testified that they went to talk to both the defendant and his father. The defendant's eighteen-year-old brother Terry answered the door. Carter asked for Terry's father and Terry said that he "was over at Jerry Gable's." Carter then asked if the defendant was there and Terry replied that he was. Investigator Carter said, "We would like to see him, to talk to him." Terry opened the door, said "come on in," and walked

---

[82]The petitioner argues that the evidence reflects that the magistrate relied upon the signed, handwritten statement that was taken at 5:25 p.m. on May 3, 1985, and that this statement could not have served as probable cause for the arrest warrant to be issued. (*Id.* ¶ 176.)

[83]The petitioner argues that his arrest was unlawful not only because of alleged defects in the warrant but also because the police gained initial custody of him by entering his home based upon the consent of an unidentified third party.

to a bedroom where the defendant was lying in bed.  The four investigators followed Terry. Investigator Grant testified that the defendant had been sleeping but was awake when they entered the room.  The defendant said that he had been to Montgomery the night before and had slept during that day.  Carter testified that the defendant did not look tired.  Carter testified that he said, "We need to talk with you, Tommy.  We need to talk with you down at the Courthouse, we want you to go with us."  The defendant did not say anything but "got up" and "put his clothes on."  Captain Grant testified that Carter "told Tommy we needed to talk to him, would he mind coming down to our office with us, and Tommy got up" and that the defendant "agreed and came."  After that, Carter sent Grant and Investigator Hershel Womack to find the defendant's father, whom they needed to question about an unrelated pistol that had been reported stolen.  Investigators Carter and Aubrey Newman took the defendant to the courthouse.  The defendant was not handcuffed but was read his Miranda rights when they left the house, even though he was not questioned at that time.  Carter testified that the defendant "went with us willingly out to the car."

Carter testified that they arrived at the courthouse "about 6:45, or nearly 7:00" and went to the investigator's office on the third floor.  At 6:53 that evening, the defendant signed a waiver of rights form.  The defendant was questioned about the pistol used in the four murders at the Guest Service Station.

The defendant admitted taking the .44 magnum from his father and Gable.  Between 9:00 and 10:00, the defendant, at the request of the officers, telephoned a friend.  The record does not reveal the subject matter of that conversation.  Around 11:00 or 11:30, the defendant was left alone with his father for "probably fifteen to thirty minutes." Investigator Carter testified that he "probably" would have allowed the father to stay with the defendant "if he had requested to."  Around midnight, the defendant showed the investigators where he had disposed of the pistol, which had subsequently been discovered by Mr. Jenkins.

At 12:50 on the morning of May 3, 1985, the defendant gave a tape-recorded statement, claiming that Harvey Underwood was solely responsible for the robbery and the murders.  The defendant did admit that he was present when the crime occurred, that Underwood got the murder weapon from him, and that he (the defendant) threw the pistol in the creek.  The defendant was placed in a cell to sleep at approximately 2:15 that morning. Investigator Carter testified that at any time prior to the tape-recorded

114

statement, the defendant
"could have gotten up and
left."

During the interval of approximately six hours between the time the defendant waived his rights until the tape-recorded statement was taken, he was questioned "on and off" and given something to eat. During that time, the investigators "checked out leads" the defendant had given them "to verify whether or not he had been telling us the truth." During this time, the defendant gave three different stories. Investigator Carter testified, "We would go over each statement until he decided that it wasn't true, and he would tell us another one, story. * * * Well, he would tell the same story, and then he would tell a little bit different. So we tried to check it out for him." Captain Grant testified, "We told him that the thing didn't check out, we needed to continue talking to him about it, not that we wanted another statement or we wanted him to say something else." Grant stated, "From the time he admitted that he stole the gun, yes, he would tell us all about it, and then, we would show him, you know, tell him what we had checked out, the story out, and it didn't fit, and he would start with another one."

Around 5:00 or 5:30 on the morning of May 3rd, Underwood was brought to the courthouse to face his accuser. There was testimony that this was done with the permission of both Underwood and the defendant. The defendant again accused Underwood of committing the murders, but Underwood "just practically got down on his knees and said, 'You know I didn't shoot nobody, you know. Why are you doing this?'"[54]

At 5:25 on the afternoon of May 3rd, the defendant gave a handwritten statement admitting his responsibility for the robbery and murders. On Saturday, May 4, 1985, at 1:08 p.m., the defendant gave a detailed statement, recorded by a court reporter, admitting his guilt. On January 1, 1986, after he had escaped and been captured, the defendant gave a statement in the county jail in Bowling Green, Kentucky, wherein he again admitted his guilt.

Sometime before 5:00 on the afternoon of May 3, 1985, Investigators Grant and Carter, and William Payne, the father of one of the victims, went to the clerk's office to get an arrest warrant for the defendant. Payne did not relate any facts to the magistrate other than that he was the father of one of the victims. The affidavit

---

[54]The petitioner claimed at trial that, during this encounter, Underwood threatened him as the police watched and heard. (R. 1487.) The Court finds this self-serving allegation to be unsupported by other credible evidence in the record.

merely recites that Payne "has probable cause for believing and does believe that" the defendant intentionally caused the death of four people.

At the hearing on the motion to suppress, Gene Mitchell, the magistrate, testified that when Carter and Grant "asked for a warrant all they had was an incident report, and I needed something else to go on." Grant left and "brought another [sic] statement back from" the defendant.  Mitchell stated that he "read the statement. And before reading the statement and after reading the statement I asked questions of Chief Carter." The trial court sustained the objection of defense counsel and refused to allow Mitchell to testify to anything that Investigators Carter and Grant told him.

At the hearing on the motion to suppress, Magistrate Mitchell should have been permitted to testify to the information he obtained from the officers before he issued the arrest warrant.  It is well settled that information based on hearsay may support a finding of probable cause. *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *Waldrop v. State*, 424 So. 2d 1345, 1349 (Ala. Cr. App. 1982), *cert. denied, Waldrop v. Alabama*, 472 U.S. 1019, 105 S. Ct. 3483, 87 L. Ed. 2d 618 (Ala.1985) ("multiple hearsay or hearsay upon hearsay is permissible in establishing probable cause").

At the suppression hearing, Mitchell identified the handwritten confession given by the defendant at 5:25 on the afternoon of May 3rd as "appearing" to be the statement he reviewed:  "I can't--I'm not--that appears to be the statement."  However, Investigator Grant testified that Chief Carter got a transcript of the tape-recorded interview with the defendant and delivered it to the magistrate.  Grant also testified that the 5:25 statement was given after the arrest warrant had been issued.  As explained in Part A of Part I of this opinion, the determination of which statement the magistrate actually considered is legally insignificant in deciding the issue of the legality of the defendant's arrest.

At the pretrial hearing on the motion to suppress his statements, the defendant did not testify.  At trial, the defendant testified that, on the afternoon of May 2, 1985, he was sleeping in his bed and was awakened by Sheriff Carter pulling on his foot. The defendant was "real hazy" and "still drunk" from the previous night.  He had a "real bad hangover." He stated that the officers said "let's go" and would not give him time to "comb [his] hair, or anything." He testified that when he confessed he was afraid to make a statement because he and his family had been threatened by Harvey Underwood.  He stated that the police told him that "even if [he] didn't make the statement, that they were going to release it to the newspapers that [he] had made a statement on somebody, and that was still going to jeopardize [his] family." He was threatened with being sent to "fry" in the electric chair if he did not make a statement.

116

The officers also threatened to "pull his father in" and question his mother and brother at their place of employment and "see if we can't get them fried." He was promised a life sentence if he would give a full statement and turn state's evidence. The defendant testified that, after he learned that the officers were not going to arrest Underwood, he confessed in order to protect his family from Underwood.

A.

We find that the magistrate properly issued the arrest warrant based upon a showing of probable cause. At the conclusion of the hearing on the motion to suppress, the trial court stated:

> "[I]t is absolutely true that this case is--warrant was issued upon a bare bones affidavit which is strictly prohibited under *Crittenden*. However, in that case the Court makes it clear that if the magistrate has something before him in addition to the bare bones affidavit, then, that warrant which otherwise would be invalid, therefore, a confession taken subsequent to it would be suppressed, can be validated, and I think in this case the testimony of Mr. Mitchell and Captain Grant that it has been validated. I think the magistrate had more to go on than just the bare bones affidavit and did have probable cause to issue the arrest warrant, and therefore, the statement given subsequent to that arrest warrant, assuming that he was Mirandized and warned, and so forth, is a statement that will not be suppressed."

The affidavit in support of the arrest warrant is merely a "bare-bones" type affidavit. "[A]ffidavits, like the one in the present action, which consist solely of the affiant's conclusion that the named individual committed an offense, without setting forth the facts upon which the conclusion is based, are fatally defective." *Crittenden v. State*, 476 So. 2d 632, 634 (Ala. 1985).

Here, the issuing magistrate recognized the defect in the affidavit, and required and obtained more information before he issued the warrant. We do not know what additional facts Investigator Carter told the magistrate because the trial court sustained defense counsel's objection and refused to allow the magistrate to testify about what Carter had told him. We do know that the magistrate reviewed one of the defendant's statements before issuing the warrant. If the magistrate reviewed the defendant's first statement, he knew that the defendant was with the alleged perpetrator immediately before and after the crime, that the defendant was present at the scene of the crime, that the perpetrator got the murder weapon from the defendant, and that the defendant disposed of the weapon after the crime. These facts supplied the probable cause to arrest the defendant. However, if the magistrate

117

reviewed the defendant's second statement, he also had the probable cause necessary to issue the arrest warrant because in that statement the defendant confessed and admitted his responsibility for the robbery and murders.

"A 'bare-bones' affidavit can be validated if it is supplemented with additional facts which the magistrate considered before determining that probable cause was present." *Crittenden*, 476 So.2 d at 634; *Davis v. State*, 500 So. 2d 472 (Ala. Cr. App. 1986); *Swain v. State*, 504 So. 2d 347, 351-53 (Ala. Cr. App.1986). "Response to police questioning, then, frequently is an ingredient in the probable cause determination." W. LaFave, 2 *Search and Seizure* § 3.6(f) at 65 (2d ed. 1987). *See also State v. Hanson*, 480 So. 2d 620, 624 (Ala. Cr. App. 1985)(statements given during a period of illegal detention may not be used to establish probable cause for an arrest); *Johnson v. State*, 455 So. 2d 152, 156-57 (Ala. Cr. App. 1984). Therefore, we find that the additional information supplied the magistrate was sufficient to cure the defective "bare-bones" affidavit.

B.

From the record before us, it is difficult to determine exactly when the defendant was taken into actual custody. The evidence, even though conflicting, is sufficient to justify a finding that the defendant consented to go with the investigators for questioning.

"The Fourth Amendment does not involve consensual conduct. '*Dunaway [v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979)], of course, does not change the rule that a voluntary trip to the police station for questioning does not implicate the fourth amendment.' *United States v. Webster*, 750 F. 2d 307, 321 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106, 105 S. Ct. 2340, 85 L. Ed. 2d 855 (1985). One 'category of police-citizen encounter is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through noncoercive questioning; this type of contact does not rise to the level of a seizure.' [*U.S. v.*] *Black*, 675 F.2d [129] at 133 (7th Cir. 1982). *See also United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984)." *Cox v. State*, 489 So. 2d 612, 618-19 (Ala. Cr. App. 1985). *See also Waldrop v. State*, 462 So. 2d 1021, 1028 (Ala. Cr. App. 1984), *cert. denied*, 472 U.S. 1019, 105 S. Ct. 3483, 87 L. Ed. 2d 618 (1985); *Johnson v. State*, 453 So. 2d 1323, 1325 (Ala. Cr. App. 1984).

The rule of *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), is that the police may not make a warrantless, nonconsensual entry into a suspect's home to effect a routine felony arrest. "[N]o person may be arrested in his home

without a warrant unless both probable cause and exigent circumstances exist." *United States v. Davis*, 785 F.2d 610, 615 (8th Cir. 1986). "A warrantless, nonconsensual entry into a suspect's home to make a routine felony arrest is presumed to be unreasonable." *United States v. Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986). When the sheriff's investigators went to the defendant's residence they had probable cause to arrest him because they had reliable evidence that he had been in possession of the actual murder weapon "a day or so" before the murders were committed. Additionally, we find that the investigators were lawfully in the defendant's residence. *See Jarrell v. Balkcom*, 735 F.2d 1242, 1249-50 (11th Cir. 1984), *cert. denied*, 471 U.S. 1103, 105 S. Ct. 2331, 85 L. Ed. 2d 848 (1985); *Fisher v. State*, 468 N.E.2d 1365, 1368 (Ind. 1984); *State v. Hein*, 138 Ariz. 360, 674 P.2d 1358, 1362 (1983).

"A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority." *Edmondson*, 791 F.2d at 1515 (Arrest illegal where FBI agents, with weapons drawn, knocked and "yelled, 'FBI. Open the door.'"). "[C]onsent cannot be presumed from the absence of proof that a person resisted police authority of proof that the person merely acquiesced. *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S. Ct. 1788, 1791-92, 20 L. Ed. 2d 797 (1968)." *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir. 1985). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49, 88 S. Ct. at 1792.

> "Whether consent to entry was given voluntarily is a question of fact to be determined from the totality of the circumstances . . . . No one factor is controlling on the question of voluntariness; . . . which is normally to be decided by the trial court based on the evidence and the reasonable inferences drawn from that evidence. . . . The determination to be made is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice. . . . The State must establish that the consent was voluntary and not the product of coercion or acquiescence to a claim of lawful authority."

*State v. Cobbs*, 7 Conn. App.  656, 510 A.2d 213, 215 (1986) (citations omitted).

Here, the only implied or explicit evidence of coercion exhibited before the defendant indicated he would accompany the investigators is the presence of four investigators.  "'The presence of a number of officers tends to suggest an

119

undertaking which is not entirely dependent on the consent and cooperation of the suspect.'" *Edmondson*, 791 F.2d at 1515. However, Chief Carter only asked to "see" and "talk" to the defendant. He did not request to be admitted into the house. There is substantial evidence that, after agreeing to accompany the investigators, the defendant voluntarily waived his Miranda rights. The fact that the defendant initially gave the investigator so much false information tends to indicate that he had "decided to adopt a cooperative posture in the mistaken belief that he could thereby divert or prevent police suspicion of him." 3 LaFave s 8.2(g) at 204. The evidence that the defendant was given the Miranda warnings as they left his residence is significant because it indicates that the investigators were "prepared to recognize" the defendant's choice to assert his constitutional rights. 3 LaFave s 8.2(i) at 214.

Even if the evidence of the defendant's consent to accompany the investigators was found to be insufficient, the rule of *Payton* was not violated because the defendant's brother consented to the officers' entry.

> "Warrantless arrest in the accused's home is not permissible absent exigent circumstances or consent to enter. *Payton v. New York*, 445 U.S. 573, 576, 100 S. Ct. 1371, 1374, 63 L. Ed. 2d 639 (1980). '[T]he consent of one who possesses common authority over the premises . . . is valid as against the absent, nonconsenting person with whom the authority is shared.' *United States v. Matlock*, 415 U.S. 164, 170, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242 (1974). We have previously held that the third party consent must be voluntarily given to be valid and binding against the accused. *E.g., United States v. Patterson*, 554 F.2d 852, 854 (8th Cir. 1977)(per curiam). Whether the consent is truly voluntary is to be determined by the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973)." *United States v. Purham*, 725 F.2d 450, 455 (8th Cir. 1984).

*See also People v. Gary*, 150 Mich. App. 446, 387 N.W. 2d 877 (1986); *In re Anthony F.*, 293 Md. 146, 442 A.2d 975, 977-79 (1982).

> "The consent necessary in *Payton* context is consent to enter, not consent to arrest." *United States v. Briley*, 726 F.2d 1301 (8th Cir. 1984). *State v. Howard*, 373 N.W. 2d 596, 599 (Minn. 1985).

> For these reasons, we find that the detention of the defendant was legal and that his confessions were not the product of any unlawful arrest.

*Fortenberry*, 545 So. 2d at 132-37. The findings of fact contained above are supported by

the record and are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

The petitioner's complaint that the police entered his home illegally to take him into custody and his complaint that the arrest warrant issued against him was invalid are both claims that his Fourth Amendment rights were violated. In *Stone v. Powell*, 428 U.S. 465, 482, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976), the Court said:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

*Stone*, 428 U.S. at 482.

Federal courts will not honor this bar, however, unless the state courts fully and fairly "considered" the Fourth Amendment claims. *See Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990), *cert. denied, Singletary v. Tukes*, 502 U.S. 898, 112 S. Ct. 273, 116 L. Ed. 2d 225 (1991). The *Tukes* Court stated that "where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court." *Tukes*, 911 F.2d at 514 (quoting *Morgan v. Estelle*, 588 F.2d 934, 941 (5th Cir. 1979)).

The *Stone* Court cited *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), *overruled in part, Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992), as a case with an analogous determination of "full and fair litigation." *Stone*, 428 U.S. at 494 & n.36.  In deciding whether or not courts must hold an evidentiary hearing on a habeas claim, the *Townsend* Court applied the following factors:

1. the merits of the factual dispute were not resolved in the state hearing;

2. the state factual determination is not fairly supported by the record as a whole;

3. the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

4. there is a substantial allegation of newly discovered evidence;

5. the material facts were not adequately developed at the state court hearing; or

6. for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

*Stone* bars federal habeas review of the petitioner's Fourth Amendment claims because the state courts provided ample opportunity for full and fair litigation of those claims. The *Townsend* factors do not dictate otherwise. The state courts resolved the merits, carefully considering the petitioner's fourth amendment claims, as is illustrated by the quoted passage set forth above, and its determinations are supported by the record. The state trial court allowed the parties to present extensive evidence and argument with respect to the allegedly illegal entry of the petitioner's home and the allegedly illegal arrest warrant. The Rule 20 trial court did not restrict the petitioner from presenting evidence on fourth amendment issues. The fact-finding procedure used by the state courts was adequate to provide a full and fair hearing and permitted the adequate development of facts. There is no substantial allegation of newly discovered evidence and it appears that the state courts afforded the petitioner a full and fair fact hearing. (See also the Court's Mem. Op. and

Order addressing the Pet'r's Second Mot. for an Evidentiary Hr'g (Doc. 27), which is issued concurrently herewith).

Even if *Stone* did not bar habeas review of the petitioner's Fourth Amendment claims, he would not prevail because those claims are meritless, as is demonstrated below. The other claims discussed in this section are meritless as well.

There is no merit in the petitioner's claim that the police illegally entered his home without a warrant in reliance on the consent of an unidentified third party. The petitioner cites *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) for this proposition, but *Matlock* imposes no obligation upon police to ensure, before entering the premises, that the third-party consenter is authorized to give consent to the entry. *Matlock* does, however, impose a risk on police that the fruits of such a search will later be excluded at trial if the third party is not authorized to consent. *See id.* (noting that third party with common authority over premises sought to be searched may provide such valid consent). In this case, the third party was the petitioner's brother, who was fully authorized to consent for the police to enter the home. The petitioner does not argue otherwise.

The petitioner alleges that the police interrogated him for six hours before recording his May 3, 1985, 12:50 a.m. statement implicating Underwood, although he had told them that he had been drinking the night before and was tired. He also alleges that, though not under arrest after he was taken into custody, that he was not free to leave because the only exit from the interrogation area was through a locked elevator, and that police never told him that he was free to leave. The petitioner implies that his statement was coerced, so the

Court assumes, for the purposes of this opinion, that the petitioner means to challenge the voluntariness of his first statement.

In analyzing the voluntariness of a confession,[88] the federal habeas court must make its own independent examination and evaluation of the totality of the circumstances surrounding the confession. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973). In so doing, the court must determine whether the accused made "'an independent and informed choice of his own free will, possessing the capacity to do so, his will not being overborne by the pressures and circumstances swirling around him.'" *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985), *cert. denied*, 475 U.S. 1124, 106 S. Ct. 1646, 90 L. Ed. 2d 190 (1986) (quoting *Jurek v. Estelle*, 623 F.2d 929 (5th Cir. 1980) (en banc), *cert. denied*, 450 U.S. 1001, 101 S. Ct. 1709, 68 L. Ed. 2d 203, *cert. denied*, 450 U.S. 1014, 101 S. Ct. 1724, 68 L. Ed. 2d 203 (1981)). The confession must be a product of the accused's free and deliberate choice rather than the product of coercion, intimidation, or deception by the police. *United States v. Mendoza-Cecilia*, 963 F.2d 1467, 1475 (11th Cir. 1992), *cert. denied, Marin-Hernandez v. United States*, 506 U.S. 964, 113 S.

---

[88]For the purposes of this discussion, the Court will treat the petitioner's statement implicating Underwood as a confession. Although the petitioner intended the statement to be exculpatory, his later statements proved it to be false. In discussing the privilege against self-incrimination, the Supreme Court has refused to draw a distinction between inculpatory statements and those intended to be exculpatory but which are later used to impeach the defendant's testimony or to prove guilt by implication due to the false nature of the statement. *See Miranda v. Arizona*, 384 U.S. 436, 476-77, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The same distinction must be rejected in this case as well, because the voluntariness standard relevant here is grounded in policies intended to protect the defendant's right against self-incrimination. *Davis v. North Carolina*, 384 U.S. 737, 740, 86 S. Ct. 1761, 16 L. Ed. 2d 895, 897-98 (1966). *But see Harris v. New York*, 401 U.S. 222, 224-26, 91 S. Ct. 643, 645-46, 28 L. Ed. 2d 1, 3-5 (1971)(discussing the scope of the exclusionary rule is limited to prosecution's case-in-chief, making unlawfully obtained confession admissible to impeach defendant).

Ct. 436, 121 L. Ed. 2d 356 (1992). Factors relevant to the inquiry include the accused's intelligence, the length of detention, the nature of interrogation, use of physical force, and promises or inducements. *See Colorado v. Connelly*, 479 U.S. 157, 163-65 & n. 1, 107 S. Ct. 515, 520 n. 1, 93 L. Ed. 2d 473, 482 n. 1 (1986); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989), *cert. denied*, 499 U.S. 949, 111 S. Ct. 1419, 113 L. Ed. 2d 471 (1991). Each of these factors, along with other surrounding circumstances, combine to determine the crucial question--was there any "overreaching" on the part of the police. *See Connelly*, 479 U.S. at 163, 107 S. Ct. at 520.

Given the state court findings and the record evidence, it is apparent that the petitioner did not give his statement due to any coercion, intimidation, or deception by police. He had at least some prior experience with the police and the criminal justice system. His interrogation lasted, by his own account, for about six hours, although the record evidence as to the sequence of events shows that the questioning was intermittent, and did not last for the entire six hours without a break. (R. 26-27.) There is no indication that the petitioner was denied food, water, or the use of a bathroom during this time. On the contrary, the evidence shows that he was provided with food, allowed to use the bathroom, and allowed to speak to his father alone. (R. 35, 1260-61.) The evidence indicates that he left the interview room several times during the evening. (R. 1260-61.)

There is no indication that the petitioner has a low intelligence level or that he lacked the intellectual capability to make an independent and informed choice of his own free will

to give his statement. There is no record evidence, apart from a few self-serving allegations by the petitioner, that the police threatened or coerced the petitioner. The mere fact that police interviewed the petitioner in an office in the courthouse where the only means of egress was a locked elevator does not constitute coercion.[56] Although the petitioner claims that he had been drinking the day before and was tired, there is no evidence that he was experiencing any significant physical suffering or impaired condition that would have overborne his ability to resist. Thus, the record does not support any claim that the petitioner's statement was involuntary.

The petitioner's challenge to the legality of his arrest warrant is meritless as well. He complains that, after his interrogation, the police tried to obtain from a magistrate an arrest warrant "which stated only that William Payne, the father of one of the victims, as affiant, had 'probable cause for believing and does believe' that the Petitioner intentionally caused the death of four people." (Doc. 9 ¶ 174.) He states that the magistrate initially refused, stating that he "'needed something else to go on,'" but that he finally issued the warrant before 5:00 p.m. on May 3, 1985, finding probable cause based upon a handwritten, unsworn statement signed by the petitioner. (Id. ¶ 175, citing R. 104.)   The petitioner argues that the only handwritten statement he signed was taken at 5:25 p.m. on May 3, 1985, and therefore could not have served as probable cause for the arrest warrant to be issued. (Id. ¶ 176.) He argues that the warrant was therefore void and that the magistrate denied

---

[56]The Court notes that there is no evidence that the petitioner asked to leave or indicated that he wanted to leave and was not permitted to do so.

him an effective means of challenging the constitutionality of the warrant by failing to make known the information he relied upon in issuing it. (*Id.* ¶ 177-78.) Thus, the petitioner argues, any statements resulting from his arrest based upon the consent of an unidentified third party or an unlawfully issued arrest warrant are tainted because they were "the fruit of an unlawful warrantless arrest, an unlawful custodial interrogation, and an invalid arrest warrant and were improperly admitted at trial." (*Id.* ¶ 179.)

As the Alabama Court of Criminal Appeals found, however, the evidence reflects that the magistrate relied on more than a "bare bones" affidavit in issuing the warrant. The magistrate stated that he relied upon a signed statement made by the petitioner, and that it appeared to be the May 3, 1985, 5:25 p.m. statement, which apparently post-dated the issuance of the warrant. (R. 103-05.) The record demonstrates that, in issuing the warrant, the magistrate judge relied at least in part upon a signed statement by the petitioner.[57] It is apparent that, in finding probable cause to issue the warrant, the magistrate most likely relied on the petitioner's first statement (which was reduced to writing and each page of which was signed by the petitioner) implicating Underwood. (R. 1910-22, 2957-69.) Such a conclusion would be consistent with the testimony of Captain Johnny Grant of the Etowah County Sheriff's Office. He stated that, in response to the magistrate's statement that he needed evidence to establish probable cause as to the petitioner, Chief Marlin Carter, a colleague of Grant's, took the transcript of the petitioner's first statement to the magistrate

---

[57]The magistrate also relied on the answers of certain law enforcement officers to questions he posed about the facts of the case, but the court prevented him from testifying about his colloquy with the officers.

shortly after it was reduced to writing.  (R. 88-89.)  The Court finds, as did the state courts, that the petitioner's first statement would provide a sufficient basis upon which the magistrate could have found probable cause for issuing the warrant–it reflected that he had stolen the murder weapon, was present during the murders and disposed of the murder weapon.  These habeas claims are thus without merit and are due to fail.

### 12. The Introduction of Allegedly Prejudicial and Inflammatory Photographs at Trial

The petitioner argues that, in the guilt/innocence phase of his trial, the trial court admitted "highly improper and inflammatory photographs of the victims' wounds" which were "not probative of any relevant fact and highly inflammatory."  (Doc. 9 ¶¶ 181-82, citing R. 1008, 1032-37.)  He argues that the admission of those photographs violated his rights to a fair trial and a reliable sentencing hearing.  (Id. ¶ 181.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it on direct appeal but did not.  (Resp't's Mem. Br. in Supp. of Answer at 38, citing A. R. Cr. P. 32.2(a)(5).)  The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals.  (Tab R-44 at 17; Fortenberry, 659 So. 2d at 196-97.)  It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received.  As the Court has rejected the petitioner's ineffective assistance claims, this argument fails.   Neither can the petitioner avoid

procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence." The Court therefore cannot consider the merits of this procedurally defaulted claim.

The Court notes that, even if this claim were not procedurally defaulted, it would fail because it lacks merit. The petitioner does not specify which photographs should have been excluded, describing them only as "highly improper and inflammatory photographs of the victims' wounds." (Doc. 9 ¶ 181.) In briefing the claim, the petitioner refers to several pages in the trial transcript, but again, fails to specify exactly which photographs should not have been admitted. (Reply Br. of Pet'r to Resp't's Br. in Supp. of Answer at 67.) Assuming that the petitioner's allegations are sufficient to state a habeas claim, the Court has attempted to determine which photographs the petitioner claims were improperly admitted. After reviewing the trial exhibits and the trial testimony describing the photographs, the Court concludes that the only admitted photographs focusing on the victims' bodies were State Exhibit 4 (R. 2920 - showing the body of Mike Guest), State Exhibit 7 (R. 2923 - showing the body of W.T. Nelson), State Exhibit 9 (R. 2925 - showing the body of Nancy Payne), State Exhibit 12 (R. 2928 - showing Bobby Payne's body), State Exhibits 28-29 (R. 2944-45 - autopsy photos of the entry and exit wounds to the body of Nancy Payne) and State Exhibit 30 (R. 2946 - autopsy photo of wound to the body of W.T. Nelson).[58] The Court

---

[58]Several of the photostatic copies of these exhibits (most notably Exs. 9, 12 and 29-30) contained in the trial record are of very poor quality, so the Court was unable to visually evaluate these exhibits. The Court reviewed the trial transcript for descriptions of and objections to all the photographs discussed in this section. The Court is satisfied that these descriptions and objections (contained primarily in R. 1000-1100) sufficiently explain the contents of the challenged photographs for the Court to analyze the merits of this habeas claim.

therefore assumes that the petitioner intended to challenge the admission of these photographs.

The state court did not err under state law in admitting the photographs; Alabama treats the admission of such photographs liberally. The Alabama Court of Criminal Appeals states as follows:

> "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. *Chunn v. State,* 339 So. 2d 1100, 1102 (Ala. Cr. App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. *Mitchell v. State*, 450 So. 2d 181, 184 (Ala. Cr. App. 1984). The admission of such evidence lies within the sound discretion of the trial court. *Fletcher v. State*, 291 Ala. 67, 277 So. 2d 882, 883 (1973)." *Ex parte Siebert*, 555 So. 2d 780, 783 (Ala. 1989), *cert. denied*, 497 U.S. 1032, 110 S. Ct. 3297, 111 L. Ed. 2d 806 (1990).

> This court has repeatedly held that autopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter. *See Smith v. State*, 756 So. 2d 892 (Ala. Cr. App. 1997); *Travis v. State*, [Ms. CR-92-0958, April 18, 1997] --- So. 2d ---- (Ala. Cr. App. 1997); *Scroggins v. State*, 727 So. 2d 123 (Ala. Cr. App. 1997), *rev'd on other grounds*, 727 So. 2d 131 (Ala. 1998); *Boyd v. State*, 715 So. 2d 825 (1997), *aff'd*, 715 So. 2d 852 (Ala.), *cert. denied*, 525 U.S. 968, 119 S. Ct. 416, 142 L. Ed. 2d 338 (1998). Moreover, photographic evidence, if relevant, is admissible "'even if it has a tendency to inflame the minds of the jurors.'" *Boyd*, 715 So. 2d at 833, quoting *Johnson v. State*, 620 So. 2d 679, 692 (Ala. Cr. App. 1992), *rev'd on other grounds*, 620 So. 2d 709 (Ala.), *cert. denied*, 510 U.S. 905, 114 S. Ct. 285, 126 L. Ed. 2d 235 (1993).

*Perkins v. State*, 1999 WL 1046438, at *60-61 (Ala. Crim. App. Nov. 19, 1999). The challenged photographs were authenticated by witnesses and contained information relevant to the case and corroborative of other evidence presented to the jury. They do not appear to have been so shocking, repetitive or unreasonable to offend the lax standards

described in *Perkins*.  Under such standards, it would be very difficult for the court to conclude that the photographs were admitted in violation of state law.

It would be just as difficult for the court to conclude that the petitioner is entitled to habeas relief due to the admission of the photographs.  State evidentiary claims are only cognizable on federal habeas corpus review if the rulings render the state proceeding fundamentally unfair. *See Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984), *cert. denied*, 470 U.S. 1059, 105 S. Ct. 1775, 84 L. Ed. 2d 834 (1985).  After reviewing the exhibits and trial testimony describing them, the Court cannot conclude that the petitioner's trial was fundamentally unfair because the photographs were admitted.  There is no indication that they were so horrifying, gruesome or repetitious to have inflamed the jury against the petitioner. On the contrary, it appears that the court admitted just four photographs focusing on the victims' bodies at the crime scene.  It also admitted two autopsy photographs showing Nancy Payne's wounds and one autopsy photograph showing W.T. Nelson's wounds.  These photographs were not cumulative or inflammatory.  This habeas claim must therefore fail.

### 13. The Trial Court's Allegedly Improper Decision to Charge the Jury Concerning Complicity

The petitioner states that the trial court, over defense objections, charged the jury on the doctrine of complicity, although complicity was not an element in the case. (Doc. 9 ¶ 184).  This, he argues, allowed the jury to infer his guilt on the basis of speculation, rather than on facts in evidence, in contravention of his constitutional rights.  (*Id*. ¶¶ 183-85.)

The respondent argues that this claim is procedurally defaulted because the petitioner

131

could have raised it on direct appeal but did not. (Resp't's Mem. Br. in Supp. of Answer at 38-39, citing A. R. Cr. P. 32.2(a)(5).) The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals. (Tab R-44 at 18; *Fortenberry*, 659 So. 2d at 196-97.) It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received. As the Court has rejected the petitioner's ineffective assistance claims, this argument fails. Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence." The Court therefore cannot consider the merits of this procedurally defaulted claim.

Even if this claim were not procedurally defaulted, it would fail on the merits. In a case involving a similar claim, the Alabama Court of Criminal Appeals stated that

> The appellant contends that the trial court erred in instructing the jury on the elements of complicity when complicity was not charged in the indictment or included as a lesser offense of the crime charged in the indictment.

> This court has reached this issue in several cases. We have stated:

>> "'The appellant argues that the trial court erred by charging the jury on accomplice law because the appellant was allegedly denied due process as he was not notified of the "separate" accomplice charge. Apparently, the appellant is alleging that the trial court charged him with an offense for which he had not been indicted, by charging the jury on the complicity statute, § 13-2-3, *Code of Alabama* (1975). However, "one indicted as the actual perpetrator of a crime may be convicted of such upon proof of a conspiracy although not charged with such." *Kendrick v. State*, 377 So. 2d 1112, 1114 (Ala.

Cr. App. 1979), *writ denied*, 377 So. 2d 1114 (Ala. 1979), citing *Stoley v. State*, 254 Ala. 534, 541, 49 So. 2d 284 (1951); *Watkins v. State*, 357 So. 2d 156 (Ala. Cr. App.), *cert. denied*, 357 So. 2d 161 (Ala. 1978).'"

*McGee v. State*, 607 So. 2d 344, 346 (Ala. Cr. App. 1992), quoting *Hyter v. State*, 545 So. 2d 194, 197 (Ala. Cr. App. 1988). *See also Moody v. State*, 615 So. 2d 126 (Ala. Cr. App. 1992).

The trial court did not err in charging the jury on complicity.

*Knight v. State*, 652 So. 2d 769, 770 (Ala. Crim. App. 1994).

This aspect of Alabama law was noted by the court in *Johnson v. Nagle*, 58 F. Supp. 2d 1303 (N.D. Ala. 1999), which stated as follows:

> Petitioner complains that his indictment indicated that he was the killer of Mr. Cantrell, and was not consistent with a conviction as an accomplice. Unfortunately for petitioner, however, Alabama long ago abolished the distinction between principals and accessories in its criminal law. It is the law of this State that one charged as a principal properly may be convicted as an accomplice and vice versa. There is no requirement that the State notify the defendant in the indictment or otherwise that it is proceeding on an aiding and abetting theory. *E.g., Hyter v. State*, 545 So. 2d 194, 197 (Ala. Crim. App. 1988); *Wallace v. State*, 530 So. 2d 849, 855-856 (Ala. Crim. App. 1987); *Lewis v. State*, 469 So. 2d 1291, 1297 (Ala. Crim. App. 1984), *aff'd sub nom. Ex parte Blake*, 469 So. 2d 1301 (Ala. 1985).

*Johnson*, 58 F. Supp. 2d at 1347 n.36.

It appears that the challenged instructions were accurate statements under Alabama law. Furthermore, evidence in the form of petitioner's initial statement and trial testimony would also support a theory that he was a participant in the criminal activity which led to the deaths at the Guest service station. There was thus a factual basis for the court's instruction. The petitioner has offered no compelling argument that the instructions, reviewed in totality, violated his constitutional rights. The petitioner has not shown that he is entitled to habeas relief on this claim. It therefore fails.

### 14. The Trial Court's Refusal to Grant Defense Counsel's Request for a Continuance Between the Guilt/Innocence and Sentencing Phase of the Petitioner's Trial

The petitioner states that he was convicted just after 6:00 p.m. on a Saturday, and that immediately thereafter, the court asked the jury whether it wished to proceed with the penalty phase or return to court on Monday. (Doc. 9 ¶ 186.)  The petitioner argues that this was an inappropriate delegation of the court's scheduling authority to the jury which resulted in a "hurried consideration of the penalty phase." (*Id.*)  The petitioner states that, after the jury stated a desire to proceed with the penalty phase, defense counsel requested a continuance (1) on the basis that the jury was in a hurry to finish the trial due to fatigue after being in session all week and (2) on the basis that they would not be prepared to present a case for mitigation without the continuance. (*Id.* ¶ 187, citing R. 1724-25.)  The petitioner argues that defense counsel's request for a continuance indicates that they were unprepared for the penalty phase and that, given a continuance, they could have prepared and presented character witnesses on his behalf. (*Id.* ¶ 188-89.)  The petitioner argues that the court's refusal to grant a continuance violated his constitutional rights to the effective assistance of counsel and to due process. (*Id.* ¶ 190.)

In evaluating this claim on appeal from the denial of Rule 20 relief, the Alabama Court of Criminal Appeals stated as follows:

> The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in *Ex parte Saranthus*, 501 So. 2d 1256, 1257 (Ala. 1986):
>
> > "A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion.

*Fletcher v. State*, 291 Ala. 67, 277 So. 2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. *Knowles v. Blue*, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923)."

\* \* \*

After the jury returned its verdict of guilty at 6:01 on the evening of Saturday, February 15, 1986, the trial court explained the sentencing phase of the trial to the jury and the alternative times when this hearing could be held. He sent the jury into the jury room to consider the alternatives. He later polled the jury, which indicated that it wished to begin the sentencing hearing immediately. Then, defense counsel requested a continuance until Monday: "[W]e feel that it would be best for all concerned, of course, for the defendant, but everybody concerned, to wait until Monday to resume the sentence hearing when everyone is rested, and particularly for the defense, that we feel that we will be much better able to present our position for mitigation at that point."

The trial court denied this request: "[T]hey [the jury] appear to be fresh, and they want to proceed, and I'm going to go ahead and defer to their wishes and begin the sentencing phase of these proceedings." Later, defense counsel renewed the motion for a continuance adding the ground that they had "not had sufficient time to prepare any evidence or argument for this phase of the trial."

At the sentencing phase before the jury, the State called no witnesses. The defendant's father testified on the defendant's behalf. Arguments were presented and the jury was instructed. After deliberating for fifty-seven minutes, the jury returned a unanimous verdict recommending the defendant be punished by death.

The sentencing hearing before the trial court was held on March 4, 1986. There was no additional mitigating evidence presented.

Applying the principles of *Saranthus*, supra, and *Hays*, supra, we find that the trial court did not abuse its discretion in denying the request to continue the sentencing hearing.

*Fortenberry*, 545 So. 2d at 138, 140. The findings of fact contained above are supported by

the record and are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

The Eleventh Circuit has summarized the standards applicable in this context as follows:

When an individual is asserting a denial of a continuance as a basis for habeas corpus relief there must be a showing of an abuse of discretion and that the trial court's actions were so arbitrary as to result in the denial of due process. *Hicks v. Wainwright*, 633 F.2d 1146, 1148 (5th Cir. Unit B 1981). Trial courts are afforded broad discretion in determining whether a continuance should be granted. *Morris v. Slappy*, 461 U.S. 1, 11, 103 S. Ct. 1610, 1616, 75 L. Ed. 2d 610 (1983); *Corbin v. State*, 212 Ga. 231, 91 S.E. 2d 764, 766, *cert. denied*, 351 U.S. 987, 76 S. Ct. 1057, 100 L. Ed. 1501 (1956); *Gallimore v. State*, 166 Ga. App. 601, 305 S.E. 2d 164 (1983). There is no particular mechanistic device for determining whether the denial of a continuance results in a violation of due process. *Unger v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 849-50, 11 L. Ed. 2d 921 (1964). The answer must be derived from the circumstances of the particular case, especially the reasons presented to the trial judge at the time the request is denied. *Id*.

*Alderman v. Zant*, 22 F.3d 1541, 1558 (11th Cir.), *cert. denied*, 513 U.S. 1061 (1994).

Under the standards set forth above, the Court must particularly consider the reasons presented to the trial court by defense counsel for requesting a continuance. Here, defense counsel first asked for a continuance after the petitioner was convicted and after the jurors had indicated to the court that they wanted to proceed with the penalty phase immediately, rather than waiting until the following Monday. (R. 1723-25.) The court and defense counsel engaged in the following exchange:

Mr. Harrison:     Your Honor, we would like to move to come back on Monday.  For the record, it is now Saturday evening, about twelve minutes after 6:00.  We have been going in this trial since Monday morning; a couple of nights–one night we went until seven o'clock, and one night until nearly six.  The jury has indicated that they don't even want to go to supper or take a break, they want to go ahead.  We feel at this time that it would not be in the best interest of any party concerned to go ahead immediately with a jury that is in a hurry, after having been here all week.  We feel that that is not practical. The situation now is not such that a jury seems to be willing to or there seems to be a situation where they would be able to make a decision after deliberation.  And we feel that it would be best for all

136

> concerned, of course, for the defendant, but everybody concerned, to wait until Monday to resume the sentence hearing when everyone is rested, and particularly for the defense, that we feel that we will be much better able to present our position for mitigation at that point.

The Court:    All right, as I indicated, the jury wants to proceed. I have talked to the jury, they do not appear to be tired at this stage. We have had regular breaks. They have been deliberating since about three o'clock this afternoon, gone back through a good bit of the evidence. But they don't–they appear to be fresh; and they want to proceed, and I'm going to go ahead and defer to their wishes and begin the sentencing phase of these proceedings.

Mr. Buttram:    We except to the Court's ruling.

(R. 1724-25.)

Defense counsel made no further request for a continuance until after the prosecution had presented its sentencing case, the petitioner's father had testified and counsel had engaged in argument regarding mitigating and aggravating circumstances. (R. 1725-39.) Only then did defense counsel state as follows: "And we would renew our motion for a continuance on the grounds stated earlier, on the basis that *we have not had sufficient time to prepare any evidence or argument for this phase of the trial*." (R. 1739 (emphasis added).)

This Court finds that, under *Alderman*, the petitioner is not entitled to habeas relief based upon the trial court's refusal to continue the penalty phase of the case. He has failed to show that the court abused its discretion in denying the continuance or that its actions

137

were so arbitrary as to result in the denial of due process.[59] Although the possibility of a

death sentence required that the trial court exercise caution in the proceedings, its denial

of the motion to continue the sentencing hearing before the jury was not arbitrary, because

defense counsel did not offer a strong argument for continuing the hearing until the hearing

was almost over. Before the sentencing hearing, defense counsel's primary argument was

that the court should continue the penalty phase because the jury appeared to be hurried

and because everyone needed to rest until the following Monday.  The court disagreed,

stating that the jurors did not appear to be tired, that they appeared to be "fresh" and willing

to continue.  The court thus considered the primary argument offered in support of a

continuance, but legitimately rejected it based upon its differing perception that the jurors

were ready to proceed. Defense counsel simultaneously offered a secondary argument that

they would be better prepared to present the mitigation case after a continuance.  This

argument was too generalized to alert the court that a continuance was not just desirable

or advisable, but necessary.  Such an allegation would likely be true of most advocates

regardless of their level of preparation.  It was only after much of the penalty hearing had

already taken place that defense counsel told the court that they were unprepared to offer

any argument or evidence in mitigation absent a continuance.  The court's refusal to stop

the hearing in the middle, after counsel belatedly conveyed their lack of preparation, was

not arbitrary, but rather a permissible exercise of its wide discretion to grant or deny

---

[59]The petitioner's claim that the trial court inappropriately delegated its authority to schedule the trial to the jury is without merit.  It was within the trial court's discretion to decide that the penalty phase should proceed, and to question the jurors as to their readiness to proceed.

continuances. The court's decision thus cannot serve as the basis for granting the petitioner's request for habeas relief.

Also leading the Court to conclude that the petitioner is due no habeas relief on this claim are the Court's findings in section III.C.3.b. above, that the failure of the petitioner's counsel to call the additional witnesses who have submitted affidavits attesting to the petitioner's good character did not prejudice the plaintiff. As evidence that he was prejudiced by ineffective assistance and the denial of his request to continue sentencing, the petitioner submitted these affidavits reflecting the evidence that he could have presented in mitigation, had a continuance been granted. According to the Eleventh Circuit,

> [i]t is settled law that a habeas petitioner who claims that the state trial court's refusal to grant a continuance denied him due process of law must demonstrate, first, that the trial court abused its discretion and, second, that its action rendered the petitioner's trial fundamentally unfair. *See Hicks v. Wainwright*, 633 F.2d 1146, 1148 (5th Cir. Jan. 1981). [Footnote omitted]. In determining whether the trial court abused its discretion, we look to the record before the court when it made its decision and ask whether it should have concluded that the denial of a continuance would probably deprive the petitioner of a fair trial. In determining whether the court's action rendered the petitioner's trial fundamentally unfair, we look for actual prejudice to the petitioner. [Footnote omitted]. *See Skillern v. Estelle*, 720 F.2d 839, 850-51 (5th Cir. 1983), *cert. denied*, 469 U.S. 873, 105 S. Ct. 224, 83 L. Ed. 2d 153 (1984).

*Connor v. Bowen*, 842 F.2d 279, 283 (11th Cir.), *cert. denied*, 488 U.S. 840 (1988), and *cert. denied*, 488 U.S. 864 (1988). The petitioner has offered little more than these affidavits described in section III.C.1.b., which the Court has already found would not have changed the outcome of the proceedings. The trial court's refusal to grant a continuance in which the petitioner could have garnered such mitigating evidence therefore caused her no

prejudice.  The claim must fail on this ground as well.[80]

### 15. The Prosecutors' Allegedly Improper Conduct and Arguments at the Sentencing Hearing

The petitioner argues that prosecutor Wasden repeatedly misstated the applicable facts and law, and "presented highly improper and inflammatory arguments" that violated his constitutional rights.  (Doc. 9 ¶ 191.)  The petitioner states that the prosecution misstated facts "including, but not limited to, the Prosecution's claims that the murder was committed in an attempt to eliminate eyewitnesses to a robbery (R. 1745); and its claim that the crime was a massacre (R. 1745.)"  (*Id.* ¶ 192.)  The petitioner also takes issue with Wasden's statement that the crime was an execution and his comparison of the crime scene with Beirut and New York gangster land and "other inflammatory and emotional remarks." (*Id.* ¶ 193.)  He states that Wasden argued to the jury "in a manner which inferred that a sentence of death was equated with justice." (*Id.* ¶ 194.)  He argues that Wasden's remarks that the victims were entitled to "grow old and die here in this County" were inflammatory and an improper attempt "to transform the case into a contest between the Petitioner's rights and the rights of the deceased victims and their families." (*Id.* ¶ 195, citing R. 1754.)  The petitioner also cites as improper and inflammatory Wasden's argument "that even though he sealed their lips in death, . . . you can write the final chapter in their lives and the most important, that their lives are important enough, when you look at the facts in this case to

---

[80]The Court also notes that, even if the trial court had granted a continuance, it is by no means certain that the petitioner's counsel would have procured and presented any or all of the character evidence presented by the petitioner in these proceedings.

realize that there is no mitigation." (*Id.* ¶ 196, citing R. 1745-55.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it at trial and on direct appeal but did not. (Resp't's Mem. Brief in Supp. of Answer at 41, citing A. R. Cr. P. 32.2(a)(4)-(5).)[81] The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals. (Tab R-44 at 18; *Fortenberry*, 659 So. 2d at 196.) It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received. As the Court has rejected the petitioner's ineffective assistance claims, this argument fails. Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence." The Court therefore cannot consider the merits of this procedurally defaulted claim.

Even if this claim were not procedurally defaulted, it would fail on the merits for the same reasons that the substantially similar claims in section III.C.9 would fail on the merit. While some of the challenged arguments were somewhat unrestrained, they did not "so 'infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181.

---

[81]The respondent apparently intended to cite to A. R. Cr. P. 32.2(a)(3) and (5), rather than 32.2(a)(4)-(5).

### 16. Alabama's Allegedly Unconstitutional Application of the "Especially Heinous, Atrocious or Cruel" Aggravating Circumstance

The petitioner argues that Alabama's application of the "especially heinous, atrocious or cruel" ("HAC") aggravating circumstance is unconstitutional, citing *Maynard v. Cartwright*, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988). (Doc. 9 ¶ 198.) He argues that the trial court erred as a matter of law by allowing the prosecution to argue that the number of victims standing alone rendered the HAC circumstance applicable to the offenses in the case. (*Id.* ¶¶ 199-200, citing R. 255, 1730-31, 1755.) He also argues that the court's charge "did not provide sufficient guidance to allow the jury to differentiate between the offenses found to have been committed and those which are especially heinous, atrocious or cruel." (*Id.* ¶ 201.) He further argues that the trial court violated his constitutional rights by repeatedly referring to "capital offenses" in the HAC aggravating circumstance charge, and thereby improperly suggesting that "the death penalty was the more appropriate punishment for the offenses found." (*Id.*)

The petitioner challenges the following charges on the HAC aggravating circumstance, arguing that they do not channel and limit the sentencer's discretion and that "a person of reasonable sensibilities could conclude that any intentional taking of human life falls within the scope of the court's definition":

The other [aggravating] circumstance is that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.

The term heinous means extremely wicked or shockingly evil; the term atrocious means outrageously wicked and vile; the term cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment, of the suffering of others.

142

(*Id.* ¶¶ 202-03, citing R. 1759.)

The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it at trial and on direct appeal but did not.  (Resp't's Mem. Br. in Supp. of Answer at 43, citing A. R. Cr. P. 32.2(a)(4)-(5).)[62]  The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals.  (Tab R-44 at 19; *Fortenberry*, 659 So. 2d at 197.)  It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received.  As the Court has rejected the petitioner's ineffective assistance claims, this argument fails.  Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence."  The Court therefore cannot consider the merits of this procedurally defaulted claim.

Even if this claim were not procedurally defaulted, it would still fail on the merits.  The petitioner claims that the court should not have allowed the prosecution to argue that the number of victims, standing alone, rendered the HAC aggravating circumstance applicable.  The record pages cited by the plaintiff reflect that the prosecutor said that the petitioner had killed four people, twice the number necessary to classify the crime as a capital offense, but this was not the focus of the prosecution argument in favor of the HAC circumstance.  (R.

---

[62]The respondent apparently intended to cite to A. R. Cr. P. 32.2(a)(3) and (5), rather than 32.2(a)(4)-(5).

1730-31.) The prosecution focused, rather, on facts indicating that the petitioner killed his victims execution-style, and that he killed them in order to eliminate eyewitnesses. (*Id.*) The prosecution also noted that two of those victims did not even try to stop the petitioner from leaving the crime scene. (*Id.*)

The petitioner's complaint that the trial court should not have used the term "capital offense" in the course of instructing the jury on the HAC aggravating circumstance is without merit. The petitioner cites no authority in connection with this claim and it does not appear that the use of such a term constituted error. Even if it was error, the petitioner would not be entitled to habeas relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353, 373 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)). Use of the term "capital offense" would not have had such an effect on the jury's verdict. The jury was well aware that the crimes with which the petitioner was charged were capital in nature and could result in a sentence of death. The petitioner has not shown that the court's use of the term "capital offense" in its instructions constituted an endorsement of a particular sentence or that it had any effect or influence on the jury's verdict.

The petitioner also challenges the court's HAC instructions, complaining that they did not adequately channel and limit the sentencer's discretion. The Court has reviewed the challenged instructions, along with related limiting instructions, following them. (R. 1759-60.) Taken together, the instructions appear to adequately channel and limit the sentencer's

144

discretion. *Cf. Proffitt v. Florida*, 428 U.S. 242, 255-56, 96 S. Ct. 2960, 2968, 49 L. Ed. 2d 913 (1976) (finding that a court, using a HAC standard which was directed to address "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," was not provided with inadequate guidance).

### 17. Alabama's Allegedly Arbitrary and Discriminatory Application of the Death Penalty

The petitioner argues that Alabama applies its death penalty in an arbitrary and racially discriminatory manner.   (Doc. 9 ¶ 204.)   The respondent argues that this claim is procedurally defaulted because the petitioner could have raised it at trial and on direct appeal but did not. (Resp't's Mem. Br. in Supp. of Answer at 44, citing A. R. Cr. P. 32.2(a)(4)-(5).)[63] The state post-conviction court so held, and its holding was affirmed by the Alabama Court of Criminal Appeals. (Tab R-44 at 20; *Fortenberry*, 659 So. 2d at 197.) It appears that the claim is indeed procedurally defaulted, so the petitioner cannot prevail upon it.

The petitioner argues that this Court must nevertheless consider the merits of this habeas claim because he falls within the "cause and prejudice" exception due to the allegedly ineffective assistance of counsel he received.  As the Court has rejected the petitioner's ineffective assistance claims, this argument fails.   Neither can the petitioner avoid procedural default of this claim under the "fundamental miscarriage of justice" exception, since he has not made a showing of "actual innocence."   The Court therefore cannot consider the merits of this procedurally defaulted claim.

---

[63]The respondent apparently intended to cite to A. R. Cr. P. 32.2(a)(3) and (5), rather than 32.2(a)(4)-(5).

Even if this claim were not procedurally defaulted, it would fail on the merits, since the petitioner offers nothing more than conclusory statements in support of the claim. Such conclusory, unsupported allegations will not sustain habeas relief.

**IV. Conclusion and Denial of Relief**

Having carefully addressed each of the claims for habeas corpus relief asserted by the petitioner in this action, the Court finds them either meritless or barred from consideration on one or more grounds. None of the claims entitles the petitioner to relief, and, therefore, the petition for writ of habeas corpus is due to be denied. A separate final judgment to that effect will be entered.

Done, this _____ of April, 2001.


_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE